Keith Altman (SBN 257309)
The Law Office of Keith Altman
33228 W 12 Mile Road, Suite 375
Farmington Hills, MI 48334
(516) 456-5885
keithaltman@kaltmanlaw.com

*Attorneys for Plaintiffs*

# THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| The Estate of Alexandre Touloudjian, by and through its administrator Ad Prosequendum, Sarkis Touloudjian and Sarkis Touloudjian, in his own right,<br><br>Plaintiff,<br><br>vs.<br><br>Josie Gastelo, in her individual capacity, Teresa Macias, in her individual capacity,<br><br>Defendants. | **CASE NO:2:20-CV-00520-FLA-KS**<br><br>**HON: FERNANDO L. AENLLE-ROCHA**<br><br>**FOURTH AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**NOW COMES**, Plaintiffs, by and through the Undersigned Counsel, and hereby bring this Fourth Amended Complaint against Defendants as follows:

## INTRODUCTORY STATEMENT

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 seeking damages against Defendants for committing acts under color of law that deprived decedent of his rights secured to him by the Constitution and laws of the United States of America.

2. Defendants violated the rights of decedent Alexandre Touloudjian by failing to keep him in a safe and secure environment where he could be kept free from injury, harm, and death. Despite having full knowledge of Alexandre's suicidal intentions, Defendants failed to provide him with adequate medical care and attention, in violation of the Eighth Amendment to the United States Constitution.

**JURISDICTION AND VENUE**

3. Plaintiff's case arises under the Constitution and laws of the United States, specifically the Eighth and Fourteenth Amendments to the United States Constitution.

4. Plaintiff's suit is authorized by 42 U.S.C. §1983 (allowing suits to correct constitutional violations) and 42 U.S.C. § 1988 (providing for attorney fees and litigation expense-awards).

5. This Court has jurisdiction over Plaintiff's federal constitutional claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

6. Venue is proper under 28 U.S.C. § 1391 in that the incident took place in and around the County of San Luis Obispo, California, and upon information and belief, the individual Defendants reside in or around the County of San Luis Obispo, California.

**PARTIES**

7. Plaintiff, Sarkis Touloudjian, is the duly appointed Administrator of the Estate of his late son, Alexandre Touloudjian. Attached to this amended complaint is the Declaration of Sarkis Touloudjian in accordance with § 377.32 of the California Code of Civil Procedure.

8. Josie Gastelo was, at all times material hereto, the Warden of the California Men's Colony, located at Colony Drive, San Luis Obispo, CA 93409. Josie Gastelo continues to serve as the Warden of the California Men's Colony. Defendant Gastelo is sued in her individual capacity and supervisory capacity.

9. Teresa Macias was, at all times material hereto, the Chief Executive Officer of the California Men's Colony, located at Colony Drive, Sam Luis Obispo, CA 93409. Teresa Macias was responsible for the healthcare, dental care and mental health care of all inmates at the California Men's Colony. Teresa Macias is sued in her individual capacity.

**FACTUAL ALLEGATIONS**

10. Plaintiff's Decedent, Alexandre Touloudjian, was initially brought to the California Men's Colony to serve a three-year term of imprisonment following his conviction for an assault in 2015. Upon his arrival, Alexandre quickly began displaying clear signs of mental instability. His behavior grew increasingly erratic until he was admitted to the Mental Health Division at California Correctional Health Care Services (CCHCS) On or around June 14, 2017, Alexandre Touloudjian was diagnosed with undifferentiated schizophrenia by CCHCS personnel. He was then started on Risperdal, an antipsychotic medication.

11. Despite being placed on antipsychotic medication, Alexandre's mental state continued to deteriorate. Alexandre attempted suicide multiple times. Pursuant to California prison regulations, suicide attempts are events that warrant the creation of an incident report by witnessing officers to be shared directly with the Warden.

12. Pursuant to the California prison regulations, suicide attempts are events that warrant the creation of an incident report by the witnessing officers and reported directly to he Chief Executive Officer, Teresa Macias, whom is in charge of health care, dental care and mental health care of the inmate population.

13. Furthermore, it is the duty of the Chief Executive Officer to inform the Warden of significant medical events, which would include a suicide attempt. This means that each time Alexandre attempted suicide, Defendant Gastelo would have been notified about it from both the witnessing officer and the Chief Executive Officer.

