Rob Bonta
Attorney General of California
Chad A. Stegeman
Supervising Deputy Attorney General
Corinna S. Arbiter
Deputy Attorney General
State Bar No. 273074
  600 West Broadway, Suite 1800
  San Diego, CA 92101
  P.O. Box 85266
  San Diego, CA 92186-5266
  Telephone: (619) 321-5799
  Fax: (619) 645-2061
  E-mail: Corinna.Arbiter@doj.ca.gov
*Attorneys for Defendant J. Gastelo*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| **ESTATE OF ALEXANDRE TOULOUDJIAN, et al.,**<br><br>Plaintiff,<br><br>v.<br><br>**J. GASTELO**<br><br>Defendants. | 2:20-cv-00520-FLA-KS<br><br>**DEFENDANT J. GASTELO'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:        August 18, 2023<br>Time:        1:30 p.m.<br>Courtroom:   43<br>Judge:       Hon. Fernando L. Aenlle-Rocha<br>Trial Date:  10/31/2023<br>Action Filed: 1/17/2020 |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

Please take notice that Defendant Gastelo moves the Court for summary judgment in her favor based on her having no supervisory liability for the matters alleged by Plaintiff which also negates liability for the survival action and also based on qualified immunity.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Statement of Uncontroverted Facts and Conclusions of Law, the declarations and exhibits in support thereof, the pleadings and records on file in this case, and such other matters as may properly come before this Court.

Dated:  July 7, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
CHAD A. STEGEMAN
Supervising Deputy Attorney General


*/s/ Corinna S. Arbiter*
CORINNA S. ARBITER
Deputy Attorney General
*Attorneys for Defendant*
*J. Gastelo*

CASES

*al-Kidd v. Ashcroft*
    580 F.3d 949 (9th Cir. 2009) ............................................................... 15

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986) ............................................................................. 10

*Angel v. Seattle-First Nat'l Bank*
    653 F.2d 1293 (9th Cir. 1981) ............................................................. 10

*Canell v. Lightner*
    143 F.3d 1210 (9th Cir. 1998) ............................................................. 14

*Celotex v. Catrett*
    477 U.S. 317 (1986) ............................................................................. 10

*City of Canton v. Harris*
    489 U.S. 378 (1989) ............................................................................. 14

*Doe v. City of San Diego*
    35 F.Supp.3d 1214 (S.D. Cal. 2014) ................................................... 16

*Harlow v. Fitzgerald*
    457 U.S. 800 (1982) ............................................................................. 15

*Keates v. Koile*
    883 F.3d 1228 (9th Cir. 2018) ............................................................. 11

*Leer v. Murphy*
    844 F.2d 628 (9th Cir. 1988) ............................................................... 10

*Mitchell v. Forsyth*
    472 U.S. 511 (1985) ............................................................................. 15

*Pearson v. Callahan*
    129 S. Ct. 808 (2009) ........................................................................... 16

*Penilla v. City of Huntington Park*
    115 F.3d 707 (9th Cir. 1997) ............................................................... 17

*Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*
    479 F.3d 1175 (2007) ........................................................................... 11

*Saucier v. Katz*
    533 U.S. 194 (2001) ................................................................. 15, 16

*Scott v. Harris*
    550 U.S. 372 (2007) ........................................................................ 10

*Steckl v. Motorola, Inc.*
    703 F.2d 392 (9th Cir. 1983) ........................................................... 10

*Taylor v. List*
    880 F.2d 1040 (9th Cir. 1989) .................................................... 13, 14

*Wesley v. Davis*
    333 F.Supp.2d 888 (C.D. Cal. 2004) ............................................... 12

STATUTES

42 U.S.C. § 1983 ................................................................ 11, 12, 13, 14

California Code of Civil Procedure § 377.30 ......................................... 15

CONSTITUTIONAL PROVISIONS

Eighth Amendment ....................................................................... 5, 16

COURT RULES

Fed.R.Civ.P. 56(a) ........................................................................... 10

L.R. 11-6.1 ...................................................................................... 19

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This case involves the death of Alexandre Touloudjian who was diagnosed with schizophrenia.  On January 21, 2018, at 1:33 p.m., nine days after arriving at California Men's Colony (CMC), and about one year into his prison term, a nurse performing suicide precaution rounds observed Alexandre pacing in his cell.  On the next round, at 1:45 p.m., she found him lying unresponsive on the floor of his cell.  When the nurse began resuscitation measures, she discovered an object lodged in Alexandre's throat that obstructed his breathing.  It was later determined that the object Alexandre forced down his throat was the cellophane-wrapped bread or crackers he received at a meal.

