1  ROB BONTA
   Attorney General of California
2  CHAD A. STEGEMAN
   Supervising Deputy Attorney General
3  CORINNA S. ARBITER
   Deputy Attorney General
4  State Bar No. 273074
    600 West Broadway, Suite 1800
5  San Diego, CA 92101
   P.O. Box 85266
6  San Diego, CA 92186-5266
   Telephone: (619) 321-5799
7  Fax: (619) 645-2061
   E-mail: Corinna.Arbiter@doj.ca.gov
8  *Attorneys for Defendant J. Gastelo*

9          IN THE UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11              LOS ANGELES DIVISION

12

| | |
|---|---|
| **ESTATE OF ALEXANDRE TOULOUDJIAN, et al.,**<br><br>Plaintiff,<br><br>v.<br><br>**J. GASTELO**<br><br>Defendants. | 2:20-cv-00520-FLA-KS<br><br>**DEFENDANT J. GASTELO'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        August 18, 2023<br>Time:        1:30 p.m.<br>Courtroom:   43<br>Judge:       Hon. Fernando L. Aenlle-Rocha<br>Trial Date:  10/31/2023<br>Action Filed: 1/17/2020 |

23      Defendant Gastelo submits this Statement of Uncontroverted Facts and

24 Conclusions of Law in Support of her Motion for Summary Judgment. Gastelo

25 identifies these facts as undisputed solely for the purpose of summary judgment.

26 She reserves the right to contest all material facts at trial.

27

28

| Issue One |
|---|
| Plaintiff's claim against Defendant Gastelo for supervisory liability for medical deliberate indifference to Alexandre Touloudjian (hereinafter referred to as "Alexandre") fails because she was not personally deliberately indifferent to Alexandre and the custody staff under her supervision were not deliberately indifferent to Alexandre's medical needs. |

| Undisputed Facts | Evidence |
|---|---|
| 1.      Alexandre was convicted of elder abuse with great bodily injury to his grandmother in January 2017.  He was sentenced to serve time in the custody of the California Department of Corrections and Rehabilitation (CDCR). | Declaration of S. Pennisi (Pennisi Decl.) at ¶ 5, and Exhibit (Ex.) 1, Abstract of Judgment and Plea Sentencing Agreement. |
| 2.      Alexandre was transferred to California Correctional Institution (CCI) on June 7, 2017. | Pennisi Decl. at ¶ 6 and Ex. 2, Bed Assignments; Declaration of A. Aithal, Psy.D. (Aithal Decl.) at ¶¶ 1-8. |
| 3.      While at CCI, Alexandre was diagnosed with undifferentiated schizophrenia and placed on medication for treatment of same. | Aithal Decl. at ¶¶ 1-8. |
| 4.      While at CCI, Alexandre took the medication for schizophrenia for a period of time, but then became non-compliant. | Aithal Decl. at ¶¶ 1-7, 9, 10. |
| 5.      On December 21, 2017, CCI clinical staff initiated a change in Alexandre's mental health level of care status to extended out-patient which required transfer to a prison that provided care at that level. | Aithal Decl. at ¶¶ 1-7, 11. |
| 6.      On January 11, 2018, Alexandre attempted suicide by jumping off the second tier of his housing unit at CCI. Alexandre was taken to a community hospital but refused treatment and was discharged against medical advice. | Aithal Decl. at ¶¶ 1-7, 12. |
| 7.      On January 11, 2018, clinical staff at CCI requested that Alexandre be placed in a prison with a higher level of care than was available at CCI. | Aithal Decl. at ¶¶ 1-7, 13. |