14. Furthermore, official California Men's Colony (CMC) death statistics show that Alexandre was the *only* suicide in 2018 and there were *no* suicides in 2019. This data indicates suicide is an exceedingly rare occurrence among CMC inmates. Because of the low incidence of suicide among the CMC inmate population, the Officer and Medical Defendants, as well as Defendant Gastelo and Defendant Macias would have been well aware of Alexandre's suicide attempts and should have had ample resources to provide him with the resources he needed.

15. Despite crying out for help through his multiple and notorious suicide attempts, Alexandre was ignored by the people charged with his safety. His behavior escalated until January 2018, when Alexandre attempted to jump from the second tier of the prison. It was only after this unprecedented and extraordinary display of despair that Alexandre's suffering was finally acknowledged by Defendants. On January 11, 2018, Alexandre was placed on suicide watch by Psychologist Katrina Weilbacher. He also been prescribed Versed 7, a sedation medication, which was administered to him by CCHCS staff. After a few days at the CCHCS

mental health ward, Alexandre was housed in a single-person prison cell in a mental health crisis unit of the California Men's Colony. Per the orders of Weilbacher, Alexandre was prescribed anti-suicide precautions including a safety smock, a safety mattress, a safety blanket, and tooth powder. Orders for constant observation were also issued.

16. Despite being aware of Alexandre's extremely high suicide risk, Defendants inexplicably cancelled the orders for the safety smock, safety mattress, and safety blanket after only a few days of suicide watch. Alexandre was also taken off the sedation medication. Because of the reporting procedures outlined above, Defendants Gastelo and Macias were aware of this shocking act that was undertaken in complete and callous disregard for Alexandre's safety. However, in a demonstration of complete indifference towards the life or death of Alexandre, Defendants Gastelo and Macias undertook no actions to reinstate the anti-suicide precautions.

17. The deliberate and callous indifference of the Defendants cost Alexandre Touloudjian his life when around 1:45 PM on January 21st, 2018, he undertook a tragically successful suicide attempt.

18. Alexandre's method of death was desperate, agonizing and above all, easily preventable.

19. Alexandre was found with two bags of crackers, and carrots stuffed down his throat. When found, Alexandre was pulseless and apneic, indicating that he had been without oxygen for at least four minutes.

20. Alexandre was housed in the mental health crisis unit, a unit that exists for the express purpose of preventing self-harm at the time of his suicide. Beyond this, Defendants were also under orders that Alexandre be observed at all times. These protocols were a complete failure as Alexandre was somehow able to smuggle food into his cell and had enough time to stuff an extremely large quantity of it down his throat without anyone intervening. Furthermore, this brutal process of shoving food down his throat to the point of asphyxiation would have certainly resulted in loud gagging and choking sounds that were apparently ignored or unheard by CMC staff.

21. The Mental Health records of the California Men's Colony indicate that while observations were to be made on approximately 11-minute intervals with a leeway of 4 minutes, the records indicate that on the day of his death, orders for his observations were issued but were later marked as "discontinued" and not as "completed." Thus, the records show that Touloudjian was not observed at all on the day of his death.

22. Alexandre Touloudjian was transferred to Dignity Health, French Hospital Medical Center, San Luis Obispo, CA, under the care of Thomas Vendegna, M.D. He was documented to have severe brain damage.

23. Dr. Vendegna had difficulty believing the official account of Alexandre Touloudjian's death. In the admission medical record, Dr. Vendegna wrote, "The details of this event are unclear as I have been told multiple different versions of the event by C.M.C. workers, C.M.C. security guards, E.M.S. and Dr. Ward, the physician at C.M.C. who arrived when the patient was loaded onto the gurney."

24. Alexandre Touloudjian excruciating suffering finally came to an end on January 29th, 2018, when he died in the hospital of severe brain damage

**FIRST CLAIM FOR RELIEF**

**SUPERVISORY LIABILITY OF ALL DEFENDANTS UNDER 42 U.S.C. § 1983**

25. The allegations set forth in all previous paragraphs of the complaint are incorporated by reference as is fully set forth herein.

26. At all times relevant hereto, Defendant Gastelo served as Warden of the California Men's Colony in San Luis Obispo, California.