Sarkis Touloudjian, Alexandre's father, wrongfully sues Defendant Gastelo, former warden of California Men's Colony, alleging deliberate indifference to Alexandre from the time the California Department of Corrections and Rehabilitation (CDCR) took custody of him in 2017, until his ultimately successful suicide attempt on January 21, 2018, to which he succumbed on January 27, 2018.

For the reasons discussed in Section I(B), *infra,* Gastelo has no supervisory liability.  She had no involvement with Alexandre personally and was therefore not personally deliberately indifferent.  As the warden of California Men's Colony, she supervised custody staff, not clinical staff.  Custody staff were appropriately trained.  They had no responsibility for, and did not institute, change, or cancel any suicide prevention orders in place for Alexandre, including what medication he was

given or what clothing he was allowed to wear.  Custody staff were not lax in their custodial responsibilities such that Alexandre had the means and the opportunity to take his life.  Thus Gastelo did not set in motion a series of acts by staff under her supervision, or fail to terminate acts by staff under her supervision, that would inflict a constitutional injury on Alexandre.

## PLAINTIFF'S ALLEGATIONS

Sarkis Touloudjian, representative of the Estate of Alexandre Touloudjian (Plaintiff) asserts an Eighth Amendment claim against Gastelo for supervisory liability based on the allegedly deliberate indifferent acts of staff under Gastelo's supervision, towards Alexandre.  (Third Amended Complaint (TAC) at ¶¶ 43-62.) Plaintiff also asserts a survivor claim against Gastelo.  (*Id.* at ¶¶ 86-93.)

Based only on information and belief, Plaintiff asserts that Gastelo knew or should have known: (1) Alexandre's entire medical history while an inmate of the California Department of Corrections and Rehabilitation (*id.* at ¶ 29); (2) Alexandre's diagnosis of undifferentiated schizophrenia and all aspects of his treatment since he was incarcerated (*id.* at ¶¶ 30, 32); and (3) Alexandre's suicide attempts at other prisons.  (*Id.* at ¶¶ 31, 45, 46.)  Specifically, Plaintiff claims Gastelo failed to:

1. (a) appropriately train staff under her supervision; (b) oversee implementation of inmate welfare policies; (c) reprimand or terminate staff who failed to adhere to inmate welfare policies (*id.* at ¶ 52);

2. ensure Alexandre was hospitalized after his prior suicide attempts (*id.* at ¶ 54a);

3. provide Alexandre with mental health resources (*id.* at ¶ 54b);

4. ensure that Alexandre was placed at the mental health crisis unit "and that anti-suicide measures [sic]" (*id.* at ¶ 54c);

5. implement suicide prevention measures for Alexandre (*id.* at ¶¶ 33, 38, 57, 58, 59, 60b); and

6. stop Alexandre from smuggling crackers into his cell that he purportedly used to asphyxiate himself. (*Id.* at ¶¶ 37, 60a.)

Plaintiff incorporates by reference the same allegations set forth in the supervisory liability claim, so the survival claim rests on his ability to prove that Gastelo failed to adequately supervise her staff such that they were deliberately indifferent to Alexandre's mental health needs. (*Id.* at ¶¶ 86-93.)

Aside from the fact that many of these allegations are contradicted by the records, Plaintiff's premise is wrong. Gastelo supervised custody staff at (CMC). Custody staff did not have anything to do with most of the alleged acts described above. For item No. 3, the one allegation that does relate to custody, has no relationship to Alexandre's suicide. Alexandre forced down his throat the pre-wrapped bread or crackers he received from his meal to asphyxiate himself. (Statement of Uncontroverted Facts and Conclusions of Law (SUF) 31, 33, 34.)