| | |
|---|---|
| 8.     California Men's Colony (CMC), a prison under the CDCR umbrella, has a 50-hospital bed mental health crisis bed unit (MHCB) for inmates who require short-term (up to ten days) acute mental health care. | Declaration of J. Gastelo (Gastelo Decl.) at ¶¶ 1, 3, and attached Exhibit (Ex.) 1, excerpts from CMC Mental Health Policy & Procedures (MHPP) at AGO 001695. Gastelo Decl. at ¶¶ 1, 3.<br><br>Declaration of R. Canning, Ph.D. (Canning Decl.) at ¶ 13. |
| 9.     On January 12, 2018, Alexandre was transferred to CMC and admitted to the MHCB H 001A1 Bed 016001L. This means that Alexandre was housed in the MHCB on Tier A in bed # 01600. | Pennisi Decl. at ¶ 6 and Ex. 2, Bed Assignments; Declaration of M. Rocha, Jr. (Rocha Decl.) at ¶ 3. |
| 10.     Gastelo was the warden at CMC in January 2018.  As the warden, Gastelo was responsible for the safety and security of the inmates, staff, and the public.  She was not a mental health professional and did not have direct involvement in providing for mental health treatment to or suicide prevention for inmates at CMC.  In January 2018, there were about 6,500 inmates at CMC. | Gastelo Decl. at ¶¶ 1, 3. |
| 11.     Gastelo had no supervisory responsibilities for CCI or any other prison under CDCR umbrella. Thus, Gastelo did not receive reports concerning Alexandre Touloudjian made pursuant to Department Operations Manual sections 51060.1, 51060.4.1 and 51060.5, and 51070.6 from any other prison within CDCR because those reports are made to the wardens of those prisons. | Gastelo Decl. at ¶¶ 4, 9. |
| Conclusion of Law: Gastelo had no personal liability and no supervisory liability for any actions or lack of action regarding the treatment of Alexandre's mental health condition, or suicide prevention measures at CCI because she was not the warden at CCI, and had no supervisory connection to CCI.  Therefore, she cannot be liable for any purported failures at CCI. | |
| 12.     Gastelo had no personal contact with Alexandre while he was at CMC. | Gastelo Decl. at ¶ 5. |

| | |
|---|---|
| 13.    Gastelo supervised custody staff (Custody Staff) at CMC and had no supervisory role over clinical staff at CMC who worked under the supervision of the Chief Executive Officer (CEO) of health care services at CMC. | Gastelo Decl. at ¶¶ 6, 7. |
| 14.    Gastelo was not included in the communications between the clinical staff at CCI and the clinical staff at CMC concerning the reason for Alexandre's transfer. | Gastelo Decl. at ¶ 8, and Ex. 1, MHPP at AGO 001714-1715; Canning Decl. at ¶ 19. |
| 15.    Gastelo was not informed of Alexandre's prior suicide attempt at CCI because that information was directed to the clinical staff at CMC. | Gastelo Decl. at ¶ 8. |
| 16.    Gastelo was not informed of Alexandre's mental health information or his prior suicide attempts at any other prison based on laws, and CDCR and CMC policies regarding privacy of inmate mental health records. | Gastelo Decl. at ¶ 8; Canning Decl. at ¶ 20. |
| 17.    Gastelo would not have information regarding Alexandre from CCI through the reporting requirements of Department Operations Manual sections 51060.1, 51060.4.1 and 51060.5, and 51070.6 because those incidents did not take place at CMC. | Gastelo Decl. at ¶ 9. |

Conclusions of Law:  As the warden at CMC, Gastelo would not have known that Alexandre had mental health issues or suicidal tendencies upon arriving at CMC, because as the warden, it was not within her scope of responsibilities or duties to be given that information unless deemed necessary by clinical staff not under her supervision.  In this situation, Gastelo did not receive such information.

Conclusion of Law: As the warden at CMC who was not a mental health clinician, Gastelo had no role in ordering or altering Alexandre's mental health treatment or suicide prevention measures for his safety, so she was not personally deliberately indifferent to his medical needs.

| | |
|---|---|
| 18.    Clinical staff at CMC (Clinical Staff) assessed Alexandre's mental health, created his treatment plan, and ordered individual suicide prevention measures for him.  This information was entered by clinical staff into a comprehensive electronic health record (EHRS) that managed all aspects of a patient's care. | Canning Decl. at ¶ 14. |