27. Plaintiff is informed, believes, and therefore alleges that on January 21, 2018, Defendant Gastelo was aware of, should have been aware of, and/or had actual knowledge of the pattern and culture of unconstitutional behavior and deliberate indifference, including the failure to adequately screen and monitor inmates, and the failure to protect inmates from injury, harm or death by staff, employees and/or corrections officers at Defendant California Men's Colony.

28. Provision 51060.1 of the California Department of Corrections and Rehabilitation Operations Manual (prison regulation) states: "Each Warden shall maintain a chronological log of unusual or significant occurrences regarding inmates and staff or other events about which facility management should be informed."

29. Provisions 51060.4.1 and 51060.5 provides that staff members are required to note "unusual or significant occurrences" that occur throughout the prison. "Injuries to…inmates" is expressly listed as a category of occurrence that should be noted. Suicide attempts clearly fall within the definition of an "injury to

inmate". This information is compiled in a "Daily Activity Report" which is to be given to the Warden. Furthermore, the Watch Commander is required to "report significant occurrences to the Warden at any time through the normal chain of command or through the Administrative Officer-of-the-Day."

30. Provision 51070.6 provides that a Chief Medical Executive is required to "Notify the Warden or Administrative Officer-of-the-Day (AOD), giving all significant points of administrative and medical/legal interest." An inmate suicide attempt would certainly be considered a point of medical interest.

31. The above-mentioned provisions indicate that Defendant Gastelo, as Warden of the CMC, would have known about Alexandre's suicide attempts from either a Daily Activity Report, a direct report from a Watch Commander or from a report from the Chief Medical Executive. Thus, in the years leading up to Alexandre's death, there would have been at least three independent reporting channels for Defendant Gastelo to have been made aware of Alexandre's suicidal behavior.

32. Furthermore, it is extremely likely that Alexandre's suicide attempts would have been notorious within the CMC. Official CMC death statistics show that Alexandre was the *only* suicide in 2018 and there were *no* suicides in 2019. This trend indicates that at the time around Alexandre's death, suicide was a relatively rare occurrence. It therefore stands to reason that any suicide attempts within the prison would have been well known and notorious.

33. Therefore, even apart from the multiple reporting mechanisms, it is exceedingly likely that Defendant Gastelo would have been aware of Alexandre's suicide attempts simply through word of mouth at the CMC.

34. Pursuant to Provision 53130.9.2.1, inmates who are actively suicidal are to be placed into inpatient care.

35. As the Warden of CMC, Defendant Gastelo oversaw all staff at CMC and was tasked with undertaking supervisory actions to ensure that CMC was meeting the needs of inmates. Such supervisory actions include:

    a. Training staff members to implement CMC inmate welfare policies.

    b. Overseeing staff implementation of CMC inmate welfare policies

    c. Reprimanding and/or terminating staff members who fail to properly adhere to inmate welfare policies.

36. Accordingly, Defendant Gastelo was charged with undertaking supervisory actions to ensure that CMC staff adequately responded to Alexandre's suicide attempts and provided him with the medical resources he needed.

37. Despite having full awareness of Alexandre's suicide attempts between 2016 and January 2018, Defendant Gastelo failed to undertake supervisory actions to compel CMC staff to provide him with the medical resources that he needed as follows.

    a. Defendant Gastelo failed to ensure that Alexandre was hospitalized after his suicide attempts.

    b. Defendant Gastelo failed to provide Alexandre with mental health resources such as behavioral therapy or variation in his anti-psychotic medication that was clearly not working.

    c. Defendant Gastelo failed to ensure that Alexandre was placed into the mental health crisis unit and that anti-suicide measures.

38. The above actions could have been undertaken by Defendant Gastelo at any time, and her failure to do so constitute deliberate indifference to Alexandre's suicidal behavior. This deliberate indifference culminated in Alexandre attempting to take his own life by jumping from the second tier of the prison.

39. Defendant Gastelo's deliberate indifference grew more callous after January 21st, 2018, when Alexandre was placed on suicide watch.

    Per the orders of Defendant Weilbacher, Alexandre was prescribed anti-suicide precautions including a safety smock, a safety mattress, a safety blanket and tooth powder and a sedation medication called Versed 7. Orders for constant observation were also issued.