## STATEMENT OF FACTS

After being arrested and convicted for elder abuse with great bodily injury to his grandmother, Alexandre Touloudjian (Alexandre) was sentenced to serve time in the custody of CDCR (SUF 1.) Alexandre was transferred to California Correctional Institution (CCI) on June 7, 2017. (SUF 2.) While at CCI, Alexandre was diagnosed with undifferentiated schizophrenia and placed on medication for same. (SUF 3.) He took the prescribed medication for a period of time, but then became non-compliant. (SUF 4.) On December 21, 2017, CCI clinical staff initiated a change in Alexandre's mental health level of care status to extended out-patient which required transfer to a prison that provided care at that level. (SUF 5.)

On January 11, 2018, while at CCI, Alexandre attempted suicide by jumping off of the second tier of his housing unit at CCI. (SUF 6.) He was taken to a community hospital, but refused treatment and was discharged against medical advice. (*Id.*) CCI requested that Alexandre be transferred to a prison with a higher level of mental health care than was available at CCI. (SUF 7.)

CMC has a 50-hospital bed mental health crisis bed unit (MHCB) for inmates who require short-term (up to ten days) acute mental health care.  (SUF 8.)  Alexandre was admitted to the MHCB on January 12, 2018.  (SUF 9.)

Gastelo was the warden at CMC in January 2018.  (SUF 10.)  Gastelo had no supervisory responsibilities for CCI or any other prison under the CDCR umbrella.  (SUF 11.)  Gastelo had no personal contact with Alexandre while he was at CMC.  (SUF 12.)  She had no supervisory role over clinical staff, who worked under the supervision of the Chief Executive Officer (CEO) of health care services at CMC.  (SUF 13.)

Gastelo was not included in the communications between the clinical staff at CCI or the clinical staff at CMC concerning the reason for Alexandre's transfer.  (SUF 14.)  Gastelo was not informed of Alexandre's prior suicide attempt at CCI (SUF 15) because that information was directed to the clinical staff.  (SUFs 16, 17.)  Gastelo was not informed of Alexandre's mental health information or his prior suicide attempts at any other prison based on laws, and CDCR and CMC policies regarding privacy of inmate mental health records.  (SUF 16.)  Gastelo did not have information regarding Alexandre's past suicide attempt or mental health condition from CCI through the reporting requirements of DOMS 51060.1, 51060.4.1 and 51060.5, and 51070.6 because that incident did not take place at CMC.  (SUF 17.)  Disclosure of an inmate's mental health information is a determination made by treating clinical staff and is subject to a patient's privacy rights.  (SUFs 16, 17.)

Clinical staff—not supervised by Gastelo—assessed Alexandre's mental health, created his treatment plan, prescribed medication for his schizophrenia, and ordered individual suicide prevention measures for him.  (SUF 18.)  This information was entered by clinical staff into a comprehensive electronic health record (EHRS) that managed all aspects of a patient's care.  (*Id.*)  Suicide prevention measures ordered for Alexandre included providing him with a suicide smock, a suicide mattress, a suicide blanket, and no hard plastics.  (SUF 19.) A

suicide smock is a hospital gown with sleeves and a neck, made of heavy canvas. (*Id.*)  It is not a restraint.  (*Id.*)

Custody Staff were not involved in the creation of Alexandre's treatment plan, nor did they have the ability to access or modify orders made by clinical staff in the electronic health record.  (SUFs 21, 22.)  Custody Staff were not involved in assessing the mental health of Alexandre.  (*Id.*)  Custody Staff were not involved in the creation of treatment plans for Alexandre.  (*Id.*)  Custody Staff did not determine how often Alexandre was seen by medical or clinical staff or what medication he was given, or what to do if Alexandre refused medication.  (*Id.*)  Custody Staff did not perform rounds on Alexandre for suicide prevention.  (*Id.*)

Though Custody Staff accompanied clinical staff who delivered meals and administered medications to inmates in the MHCB unit, Custody Staff did not prepare meals or supervise the inmate in taking medication.  (SUF 23.)  Meals for Alexandre and other inmates in the MHCB unit were prepared under the supervision of personnel who reported to the CEO.  (SUF 33.)  Bread and crackers for inmate meals were delivered pre-wrapped in a light plastic film to ensure cleanliness and freshness.  (SUF 34.)