| | |
|---|---|
| 19.    Clinical Staff ordered medication for Alexandre's schizophrenia as well as suicide prevention orders, including but not limited to a suicide smock, a suicide mattress, a suicide blanket, and no hard plastics.  A suicide smock is not a restraint.  It is a hospital gown made of heavy canvas.  Clinical Staff ordered suicide precaution rounds to be performed by Clinical Staff for Alexandre at a frequency of 11 minutes +/- 4, on a staggered basis. | Canning Decl. at ¶ 15. |
| 20.    Orders for mental health patients in MHCB must be re-initiated in the electronic health record system (EHRS) every 24 hours.  This ensures that Clinical Staff are evaluating the patient daily. | Canning Decl. at ¶¶ 10, 16. |
| 21.    Custody Staff were not involved in creating Alexandre's mental health treatment plan, including a suicide evaluation or suicide prevention measures, nor did they ever access or modify orders for Alexandre's mental health, or suicide prevention measures while he was at CMC, including the discontinuation of suicide precaution rounding and the issuance of a suicide smock. | Gastelo Decl. at ¶ 17; Rocha Decl. at ¶¶ 1-7; Canning Decl. at ¶¶ 17-19. |
| 22.    Custody Staffs' responsibilities did not include, and they were not involved in, assessing the mental health of Alexandre.  Custody Staffs' responsibilities did not include and they were not involved in the creation of treatment plans for Alexandre.  Custody Staffs' responsibilities did not include and they did not determine how often Alexandre was seen by medical or clinical staff or what medication he was given, or what to do if Alexandre refused medication.  Custody Staffs' responsibilities did not include, and they did not perform, suicide precaution rounds on Alexandre. | Rocha Decl. at ¶¶ 1-7; Canning Decl. at ¶¶ 17-19. |

| | |
|---|---|
| 23.     Custody Staff provided coverage to medical or clinical staff who delivered meals and medication to inmates in the MHCB but Custody Staff did not plan, or prepare meals or supervise the inmate in taking medication. | Rocha Decl. at ¶¶ 1-6, 8. |
| 24.     Custody Staff at the CMC MHCB unit met or exceeded the expectations of custodial staff for such a unit between January 12, 2018, and January 21, 2018. These units' primary functions are as clinical psychiatric units, so custody staff have a minimal role in delivering health care in these units – serving mostly as escort officers, coverage for distribution of meals, opening/closing cell doors, monitoring entry and exit from the unit, maintaining logs, and managing other custodial duties as pertains to patients being treated.  They function mostly in the background and thus are not typically visible in the clinical record. | Canning Decl. at ¶ 25. |
| 25.     The policies and procedures for Custody Staff in place at CMC for the MHCB unit between January 12, 2018, and January 21, 2018 complied with the requirements mandated by the *Coleman v. Newsom* class action litigation. | Canning Decl. at ¶ 26. |

Conclusion of Law: Defendant Gastelo had supervisory duty over Custody Staff who worked at CMC.  Custody Staff under her supervision were not deliberately indifferent to Alexandre's mental health needs by instituting or altering mental health and suicide prevention orders for Alexandre, because they had no authority to institute orders for Alexandre's mental health needs, or suicide prevention measures, and they did not make such orders, and they did not have the power to alter his mental health orders or suicide prevention measures during the time that Alexandre was a patient in the MHCB beds at CMC.  Thus Gastelo did not set in motion a series of acts by others which she knew or reasonably should have known would cause Custody Staff to be deliberately indifferent to Alexandre's mental health needs or suicide prevention needs because Custody Staff had no role in addressing Alexandre's mental health needs or suicide prevention needs.

| | |
|---|---|
| 26.    Between January 12, 2018, and January 21, 2018, Officers Holman, Sedgwick, Fitzpatrick, Castillo, Esquivias, Borges, Jacobs, Kopcho, Cavan, Kestler, Kelly, Simpson, Marks, Salazar, Gonzales, Roinestad, Lomeli, Florentino, Romero, Perez, Wern, Webb, Scott, Cornejo, Soto, Strader, Zeno, Nelson, Leyva, Umphenour, Torres, and Kent were posted to Tier A on first, second, and third watch. | Rocha Decl. at ¶¶ 1-6. |
| 27.    Custody Staff are required to participate in two hours of mental health and suicide prevention training annually. Officers Holman, Sedgwick, Fitzpatrick, Castillo, Esquivias, Borges, Jacobs, Kopcho, Cavan, Kestler, Kelly, Simpson, Marks, Salazar, Gonzales, Roinestad, Lomeli, Florentino, Romero, Perez, Wern, Webb, Scott, Cornejo, Soto, Strader, Zeno, Nelson, Leyva, Umphenour, Torres, and Kent were current on their mental health and suicide prevention training. | Pennisi Decl. at ¶ 10; Declaration of R. Regalado at ¶¶ 2, 3, 5, 6, 7. |