40. Despite being aware of Alexandre's extremely high suicide risk, Medical and Officer Defendants inexplicably cancelled the orders for the safety smock, safety mattress, and safety blanket after only a few days of suicide watch. Alexandre was also taken off the sedation medication.

41. Because of the multiple reporting channels outlined above, Defendant Gastelo was aware of this shocking act that was undertaken in complete and callous disregard for Alexandre's safety. However, in a demonstration of complete indifference towards the life or death of Alexandre, Defendant Gastelo undertook no actions to reinstate the anti-suicide precautions.

42. Defendant Gastelo also failed to ensure that the observation orders were being implemented by CMC staff.

43. This indifference on the part of Defendant Gastelo directly facilitated Alexandre's successful suicide attempt.

     a.     Because Alexandre was not being watched, he was able to smuggle food into his cell. He had enough time to shove enormous quantities of it down his throat without being stopped.

     b.     Because Alexandre had been deprived on his anti-suicide Smock, he was able to undertake the actions necessary to shove the food down his throat.

44. Defendant Gastelo understood as Warden, she was ultimately responsible for the safety of inmates within her prison. Given her lack of concern for Alexandre's well-being as demonstrated above she was well aware that she was violating his 8th amendment right to adequate medical treatment.

45. Accordingly, Defendant Gastelo's violation of Alexandre Touloudjian's 8th amendment rights under the United States Constitution was a proximate cause of damage to Plaintiff, thereby entitling Plaintiff to compensatory damages from Defendant Gastelo in an amount exceeding $1,000,000.

**WHEREFORE**, the Plaintiff, Sarkis Touloudjian, on behalf of the Estate of Alexandre Touloudjian and in his own right, demands judgment against the Defendants for compensatory and punitive damages, counsel fees, and all costs of suit.

### SECOND CLAIM FOR RELIEF

### LIABILITY OF ALL DEFENDANTS FOR FEDERAL CONSTITUTIONAL VIOLATIONS

46. The allegations set forth in all previous paragraphs of the complaint are incorporated by reference as if fully set forth herein.

47. At all times hereto, Defendants were acting under color of state law as employees of the California Department of Corrections.

48. Each of the Defendants was aware that Alexandre Touloudjian suffered from serious mental illness and had previously attempted suicide.

49. Each of the Defendants was aware that prisoners such as Alexandre Touloudjian were at extreme risk for further self-injurious behavior and needed specific monitoring and protection.

50. It is extremely likely that Alexandre's suicide attempts would have been notorious within the CMC. Official CMC death statistics show that Alexandre was the *only* suicide in 2018 and there were *no* suicides in 2019.  This trend indicates that at the time around Alexandre's death, suicide was a relatively rare occurrence.  It therefore stands to reason that any suicide attempts within the prison would have been well known and notorious.  Therefore, it is exceedingly likely that Defendants would have been aware of Alexandre's suicide attempts through word of mouth at the CMC.

51. Defendants had a duty to monitor Alexandre Touloudjian and were aware that Alexandre Touloudjian had previously exhibited suicidal tendencies and suffered from significant mental illness.

52. Despite knowledge of Alexandre Touloudjian's suicidal tendencies and significant mental illness, Defendants failed to take steps to protect Decedent from intentional self-harm.

53. Despite having full awareness of Alexandre's suicide attempts between 2016 and January 2018, Defendants failed to provide him with the medical resources that he needed as follows.

      a.    Defendants failed to ensure that Alexandre was hospitalized after his suicide attempts.

      b.    Defendants failed to provide Alexandre with mental health resources such as behavioral therapy or variation in his anti-psychotic medication that was clearly not working.

      c.    Defendants failed to ensure that Alexandre was placed into the mental health crisis unit and that anti-suicide measures.

54. The above actions could have been undertaken by Defendants at any time. This failure culminated in Alexandre attempting to take his own life by jumping from the second tier of the prison.

55. Defendants' inaction grew more callous after January 21st, 2018, when Alexandre was placed on suicide watch. Per the orders of Weilbacher, Alexandre was prescribed anti-suicide precautions including a safety smock, a safety mattress, a safety blanket and tooth powder and a sedation medication called Versed 7. Orders for constant observation were also issued.

56. Despite being aware of Alexandre's extremely high suicide risk, orders for the safety smock, safety mattress, and safety blanket were canceled after only a few days of suicide watch. Alexandre was also taken off the sedation medication.