Between January 12, 2018, and January 21, 2018, Officers Holman, Sedgwick, Fitzpatrick, Castillo, Esquivias, Borges, Jacobs, Kopcho, Cavan, Kestler, Kelly, Simpson, Marks, Salazar, Gonzales, Roinestad, Lomeli, Florentino, Romero, Perez, Wern, Webb, Scott, Cornejo, Soto, Strader, Zeno, Nelson, Leyva, Umphenour, Torres, and Kent (Custody Staff) were posted to Housing Unit A on first, second, and third watch.  (SUF 26.)  Each of these officers were current on their mental health and suicide prevention training.  (SUF 27.)

Alexandre did not attempt suicide at CMC until his ultimately successful attempt on January 21, 2018, wherein he used the bread or crackers that came with his meal, wrapped in the thin plastic film, to asphyxiate himself by forcing the wrapped food down his throat.  (SUF 28-32.)  On January 21, 2018, at 1:36 p.m.

Alexandre was observed walking in his cell by Clinical Staff performing rounds. (SUF 28.)  Shortly after, at 1:45 p.m. the nurse performing suicide precaution rounds found Alexandre unresponsive on the floor of his cell.  (SUF 29.)  She immediately called a code and sounded the alarm.  (*Id.*)  Officers Cavan and Castillo, who were at the officer's podium behind the nurse's station responded to allow entry into the cell.  (SUF 30.)  A nurse initiated life-saving measures.  (SUF 31.)  She pulled a long plastic bag from Alexandre's throat with "contents [she] could not identify."  (*Id.*)  Investigative Services Unit officers determined that the objects were state-issued bread wrapped in cellophane.  (*Id.*)  Custody who responded to the code and Clinical Staff present on the scene were able to restore Alexandre's breathing and pulse.  (SUF 32.)  He was taken to a community hospital, where it was determined that he suffered from brain death.  (*Id.*)  He succumbed to his injuries on January 27, 2018.  (*Id.*)

## LEGAL STANDARD ON MOTION FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24 (1986).  Summary judgment is mandated where the nonmoving party fails to set forth "specific facts showing that there remains a genuine factual issue for trial" and evidence "significantly probative as to any [material] fact claimed to be disputed." *Steckl v. Motorola, Inc*., 703 F.2d 392, 393 (9th Cir. 1983), citing *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979).  If the evidence presented by the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  There is no triable issue of fact unless the nonmoving party submits sufficient evidence for a jury to return a verdict in the nonmoving party's favor.  *Id*. at 250.

A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data. *Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988). When the moving party has carried its burden to show there is no disputed material fact, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Id.*

## ARGUMENT

### I. GASTELO HAS NO SUPERVISORY LIABILITY FOR THE ALLEGED CONSTITUTIONAL VIOLATIONS.

#### A. Standard for Supervisory Liability

A supervisory official is liable under § 1983 only if "there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Keates v. Koile*, 883 F.3d 1228, 1242-43 (9th Cir. 2018) (quoting *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms." *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (2007). The requisite causal connection may be established when an official sets in motion a "series of acts by others which the actor knows or reasonably should know would cause others to inflict" constitutional harms. *Id.*

### B.   Analysis of Supervisory Liability.

#### 1.   Gastelo Has No Supervisory Liability for Constitutional Violations that Occurred at Another Prison.

There is not, and cannot be, a causal connection between Gastelo's conduct and the alleged constitutional violation that occurred at any prison other than CMC because Gastelo was the warden for CMC only.  Each prison within CDCR is separately run with their own staff.  Accordingly, the only allegations that cross the threshold into the potential liability of Gastelo, are acts or omissions that occurred in the ten days Alexandre was at CMC—January 12, 2018, through January 21, 2018.  This undisputed fact eliminates the allegations regarding Alexandre's prior suicide attempt and the failure to send him to a hospital.  (TAC at ¶¶ 29, 30, 31, 32.)