Conclusion of Law: Gastelo was not deliberately indifferent to Alexandre's mental health needs or suicide prevention needs by failing to provide mental health training and suicide prevention training to Custody Staff who worked in the MHCB unit at CMC because she required that these staff participate in two hours of mental health training and suicide prevention training annually and the staff assigned to the MHCB, Tier A, where Alexandre lived were current on their training.  Thus Gastelo did not set in motion a series of acts by Custody Staff by failing to provide them with proper training, which she knew or reasonably should have known would cause Custody Staff to be deliberately indifferent to Alexandre's mental health needs or suicide prevention needs by failing to train staff under her supervision.

| | |
|---|---|
| 28.    On January 21, 2018, at 1:36 p.m., Alexandre was observed walking in his cell by Clinical Staff performing rounds. | Canning Decl. at ¶ 21. |
| 29.    On January 21, 2018, at 1:45 p.m., Alexandre was found unresponsive on the floor of his cell by the rounding nurse.  She called for a code and sounded the alarm. | Canning Decl. at ¶ 22; Pennisi Decl. at ¶ 7. |
| 30.    Officers Cavan and Castillo, who were located at the officer's podium behind the nurse's station responded to the code and went to Alexandre's cell to let the nurse in. | Rocha Decl. at ¶ 9; Pennisi Decl. at ¶ 7. |

| | |
|---|---|
| 31.    A nurse gained access to the cell, and initiated life-saving measures.  She pulled a long plastic bag with "contents [she] could not identify."  Investigative Services Unit officers determined that the objects were state-issued bread wrapped in cellophane. | Rocha Decl. at ¶ 9; Canning Decl. at ¶ 23; Pennisi Decl. at ¶ 7. |
| 32.    Alexandre's breathing and pulse were restored by Clinical Staff and he was taken to Dignity hospital for further evaluation where it was determined that his brain was severely damaged from a lack of oxygen and he succumbed to his injuries on January 27, 2018. | Canning Decl. at ¶ 23. |
| 33.    Meals for Alexandre and other inmates in the MHCB unit were prepared by kitchen staff who reported to the CEO. | Declaration of LaDon Silva (Silva Decl.) at ¶ 2. |
| 34.    Bread and crackers for inmate's meals were delivered pre-wrapped in a light plastic film to ensure cleanliness and freshness. | Silva Decl. at ¶ 3. |
| 35.    Custody Staff did not fall below the standard of care with respect to suicide prevention measures by accompanying/covering Clinical Staff who delivered meals to Mr. Touloudjian that contained bread or crackers wrapped in a light plastic film where the suicide prevention orders stated, *inter alia,* "no hard plastics in cell" because this does not apply to the light plastic film used to package bread or crackers. | Canning Decl. at ¶ 24. |

Conclusion of Law: Custody Staff were not deliberately indifferent to Alexandre by allowing him to "smuggle" something into his cell because there is no evidence that anything smuggled into Alexandre's cell was his mode of suicide.  Alexandre asphyxiated himself with bread or crackers pre-wrapped in a light plastic film served to him at a meal. Thus, Gastelo did not set in motion a series of acts by Custody Staff who provided coverage to clinical staff delivering meals which she knew or reasonably should have known would cause others to be deliberately indifferent to Alexandre's mental health needs or suicide prevention needs.

**Issue Two**
Gastelo Is Not Liable for Plaintiff's Survival Claim
Undisputed Facts and Conclusions of Law relied on for this issue are enumerated in Issue One above.

8

Conclusion of Law: because Plaintiff incorporates by reference the allegations in previous paragraphs of his TAC, but adds no other allegations, for the same reasons discussed in Issue One, Gastelo has no liability for Plaintiff's Survival Claim.

**Issue Three**
Gastelo Is Entitled to Qualified Immunity
Undisputed Facts and Conclusions of Law relied on for this issue are enumerated in Issue One above

Conclusion of Law: Defendant Gastelo is entitled to qualified immunity because, as established by the undisputed facts and conclusions of law, Defendant did not violate clearly established law.

Dated:  July 7, 2023                              Respectfully submitted,

                                                 ROB BONTA
                                                 Attorney General of California
                                                 CHAD A. STEGEMAN
                                                 Supervising Deputy Attorney General


                                                 /s/ *Corinna S. Arbiter*
                                                 CORINNA S. ARBITER
                                                 Deputy Attorney General
                                                 *Attorneys for Defendant*
                                                 *J. Gastelo*

SA2020101463