57. Defendants also failed to implement the observation orders.

58. Given Defendants' knowledge of Alexandre's history of suicide attempts, this action represents a complete disregard for whether Alexandre lived or died.

59. This failure to supervise on the part of Defendants directly facilitated Alexandre's successful suicide attempt.

      a.     Because Alexandre was not being watched, he was able to smuggle food into his cell. He had enough time to shove enormous quantities of it down his throat without being stopped.

      b.     Because Alexandre had been deprived on his anti-suicide Smock, he was able to undertake the actions necessary to shove the food down his throat.

60. At the time of Alexandre Touloudjian's death, each Defendant was aware that Touloudjian needed immediate medical care and failed to summon such care in violation of Touloudjian's constitutional rights.

61. Upon information and belief, Defendants had a duty to properly screen Alexandre Touloudjian for any suicidal tendencies, or any other psychological problems.

62. Defendants acted contrary to law, and intentionally, willfully, wantonly, and unreasonably deprived Alexandre Touloudjian of his rights, privileges, and immunities secured by the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

63. Specifically, medical personnel were aware of Touloudjian's suicidal potential and knowing that he was at a high risk of a suicidal event, failed to ensure that the proper precautions were taken, not observing Touloudjian as ordered, and allowing the instruments of Touloudjian's suicide into his cell.

64. Specifically, correctional officers were aware of Touloudjian's suicidal potential and knowing that he was at a high risk of a suicidal event, failed to monitor Touloudjian as required.

65. The actions of Defendants in their individual capacities were intentional, malicious, willful, wanton, and/or in reckless disregard of Plaintiff's federally protected rights, therefore entitling Plaintiff to an award of punitive damages.

66. Plaintiff is entitled to recover punitive damages against Defendants in their individual capacities in an amount greater than $1,000,000.

67. Plaintiff is entitled to recover reasonable attorney's fees and the costs and expenses of this action.

**WHEREFORE**, the Plaintiff, Sarkis Touloudjian, on behalf of the Estate of Alexandre Touloudjian, and in his own right, demands judgment against the Defendants for compensatory and punitive damages, counsel fees, and all costs of suit.

### THIRD CLAIM FOR RELIEF

### SURVIVAL ACTION
### AGAINST ALL DEFENDANTS

68. The allegations set forth in all previous paragraphs of the complaint are incorporated by reference as if fully set forth herein.

69. Each Defendant had specific knowledge of Alexandre Touloudjian, his mental health, and his previous suicide attempts.

70. Under the U.S. Constitution, because Defendants knew about Alexandre Touloudjian's mental health and prior suicide attempts, Defendants were required to protect Touloudjian from self-harm.

71. Defendants failed to protect Touloudjian with deliberate indifference to his constitutional rights and this violation resulting in Touloudjian's death.

72. The Defendants' deliberate indifference to Alexandre Touloudjian's rights caused the death of Alexandre Touloudjian.

73. As a direct and proximate result of Defendants' violations of Touloudjian's constitutional rights as described above, decedent Alexandre Touloudjian suffered fright and conscious pain and suffering during the period before he was discovered in his jail cell until his death.

74. As a direct and proximate result of Defendants' violations of Touloudjian's constitutional rights as described above, the Estate of Alexandre Touloudjian incurred funeral expenses and medical bills.

75. Plaintiff brings a survivor action pursuant to applicable law against the Defendants for the aforementioned expenses, conscious pain and suffering, and fright suffered by decedent Alexandre Touloudjian.

**WHEREFORE**, the Plaintiff Sarkis Touloudjian as Administrator of the Estate of Alexandre Touloudjian, hereby demands judgment against the Defendants for the survival claims of the Decedent, for economic and non-economic damages, compensatory damages, plus costs, prejudgment interest, and post-judgment interest and counsel fees.

## JURY DEMAND

The Plaintiff hereby demands trial by jury.

Respectfully Submitted,

Law Offices of Keith Altman

Dated: June 30, 2023        By:    */s/ Keith Altman*
                                    Keith Altman (SBN 257309)
                                    The Law Office of Keith Altman
                                    33228 W 12 Mile Road, Suite 375
                                    Farmington Hills, MI 48334
                                    (516) 456-5885
                                    keithaltman@kaltmanlaw.com