Plaintiff's allegation that Gastelo would have known or should have known of Alexandre's prior suicide attempt because of incident reporting is also unfounded because the prior suicide attempt took place at CCI, not CMC.  (*Id.* at ¶¶ 45, 46, 47, 48, 49, 50.)  Reports pursuant to DOMS 51060.1, 51060.4.1 and 51060.5, and 51070.6, if made concerning Alexandre, were made to the Warden of CCI, not Gastelo.  (SUF 11.)  So, Gastelo would not have known of Alexandre's suicide attempt at CCI through any formal reporting mechanism.

Gastelo did not hear about Alexandre's prior suicide attempt by word of mouth.  (SUFs 14-17.)  As the warden of CMC, responsible for the safety and security of 6,500 inmates, staff, and the public, with many inmates transferring in and out on a daily basis (SUF 10), and based on Alexandre's privacy rights (SUFs 14 -16) that type of granular information was not communicated to her.  Disclosure of an inmate's mental health information is a determination made by treating clinical staff and is subject to a patient's privacy rights.  (SUF 16.)

### 2.   Gastelo Had No Personal Involvement with the Alleged Constitutional Violations.

An individual's general responsibility for supervising the operations of a prison is insufficient to establish personal involvement for purposes of asserting a claim under 42 U.S.C. section 1983. *Wesley v. Davis*, 333 F.Supp.2d 888, 892 (C.D. Cal. 2004). Gastelo did not supervise the day-to-day operations of the mental health staff or the MHCB. She had no contact with Alexandre (SUF 12) and was not personally involved in assessing his mental health, creating or implementing his treatment plan, or implementing or cancelling suicide prevention measures for Alexandre. (SUFs 18, 19, 21.) She had no knowledge of Alexandre's mental health diagnosis or prior attempted suicide for the duration of his stay at CMC until after January 21, 2018, after he asphyxiated himself. (SUFs 14-17.) Since Gastelo did not personally participate in the mental health care decisions regarding Alexandre, she is not liable under 42 U.S.C. section 1983. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Gastelo was not informed of Alexandre's mental health history or his history of suicide attempts (SUFs 14-16). The determination to disclose such information is made by Clinical Staff and that did not happen here. (*Id.*) The disclosure of such information is a determination made by treating clinical staff and is subject to a patient's privacy rights. (SUF 16.) Clinical staff share information with non-clinical staff on a "need to know" basis. (*Id.*) The CMC Mental Health Policies and Procedures preclude disclosure of information with that level of granularity to non-clinical staff. (*Id.*)

### 3.   Gastelo Has No Supervisory Liability Because Custody Staff Did Not Violate Alexandre's Constitutional Rights.

Gastelo supervised custody staff not clinical staff at CMC. (SUF 13.) Custody Staff did not assess the mental health of Alexandre or any other patients in the MHCB unit, create or implement treatment plans, or order suicide prevention

measures. (SUFs 21-22.) Here, Custody Staff did not alter suicide prevention measures ordered for Alexandre. (*Id*.) Custody Staff were not responsible for performing the rounding checks on Alexandre for his well-being. (*Id.*) Alexandre did not "smuggle" food into his cell to asphyxiate himself. He used the pre-wrapped bread or crackers he received at meals. (SUFs 31, 33, 34.)

Defense expert Dr. Robert Canning opines that Custody Staff did not fall below the standard of care with respect to suicide prevention measures by covering clinical staff who delivered the pre-wrapped items where the suicide prevention orders stated, inter alia, "no hard plastics in cell" because this order did not apply to the light plastic film used to package bread or crackers. (SUF 35.) He further opines that Custody Staff did not fall below the standard of care with respect to suicide prevention measures because the primary function of custodial staff in the MHCB unit is the safety and security of the unit, the staff, and patients. (SUF 24.) Given that these units' primary functions are as clinical psychiatric units, the custody staff have a minimal role in delivering health care in these units – mostly as escort officers, coverage for distribution of meals, opening/closing cell doors, monitoring entry and exit from the unit, maintaining logs, and managing other custodial duties as pertains to the patients being treated. (*Id.*) They function mostly in the background in MHCB units and thus are not typically "visible" in the clinical record. (*Id.*) As such, it is his opinion, based upon the records reviewed, that Custody Staff met or exceeded the expectations of custodial staff for such a unit between January 12, 2018, and January 21, 2018. (*Id.*)

## C. Gastelo Ensured Custody Staff Training Was Current.

A supervisor's failure to train subordinates can give rise to individual liability under § 1983 where the supervisor's failure amounts to deliberate indifference to the rights of persons with whom the employees are likely to come into contact. *See Canell v. Lightner*, 143 F.3d 1210, 1213-14 (9th Cir. 1998). To prevail on a claim

that a supervisor violated an inmate's constitutional rights by failing to properly train subordinates, the failure must amount to deliberate indifference. For liability to attach in this circumstance, a plaintiff must show that the training of the subordinate was inadequate and that the inadequacy of the training was the result of a deliberate or conscious choice. *Id.* at 1214. Also, the identified training deficiency must be causally connected to the ultimate injury. *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). In other words, to impose liability, a plaintiff must show that the alleged inadequate training actually caused the constitutional violation and that the violation would have been avoided had the employees been properly trained. *Id.* at 389-91.

There are no facts to support the allegations that Gastelo failed to properly train custody staff, which failure caused a constitutional harm. The undisputed facts show that Custody Staff met the training requirements for suicide prevention measures (SUFs 26-27) and when they did have cause to interact with Alexandre on January 21, 2018, they acted appropriately during the medical emergency. (SUFs 29-32.)

## II.   GASTELO IS NOT LIABLE FOR PLAINTIFF'S SURVIVOR CLAIM BECAUSE SHE HAS NO SUPERVISORY LIABILITY.

California Code of Civil Procedure § 377.30 authorizes survival actions. The success or failure of Plaintiff's Survival claim rises or falls with his Supervisory Liability claim because the claim incorporates by reference the allegations in the preceding paragraphs, and states only that "Defendants failed to protect Touloudjian with deliberate indifference to his constitution rights." (TAC at ¶¶ 86-93.) Thus there are no allegations different than what are set forth in the Supervisory Liability Claim against Gastelo. As set forth in Section I, Gastelo was not deliberately indifferent, nor were the Custody Staff under her supervision. Thus, Plaintiff's survival claim fails for all of the same reasons as does the Supervisory Liability Claim.

1

2

### III. GASTELO IS QUALIFIEDLY IMMUNE FROM PLAINTIFF'S CLAIMS BECAUSE CUSTODY STAFF DID NOT VIOLATE ALEXANDRE'S CONSTITUTIONAL RIGHTS.

3

4

5

6

7

8

9

10

11

12

Because supervisory liability is personal liability, an official against whom a claim of supervisory liability is advanced may assert the affirmative defense of qualified immunity. *al-Kidd v. Ashcroft*, 580 F.3d 949, 964–65 (9th Cir. 2009) (reversed and remanded on other grounds). The doctrine of qualified immunity provides a public official performing a discretionary function immunity in a civil action for damages, provided her conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The immunity is "immunity from suit rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

In *Saucier v. Katz*, the Supreme Court explained that an official is entitled to qualified immunity unless: (1) the Plaintiff establishes facts that show a constitutional violation and (2) it was clearly established, at the time, that the conduct was unconstitutional. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id*. Under the second prong, the inquiry centers on whether the right was clearly established, meaning that the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id*. The inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id*. at 205. Courts have discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in each case. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

28

Where a plaintiff asserts liability against a supervisory defendant for his or her conduct in connection with a subordinate, for purposes of the qualified immunity analysis, the plaintiff must establish that each individual defendant participated in the violation of a constitutional right. *Doe v. City of San Diego,* 35 F.Supp.3d 1214, 1230 (S.D. Cal. 2014). The plaintiff must establish that the subordinate committed a violation of a constitutional right, and that the violation is attributable to the personal conduct of the supervisory defendant. *Id.* (internal citations omitted). Conduct that violates a constitutional right must be attributable to each individual defendant. *Id.*

**A.   Custody Staff Did Not Violate Alexandre's Rights, so Gastelo Is Qualifiedly Immune.**

Without reiterating the arguments above, Custody Staff, and thus Gastelo, did not violate Alexandre's Eighth Amendment rights. Discussed in Section I above, the undisputed facts establish that Custody Staff did not personally participate in any violation of Alexandre's rights. Custody Staff's conduct with respect to their responsibilities in relation to Alexandre was objectively reasonable and they were not subjectively deliberately indifferent to a substantial risk of harm.

**B.   It Would Not Have Been Clear to a Reasonable Custody Officer that Custody Staff's Conduct Violated Clearly Established Law.**

The pivotal question, is not whether Alexandre was constitutionally harmed, but whether Custody Staff, and therefore Gastelo, was personally liable for the alleged harm. Custody Staff's discretionary conduct did not violate any clearly established rights of which a reasonable person should have known. *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997).

The requisite causal connection—the setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury—cannot be established. CMC Custody Staff were not trained

17

clinical staff.  They were not involved in the assessment, treatment, and suicide prevention measures taken with respect to Alexandre.  (SUFs 21-22.)  There is no evidence that Custody Staff chose to ignore Alexandre's clinical needs.  The manner of Alexandre's suicide attempt at CMC had nothing to do with "smuggled" food.  (SUF 31.)  Custody Staff did not change his suicide prevention orders.  (SUFs 21-22.)  They were not responsible for suicide precaution rounds.  (*Id.*)  Because Alexandre's suicide precaution orders did not include "no bread or crackers wrapped in light film" (SUF 19), Custody Staff would not have known that by providing coverage to clinical staff delivering his meals, they were assisting in giving him the instrumentality for his suicide.  Under the circumstances, reasonable custody staff would not have understood their actions to be unconstitutional.  Thus, Gastelo, Custody Staff supervisor, did not cause a violation of Alexandre's constitutional rights.

## CONCLUSION

Based on the foregoing, Defendant Gastelo requests that the Court grant her Motion for Summary Judgment and enter judgment against Plaintiff.


Dated:  July 7, 2023                    Respectfully submitted,

                                        ROB BONTA
                                        Attorney General of California
                                        CHAD A. STEGEMAN
                                        Supervising Deputy Attorney General


                                        */s/ Corinna S. Arbiter*
                                        CORINNA S. ARBITER
                                        Deputy Attorney General
                                        *Attorneys for Defendant*
                                        *J. Gastelo*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Gastelo, certifies that this brief contains 4,569 words, which:

_x_ complies with the word limit of L.R. 11-6.1.

Dated:  July 7, 2023                              Respectfully submitted,

                                                 ROB BONTA
                                                 Attorney General of California


                                                 /s/*Corinna S. Arbiter*
                                                 CORINNA S. ARBITER
                                                 Deputy Attorney General
                                                 *Attorneys for Defendant Gastelo*

SA2020101463

# CERTIFICATE OF SERVICE

Case Name:   **Estate of Alexandre**          No.   **2:20-cv-00520-FLA-KS**
             **Touloudjian, et al. v. CDCR, et**
             **al.**

I hereby certify that on <u>July 7, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- DEFENDANT J. GASTELO'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES

- DEFENDANT J. GASTELO'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

- REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- DECLARATION OF A. AITHAL, PSY.D. IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- DECLARATION OF J. GASTELO IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

- DECLARATION OF L. SILVA IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- DECLARATION OF M. ROCHA, JR. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

- DECLARATION OF R. CANNING, PH.D. IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- DECLARATION OF R. REGALADO IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- DECLARATION OF S. PENNISI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

- PROPOSED JUDGMENT

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

I further certify that some of the participants in the case are not registered CM/ECF users.  On July 7, 2023, I have caused to be mailed in the Office of the Attorney General's internal mail system, the foregoing document(s) by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within three (3) calendar days to the following non-CM/ECF participants:

Keith L. Altman
Attorney at Law
The Law Office of Keith Altman
33228 West 12 Mile Road, Suite 375
Farmington Hills, MI 48334

(Counsel for Plaintiff Sarkis Touloudjian)


I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on July 7, 2023, at San Diego, California.


|  |  |
| --- | --- |
| C.  Krystof | /s/ C. Krystof |
| Declarant | Signature |

SA2020101463
84040494.docx