# EXHIBIT A

Transcript of the Testimony of

# Josie Gastelo

**Date:** May 17, 2023

**Case:** Touloudjian v. Gastelo

American Reporting, Inc.
Phone:248-559-6750
Fax:248-559-9918
Email:scheduling@american-reporting.com
Internet: american-reporting.com

Josie Gastelo                                              Touloudjian v. Gastelo

THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

THE ESTATE OF ALEXANDRE TOULOUDJIAN,

by and through its administrator

Ad Prosequendum, SARKIS TOULOUDJIAN and

SARKIS TOULOUDJIAN, in his own right,

    Plaintiff,                    Case No.: 2:20-CV-00520-FLA-KS


                                  Hon. Fernando L. Aenlle-Rocha

vs

JOSIE GASTELO, in her individual capacity,

    Defendant.

_____/


DEPOSITION VIA REMOTE VIDEOCONFERENCE OF:

JOSIE GASTELO

DATE:  May 17, 2023

TIME:  10:00 a.m. (PT)/1:00 p.m. (ET)


                                                     Page 1

Josie Gastelo                                                              Touloudjian v. Gastelo

---

**Page 2**

Taken in the above-entitled cause, before James A. Hengstebeck, Certified Electronic Recorder, CER #4623, and Notary Public for the County of Oakland.

APPEARANCES:

    KEITH ALTMAN, ESQUIRE
    The Law Office of Keith Altman
    33228 W 12 Mile Rd Ste 375
    Farmington Hills, MI 48334-3309
    Appearing on behalf of the Plaintiff.
    kaltman@lawampmmt.com

    CORRINA ARBITER, ESQUIRE
    California Department of Justice
    600 W. Broadway
    San Deigo, CA 92101-4270
    Appearing on behalf of the Defendant.
    Corinna.Arbiter@doj.ca.gov

    Present:  DAG Kandace Jung, Esquire
             Nicholas Kyle
             Jackson Kushner

---

**Page 3**

I N D E X

WITNESS:                                              PAGE:
JOSIE GASTELO
    Examination by Mr. Altman                      5

EXHIBITS:
    Deposition Exhibit Number 1                   62
    (Incident report package)

---

**Page 4**

1                Remote videoconference
2                May 17, 2023, 12:57 p.m.
3   (Whereupon counsel stipulated to the remote
4   swearing-in of the witness.)
5      MR. ALTMAN:  Good morning, Warden, how are you?
6      THE WITNESS: Okay.  How are you?
7      MR. ALTMAN: Okay.  My name is Keith Altman.  I am
8   the attorney representing the Touloudjian family in the
9   pending matter for which you are defendant.  Before we
10  begin, have you ever been deposed before?
11     THE WITNESS:  Yes.
12     MR. ALTMAN:  Approximately how many times?
13     THE WITNESS:  Approximately, two.
14     MR. ALTMAN:  Were they both connected with your work
15  or were they personal?
16     THE WITNESS:  With work.
17     MR. ALTMAN:  When was the last time you were deposed?
18     THE WITNESS:  It's been a few years.  I don't
19  remember the specific date.
20     MR. ALTMAN:  I want to go over a few things before we
21  get started.  One of the things that is going to take
22  practice is for you to wait for me to finish asking my
23  questions and for me to wait for you to finish answering
24  my questions so we get a nice clean record.  Okay?
25     THE WITNESS:  Okay.

---

**Page 5**

1     MR. ALTMAN:  You have to use verbal responses.  Nods
2  of the head, shakes of the head don't work.  Okay?
3     THE WITNESS:  Right.  Okay.
4     MR. ALTMAN:  If I ask you a question and you don't
5  understand it, please let me know.  Okay?
6     THE WITNESS:  Okay.
7     MR. ALTMAN:  And if you don't tell me you don't
8  understand a question, I'll presume that you do.  Okay?
9     THE WITNESS:  Okay.
10    MR. ALTMAN:  Lastly, anytime you think you need a
11  break, just let us know.  We'll take a break to meet your
12  needs as long as there is no question pending.  Okay?
13    THE WITNESS:  Okay.  Sounds good.
14             JOSIE GASTELO,
15  a witness herein, after having first been duly sworn, testified
16  as follows:
17            EXAMINATION
18  BY MR. ALTMAN:
19  Q.  Warden, what is your current position with the California
20  Corrections Department?
21  **A.  I am a retired warden.  I retired in December of 2020, and**
22  **currently, I am a retired annuitant working for actually**
23  **CCHCS, but it's the State of California, just consulting**
24  **and assisting.**
25  Q.  How long were you the Warden at the California Men's

---

2  (Pages 2 to 5)

Josie Gastelo                                                          Touloudjian v. Gastelo

## Page 6

1    Colony?
2    A.   Approximately five years.
3    Q.   Okay.  What was your position before that?
4    A.   I was a chief deputy warden for the California Men's
5         Colony.
6    Q.   How long were you in that position?
7    A.   Approximately two years.
8    Q.   And what was your position before that?
9    A.   Associate warden working for the California Men's Colony.
10   Q.   And how long were you in that position?
11   A.   Approximately I want to say seven years.
12   Q.   How long were you with the California Prison System?
13   A.   32 years.
14   Q.   What was your position when you first started?
15   A.   Office assistant.
16   Q.   And in becoming warden, did you have any specific training
17        associated with being a warden?
18   A.   The training that came with my prior position moving up to
19        the position of warden, but no formal education for
20        warden.
21   Q.   You say formal education, but was there training within
22        the prison system?
23   A.   It was included in my chain of promotion.  So as a chief
24        deputy, it was basically all on-the-job training and going
25        to classes which necessitated my position.  So if I was

## Page 7

1    associate warden over business services, then that would
2    be some of the training that I would get.
3    Q.   Is it fair to say that with respect to -- and I am only
4         going to be discussing kind of -- Mr. Touloudjian passed
5         away in January 2018, so I'm not really going to ask you
6         anything past that point, so let's just -- I don't want to
7         have to constantly make -- can we have an understanding
8         that essentially I am talking about in the years before
9         Mr. Touloudjian committed suicide?
10   A.   I'm sorry.  I didn't understand your question.
11   Q.   Can we have an understanding amongst us that in general,
12        when I'm asking you questions, the time period is
13        basically in the few years before Mr. Touloudjian
14        committed suicide?
15   A.   Yes.
16   Q.   Okay.  Now, is it fair to say that when you were the
17        warden of the prison, the buck stops with you?  You were
18        the highest authority there at the prison?
19             MS. ARBITER:  Objection, vague and ambiguous.
20             MR. ALTMAN:  Okay.
21   Q.   (By Mr. Altman)  You can answer.
22   A.   I was the highest authority over the custody part of the
23        institution, but in regards to health care, dental care,
24        mental health care, that responsibility, area of
25        responsibility is overseen by the chief executive officer.

## Page 8

1    Q.   Of the entire prison system or just of the CMC?
2    A.   Of just CMC.
3    Q.   Okay.  And did the chief investigative officer report to
4         you or did you report to them?
5    A.   No, we were equal.
6    Q.   You were equal.  And who did you report to?
7    A.   I reported to my associate director.  I think that's what
8         they call it.  I've been retired a few years now.  There
9         was a few during my time as warden that I reported to and
10        they worked at headquarters.
11   Q.   You'll have to forgive me.  Again, when did you say you
12        became the warden of the prison?
13   A.   In 2015.
14   Q.   When a prisoner would transfer to your prison, is that
15        something you generally would become aware of before it
16        happened?
17   A.   No.
18   Q.   When would you become aware of a prisoner coming to your
19        prison?
20   A.   So when prisoners come to our institution, there is a
21        committee, which is like an initial classification
22        committee and I would normally sit on those -- well, it
23        depends on what level the inmate is at.  It's hard to
24        explain.  We have -- there's over 3,000 inmates at the
25        institution, so I am not aware of when everyone comes in,

## Page 9

1    every inmate comes in.  So there are certain committees
2    that I sit on when the inmates are coming from maybe they
3    are high security risk because they are related to the
4    Mafia, instances like that, but other than that, I don't
5    sit in on all the classification committees when the
6    inmates come in.
7    Q.   What about if an inmate has serious mental health
8         challenges?
9    A.   No.
10   Q.   If an inmate attempts suicide in the CMC, would you have
11        been aware of that?
12   A.   Not immediately.
13   Q.   Would you have become aware of it at some point?
14   A.   Yes.
15   Q.   Typically how long after it happened would you become
16        aware of it?
17   A.   I would become aware of it at our next morning meeting if
18        it happened after hours.  If it happened during the day,
19        it would be reported to my PIO, public information
20        officer, who has to report that to headquarters.
21   Q.   I understand, but you would find out certainly by the next
22        day?
23   A.   If it were not the weekend, yes.
24   Q.   If a prisoner was going to be involuntarily treated for
25        mental health conditions necessitating court involvement,

American Reporting, Inc.
248-559-6750

Josie Gastelo                                                    Touloudjian v. Gastelo

Page 10

1     would you have been aware of that?
2   A.  No.
3   Q.  What does it mean for you to be in charge of custody?
4   A.  Custody is the safety and security of the institution, the
5     public and the staff and the inmate population.  So
6     anything that relates to that in regards to the
7     electrified fence, in regards to safety protocols for keys
8     and loss and everything but the CCHCS side of the house,
9     which is medical care and treatment, dental care and
10    treatment and mental health care and treatment.
11   Q.  Okay.  Now, if a prisoner was at risk for causing harm to
12    others, is that something you would've been aware of?
13   A.  No.
14   Q.  Who on the custody side would have been aware of that in
15    terms of management?
16   A.  So there is a chain of command.  It starts, of course, in
17    regards to management.  The lowest management position
18    would be the associate warden or, actually, excuse me, the
19    custody captain of that area.  There is a specific custody
20    captain for the mental health building and transportation
21    of inmates, so it would begin with a custody captain, then
22    it would go to the associate warden, then it would go to
23    the chief deputy warden and then it would come to me.
24   Q.  You would ultimately become aware of an inmate that was
25    found to pose a risk of harm to others?

Page 11

1        MS. ARBITER:  Vague and ambiguous as to time.
2        MR. ALTMAN:  We are talking about in the time period
3    shortly before Mr. Touloudjian arrived.  So I just wanted
4    to be clear.
5        MS. ARBITER:  I understand, and I guess my question
6    is are you asking -- and I don't know if you're asking
7    would she become aware, when with the awareness be?  Would
8    it be -- are you thinking about before or after.  That's
9    my question or that's my objection.
10   Q.  (By Mr. Altman)  Well, you said it would go to the chain
11    of command ultimately ending with you.  Does that mean you
12    would have been made aware of prisoners who were found to
13    be a risk to others?
14   A.  So it depends on the level of the risk.  So if the level
15    of the risk could be contained and dealt with at the
16    lieutenant or the captain level, then I would not have
17    heard about it.  Had it actually been an attack on a staff
18    member or another inmate, I would have known about that
19    after the incident report would have gone through the
20    process.  Unless it caused great bodily injury to one of
21    the staff members and that, then I would know about it at
22    the beginning because that staff member would've been
23    taken out to the hospital, things like that.
24   Q.  If it was determined that a prisoner needed to receive
25    involuntary treatments for a mental health condition,

Page 12

1     would you have been part of the decision-making process of
2    how to effectuate such an involuntary treatment?
3   A.  No, other than the custody portion of that.
4   Q.  Well, that would require that -- if a court would be
5    involved in such a process, that would involve
6    transportation of the prisoner to the court, right?
7   A.  Correct, and that would be an out-to-court transport.
8   Q.  I'm sorry?
9   A.  That would be an out-to-court transport, but I am not
10    aware of all out-to-court transports.  That's just -- they
11    could be there for committing an offense or as you
12    indicate, involuntary treatment.  So I just know that they
13    are going out to court.
14   Q.  Now, with respect to Mr. Touloudjian, did you ever meet
15    him personally?
16   A.  No.
17   Q.  Did you have any knowledge concerning Mr. Touloudjian?
18        MS. ARBITER:  Vague and ambiguous.
19        You can answer if you --
20   Q.  (By Mr. Altman)  While you were warden --
21   A.  I'm sorry.  You are fading out.
22   Q.  Okay.  I'm sorry.  I'll try to speak up.
23   A.  That's okay.  Thank you.
24   Q.  While you were warden, did you ever come to have any
25    specific knowledge about Mr. Touloudjian?

Page 13

1   A.  Yes, when he committed suicide.
2   Q.  It's your testimony that before that you had absolutely no
3    knowledge of Mr. Touloudjian in any way, shape or form?
4   A.  Correct, I did not.
5   Q.  Is it possible you don't remember that you had knowledge
6    of Mr. Touloudjian before or are you saying definitively,
7    certainly you had no knowledge of Mr. Touloudjian?
8   A.  From what I remember, I had no knowledge of
9    Mr. Touloudjian.
10   Q.  Is it possible you did have knowledge of Mr. Touloudjian
11    at the time in 2018 and you have forgotten about that?
12   A.  No.  Honestly, I can say no, I do not remember him.
13   Q.  I understand you don't remember him.  I asked you, is it
14    possible that at the time in 2018, you had knowledge of
15    Mr. Touloudjian before his suicide and you have just
16    simply forgotten that?
17   A.  Yes, that could be possible.
18   Q.  Now, was it typical for prisoners to transfer to the CMC
19    who had attempted suicide at another facility?
20        MS. ARBITER:  Vague, ambiguous, calls for
21    speculation.
22   Q.  (By Mr. Altman)  You can answer.
23   A.  I can't -- I can't answer that question.  I don't have any
24    records of the inmates' medical, dental or mental health
25    status when they transfer to our institution.

4 (Pages 10 to 13)

Josie Gastelo                                                    Touloudjian v. Gastelo

---

Page 14

1  Q.  That does affect how they might need to be housed at the
2      institution, correct?
3  A.  Yes.
4  Q.  And how they are housed at the institution would fall
5      under your umbrella, correct?
6  A.  Yes.
7  Q.  So if a prisoner was placed in some kind of protective
8      custody, protection from themselves, that is something
9      that would've fallen under your umbrella, correct?
10 A.  Not necessarily.  The custody staff -- we have
11     classification staff as well and they work very closely
12     with the mental health staff, medical staff and dental
13     staff to determine the housing of inmates who are mentally
14     ill.  So the classification committee on the custody side
15     takes all of their guidance and information from the
16     mental health staff in regards to the inmates' housing.
17 Q.  I understand, but ultimately, the guards, et cetera, who
18     are responsible for managing and monitoring a patient with
19     a mental health issue, falls under your umbrella, correct?
20 A.  Yes, they do fall under our chain of command.
21 Q.  If a prisoner was supposed to have a mental health -- you
22     know, was supposed to be monitored on a specific interval,
23     somebody else might've decided that they need what that
24     interval was, but it would fall under your umbrella to see
25     that it happened, correct?

---

Page 15

1  A.  If they were supposed to be doing -- because mental health
2      staff -- CCHCS has staff watch mentally ill inmates as
3      well if they are on particular suicide watch, suicide
4      precaution, they would be watched as well.  So if the
5      custody staff were involved in that, having to do that,
6      then yes, it would fall under my umbrella in regards to
7      whatever the mental health staff think they need to be
8      watched, that's what the officer should be watching them
9      at.
10 Q.  By the way, in early 2018, who was the CEO at CMC?
11 A.  Teresa Macias.
12 Q.  Okay.  And so any ultimate mental health decisions would
13     have fallen under her umbrella in terms of the treatment,
14     et cetera, anything along those lines, that would've been
15     under her umbrella, correct?
16 A.  Correct, treatment and housing.
17 Q.  How often did you meet with her?
18 A.  We had regular weekly meetings, all of our management
19     teams between custody and CCHCS.  We met twice a week.  If
20     there were something critical that she needed to speak
21     with me about, we would meet.  She had an open door to me,
22     so -- and then I would attend their -- either me or the
23     chief deputy would attend their monthly -- I believe they
24     call them quarterly management meetings.
25 Q.  Now, an actual completed suicide was a pretty rare event

---

Page 16

1      at CMC in the 2018 timeframe, right?
2          MS. ARBITER:  Objection, speculation.
3          MR. ALTMAN:  Sorry?
4          MS. ARBITER:  Go ahead.
5          MR. ALTMAN:  No, no.  I didn't hear what your
6      objection was.
7          MS. ARBITER:  It just calls for speculation, but
8      never mind.  I withdraw the objection.
9          MR. ALTMAN:  Okay.
10         THE WITNESS:  I don't particularly remember the total
11     number of suicides for each year that I was the warden,
12     but they were not unusual.
13 Q.  (By Mr. Altman)  Approximately how many suicides did you
14     have in 2017?
15 A.  Like I said, I don't remember the total amount and I don't
16     want to speculate, but I know that CMC has had several
17     suicides when I was the warden for the five-year period.
18 Q.  All right.  So taking the five years as a total, was there
19     more than one suicide?
20 A.  I can't be correct and I don't want to guess.
21 Q.  I'm not asking you -- well, was there more than one
22     suicide in the five-year period?
23 A.  At least one suicide, yes.  More than one, yes, but I
24     don't know how many.
25 Q.  Was there more than 10?

---

Page 17

1  A.  I don't want to speculate.  I don't know the exact number.
2  Q.  I didn't ask you for the exact number.  I asked you if
3      there were more than 10 suicides.
4  A.  I do not know.
5          MS. ARBITER:  And I'm going to object on harassment.
6      Move on, please.
7          MR. ALTMAN:  That's not harassment.  I'm trying to
8      get a number.
9  Q.  (By Mr. Altman)  Was there more than a hundred?
10         MS. ARBITER:  Objection, you're harassing the
11     witness.  She's already said she doesn't know.
12 Q.  (By Mr. Altman)  Was there more than a hundred suicides in
13     that five-year period?
14 A.  I don't believe there was more than a hundred, but I
15     cannot say for sure.
16 Q.  Was there more than 50 suicides in that five-year period?
17         MS. ARBITER:  Objection.  Same objection as before,
18     harassment.
19 Q.  (By Mr. Altman)  You can answer.
20 A.  I don't know.
21 Q.  Was there more than 20 suicides?
22         MS. ARBITER:  Same objection, harassment.
23         THE WITNESS:  I don't know.
24 Q.  (By Mr. Altman)  You don't think there were more than a
25     hundred, right?

---

5  (Pages  14  to  17)

Josie Gastelo                                           Touloudjian v. Gastelo

---

Page 18

1   A.  Correct.
2   Q.  Was there any specific procedure of how suicides were
3       investigated?
4           MS. ARBITER:  I am going to object on some privileged
5       grounds here.
6           Go ahead and --
7           MR. ALTMAN:  What is the privilege grounds whether
8       there was a procedure?
9           MS. ARBITER:  You can answer if you know.
10          THE WITNESS:  So on the custody side there
11      was -- they would have to do an incident report indicating
12      what happened, which would be all the individuals
13      involved, all the response people involved, what they
14      actually did.  Each one would write a report and then that
15      report would be compiled by the correctional lieutenant
16      who would ensure all the information is there and then it
17      would turn into an incident package and it would go up the
18      chain of command and go through our normal incident report
19      process.
20  Q.  (By Mr. Altman)  Okay.  And the result of -- as you sit
21      here right now, do you know how Mr. Touloudjian committed
22      suicide?
23  A.  Yes, I do.
24  Q.  Okay.  What's your understanding of how he committed
25      suicide?

---

Page 19

1   A.  It's that he shoved various items in his throat and
2       suffocated.
3   Q.  Those items were food packaging, correct?
4   A.  From reading the complaint, yes, I've seen that.
5   Q.  Do you have any evidence to say otherwise whether it was
6       food packaging?
7   A.  No.
8           MS. ARBITER:  Belated objection.  Calls for
9       speculation.
10          MR. ALTMAN:  What's the speculation of whether she
11      has any evidence?
12          MS. ARBITER:  She said she doesn't know.
13          MR. ALTMAN:  Well, how is it speculation?
14          MS. ARBITER:  So if she doesn't know and she is
15      taking the information from the complaint, then it's
16      speculative because we don't know what the complaint says
17      is true.
18          MR. ALTMAN:  But that's not what I asked her.  I
19      asked her, do you have any evidence that he committed
20      suicide in any other way than by ingesting food packaging
21      items.  That's not speculation.  She either has some or
22      she doesn't.
23  Q.  (By Mr. Altman)  Just to be clear, do you have any
24      evidence that shows that Mr. Touloudjian ingested
25      something other than food packaging to commit suicide?

---

Page 20

1   A.  No.
2   Q.  Now, how long after Mr. Touloudjian's suicide did you
3       become aware of the suicide?
4           MS. ARBITER:  Asked and answered.
5           Go ahead.
6           THE WITNESS:  It was during our morning meeting when
7       the administrative officer of the day provided the report.
8   Q.  (By Mr. Altman)  Now, was this after attempted -- he lived
9       for a few days after the attempt before he passed.  Would
10      you have learned about it when he attempted the next day
11      or when he passed the next day?
12  A.  I don't specifically remember hearing that he was in the
13      hospital and hadn't passed, but I do remember hearing that
14      we did have a suicide and the circumstances of the suicide
15      in regards to how it occurred.
16  Q.  Now, the actual transference of food into the prisoner's
17      cell falls under your umbrella, correct?
18  A.  Yes, we are -- the custody staff is responsible for
19      delivering the tray of food to the mental health crisis
20      bed cells.
21  Q.  Now, for a prisoner who is suicidal, are there any
22      restrictions of what can be given to them with their food?
23          MS. ARBITER:  Calls for an expert opinion.
24          MR. ALTMAN:  Excuse me.  How does that call for an
25      expert opinion?  I'm asking if there is a procedure.

---

Page 21

1           MS. ARBITER:  Understand, and it's my understanding
2       that this would involve psychiatrists and psychologists.
3           MR. ALTMAN:  James, can you read back my question,
4       please?
5           THE WITNESS:  Can you repeat your question, please?
6           MR. ALTMAN:  The court reporter is going to play it
7       back for us.
8           THE WITNESS:  Okay.
9           (Whereupon the question was played back by the
10      reporter.)
11  Q.  (By Mr. Altman)  That's the question.
12  A.  Okay.  So the answer to that is if the mental health
13      condition has made any restrictions to what the inmate is
14      allowed to have in their cell, then that would be relayed
15      to the supervisor of the custody staff as well as the
16      custody staff member and I believe it would also have been
17      placed on the side of the inmate's cell to indicate what
18      the inmate can and cannot have and so the custody staff
19      would be following the direction of the mental health
20      clinician through his supervisor, his or her supervisor.
21  Q.  And ultimately, that would also fall under your chain of
22      command, correct?
23  A.  What the officer does?
24  Q.  Wait.  Strike that.
25          I'm not talking about the decision as to what the

---

6  (Pages 18 to 21)

Josie Gastelo                                                    Touloudjian v. Gastelo

## Page 22

1   prisoner could have. Executing upon that decision would
2   have fallen under your chain of command, correct?
3   **A. Correct, with the direction of the mental health clinican.**
4   Q. But your people are the ones who would execute upon those
5   directions, correct?
6   **A. Yes.**
7   Q. Now, why is it important, as you understand it, to make
8   sure that the prisoner doesn't get things they are not
9   supposed to have?
10      MS. ARBITER: I'm going to object, calls for a legal
11   conclusion and expert witness.
12      MR. ALTMAN: How does that call for -- as you
13   understand it, why is it important. How does that call
14   for a legal or an expert conclusion?
15      MS. ARBITER: I made my objection on the record.
16      MR. ALTMAN: Let's take a step back.
17   Q. (By Mr. Altman) Ultimately, you were responsible for the
18   safety of the prisoners, correct?
19   **A. Yes.**
20   Q. And you agree it's important that you, and when I
21   say you, I mean big you and your team, consider all the
22   ways prisoners might cause harm to themselves or harm to
23   others, correct?
24   **A. Yeah, we would consider that. There's no way to tell**
25   **every possible way --**

## Page 23

1   Q. Understood.
2   **A. -- they could cause harm to themselves or to the public or**
3   **to each other.**
4   Q. Understood. Now, if a mental health professional limited
5   the materials that a prisoner could be given, it would be
6   important for your team to comply with that, right?
7   **A. Yes, it should be documented and the custody staff should**
8   **comply with what the mental health clinician indicated the**
9   **requirements were.**
10   Q. Now, why is it important that your people would comply
11   with those requirements for a prisoner who is suicidal?
12   **A. Because, per the mental health clinician's experience, if**
13   **they are making such request, then it is important that**
14   **that happen.**
15   Q. And what could happen if your people didn't comply with
16   what the mental health professional said?
17      MS. ARBITER: Calls for speculation.
18   Q. (By Mr. Altman) You can answer.
19   **A. Good and bad. This one was a bad case if that occurred,**
20   **but there's no telling, the officer can't tell -- I mean,**
21   **there is no way we can predict what the inmate is going to**
22   **choose, how the inmate is going to choose to commit**
23   **suicide.**
24   Q. That wasn't exactly my question. If a mental health
25   professional says these are the things the prisoner can't

## Page 24

1   have. Why is it important that your team comply with that
2   directive?
3      MS. ARBITER: Again, calls for speculation.
4      THE WITNESS: Because, again, the mental health
5   clinician has the experience, so if they don't want the
6   inmate to have certain materials, they don't have to
7   justify that to the officer, the officer just needs to
8   carry it out.
9   Q. (By Mr. Altman) I understand that, but I'm asking why is
10   it important for your officers to carry out a mental
11   health professional's directions?
12   **A. Because that's what they are being directed to do.**
13   Q. I understand that. That's kind of circular argument. I'm
14   asking why is it important?
15   **A. Well, obviously, the mental health clinician believes that**
16   **those materials might hurt him or others.**
17   Q. So you would agree that if your people don't comply with
18   the directions that they receive from the mental health
19   professional, bad things could happen, right?
20   **A. Could, yeah.**
21   Q. And that's what happened here, correct?
22   **A. I don't know if that's what happened.**
23   Q. Well, Mr. Touloudjian wasn't supposed to receive food
24   packaging, was he?
25      MS. ARBITER: Calls for speculation.

## Page 25

1   Q. (By Mr. Altman) You can answer.
2   **A. I don't have first knowledge of that.**
3   Q. Well, whether you have firsthand knowledge, did you learn
4   that secondhand?
5   **A. What are you referring to that I learned about? That I --**
6   Q. Did you learn anyway that Mr. Touloudjian was not supposed
7   to have food packaging with his food?
8   **A. No, I never knew of that.**
9   Q. Did you come to learn that after the fact?
10   **A. Unless it was in the complaint and I don't remember**
11   **reading that in the complaint, I don't recall me having**
12   **knowledge that he wasn't supposed to have food packaging**
13   **with his meal.**
14   Q. The prison was aware that Mr. Touloudjian was suicidal,
15   correct?
16      MS. ARBITER: That's vague and ambiguous. When?
17   Q. (By Mr. Altman) Well, when Mr. Touloudjian was
18   transferred to the prison, because he was only there about
19   10 days before he attempted suicide, the prison was aware
20   that he had already recently tried to commit suicide,
21   correct?
22   **A. When you say the prison, if you're talking about me, I was**
23   **not aware.**
24   Q. But you would expect that people on your team would have
25   been aware that he had already tried to commit suicide,

American Reporting, Inc.
248-559-6750

Josie Gastelo                                                    Touloudjian v. Gastelo

Page 26

1  right?
2  A.  No, unless they heard it from the mental health
3  clinicians, which I have no knowledge of that.  The only
4  people that would know that this inmate had tried to
5  commit suicide at other institutions would be the mental
6  health clinicians who are reviewing his file.
7  Correctional officers do not review any kind of medical
8  mental health, dental, as far as I know, information.
9  They are very big on HIPAA, CCHCS is with their inmates.
10  Q.  So is it your testimony that inmates have HIPAA rights?
11  A.  Yes.
12  Q.  Within the prison?
13  A.  Yes.
14  Q.  But, obviously, if he was on suicide watch, you have to
15  know that he was suicidal, right?
16     MS. ARBITER:  Calls for speculation.  We don't know
17  that he was on suicide watch.
18  Q.  (By Mr. Altman)  You can answer.
19  A.  Okay.  Repeat your question.
20  Q.  If an inmate is on suicide watch, obviously, your people
21  would have to know that he was suicidal, correct?
22  A.  So yes, they would if they were doing the suicide watch
23  themselves.  If healthcare had staff available to do
24  suicide watches and I'm not familiar with if they do or
25  don't in the mental health crisis bed building, then they

Page 27

1  may not know that.
2  Q.  Now, after you learned of Mr. Touloudjian's suicide, I
3  understand that you say you received your report.  Did you
4  do or call for any kind of investigation as to whether
5  there were any failures on the part of the staff allowing
6  Mr. Touloudjian to commit suicide?
7  A.  So what happens after a suicide -- and I am only
8  speculating on behalf of CCHCS, but they do put together a
9  suicide report and in that report it encompasses any
10  errors or anything that they believe went wrong on the
11  healthcare side, mental health side and custody side.  So
12  that's the investigation that they do and that's where it
13  would be determined if staff did something wrong.  That is
14  their report, not CDCR's report.
15  Q.  But if there were any failures on the custody side, you
16  would be aware of that, wouldn't you?
17  A.  Yes, by that report that they would provide to me.
18  Q.  Would you ever be part of the investigation of such an
19  incident if there were questions as to whether there were
20  custody failures?
21  A.  Personally involved in the investigation, no.
22  Q.  Who from your side of the house would be involved in such
23  an investigation?
24     MS. ARBITER:  I'm going to object on official
25  information privilege.

Page 28

1     Go ahead and answer, if you know.
2     THE WITNESS:  Okay.  It would be -- the closest
3  person who they would seek direction from would be either
4  the custody captain over that specific area and he reports
5  to the associate warden of that specific area.
6  Q.  (By Mr. Altman)  And you would never learn of these
7  investigations?
8  A.  As I said before, I would learn about them when the report
9  that CCHCS does is complete.
10  Q.  And so you recall receiving that report with respect to
11  Mr. Touloudjian?
12     MS. ARBITER:  I am once again going to object to this
13  line of questioning based on official information
14  privilege.
15     You can answer.
16     THE WITNESS:  Okay.  I don't recall because when they
17  produce this report, they do a meeting with their
18  headquarters and the meeting is either -- I either attend
19  the meeting or my chief deputy warden attends the meeting.
20  I do not recall attending this specific meeting on the
21  suicide, so I'm not sure if I did or if I did not.
22  Q.  (By Mr. Altman)  Now, if you did not, would you have been
23  made aware of what took place during the meeting?
24  A.  Yes.
25  Q.  So whether you were there or you weren't there, you would

Page 29

1  have knowledge about the specifics of Mr. Touloudjian's
2  suicide, correct?
3     MS. ARBITER:  Vague and ambiguous.
4  Q.  (By Mr. Altman)  You can answer.
5  A.  Oh, I can go ahead and answer?
6     If it pertains to something that custody had done
7  wrong, then yes, I would.
8  Q.  And if there was no allegations that custody did something
9  wrong, you wouldn't have learned -- you would know nothing
10  about it at that point?
11  A.  I would know that custody did nothing wrong if that was
12  the case.
13  Q.  As you sit here right now, you have no recollection of a
14  Touloudjian report, correct?
15  A.  I don't have any recollection of -- I know there was a
16  report because they always do a report, but I don't have a
17  recollection of being at that meeting or reading the
18  report.  So if it was not me, you asked me if I would've
19  been aware of it.  Yes, my chief deputy warden or the
20  associate warden would have said, hey, we have the report
21  on the suicide.  Everything was good or we had the meeting
22  on the suicide and this is what custody did wrong and I
23  don't recall receiving any information either they did
24  something wrong or they didn't.
25  Q.  Now, if one of the guards was there when Mr. Touloudjian

8  (Pages  26  to  29)

American Reporting, Inc.
248-559-6750

Josie Gastelo                                                           Touloudjian v. Gastelo

Page  30

1  was given the food that he used to commit suicide, the
2  food packaging, that guard would have come under your
3  umbrella, correct?
4  **A.  Yes.  All the officers come under my umbrella.**
5  Q.  Now, how were the officers trained with respect to
6  compliance from healthcare directives?
7  **A.  I don't know the specifics of the training, but custody**
8  **officers and staff are always trained to follow the**
9  **direction of the supervisors and follow policy and**
10 **procedure.**
11 Q.  At the time when you were the warden, were you responsible
12 for -- not necessarily solely responsible for the
13 development of policies and procedures?
14 **A.  Was I solely responsible for the policies and procedures?**
15 **Is that your question?**
16 Q.  No, not solely, but were you part of the group that
17 would've been responsible for the development of policies
18 and procedures?
19 **A.  I would have been at the higher level in regards to**
20 **reviewing the policies and procedures.  Because there are**
21 **so many, my chief deputy warden and I split and would**
22 **review the policies and sign off on the policies or not**
23 **sign off on the policies.**
24 Q.  Now, did you ultimately have to sign off on all policies
25 and procedures within the prison affecting custody?

Page  31

1  **A.  Either myself or my delegate or who I delegated to.**
2  Q.  Now, when you delegated it, would you had still have
3  knowledge of the proposed policy and procedure or -- yes,
4  that's the question.
5  **A.  If there was a major change in a policy or procedure that**
6  **my chief deputy warden had reviewed and I had not, I would**
7  **expect that he would share it with me, so that's the**
8  **answer in regards to that question.**
9  Q.  Now, in the time period in the years before
10 Mr. Touloudjian's suicide, did you become aware of the big
11 department being involved in any kind of litigation
12 associated with mental health issues?
13 **A.  I'm sorry.  I missed the -- what department?**
14 Q.  You know, the California -- the prisons as a whole became
15 involved in litigation associated with mental health
16 treatment for prisoners?
17 **A.  I'm sorry.  Can you ask that question again?**
18 Q.  During your years before Mr. Touloudjian, did you ever
19 become aware of, you know, the whole big prison system
20 being involved in litigation associated with mental health
21 treatment for prisoners?
22 **A.  Yes.**
23 Q.  And what is your understanding of what that litigation was
24 about?
25 **A.  It's under the Coleman, from my understanding, and they**

Page  32

1  **apparently were not being given appropriate mental health**
2  **treatment.**
3  Q.  Do you remember what that time period was?
4  **A.  I do not.**
5  Q.  Now, as a result of the Coleman matter, are you aware of
6  any changes that were made as to how prisoners were given
7  mental health treatment?
8  **A.  No, I was not in that specific area when all of that**
9  **started happening.  So I don't recall specific changes.**
10 Q.  Now, for changes of policies and procedures, was that
11 something that you could sign off on without referring to
12 your management?
13 **A.  For local policies and procedures and for custody or are**
14 **you speaking custody and CCHCS?  Yes.**
15 Q.  I'm talking for local policies and procedures in your
16 area, did you need to get permission from your management?
17 **A.  No, I did not need to get permission from my management,**
18 **but I always spoke with someone as part of the management**
19 **team if not as a group, if it was going to be a major**
20 **change.**
21 Q.  Do you recall when you were in the years before
22 Mr. Touloudjian, let's say the five years before, do you
23 recall any changes made with respect to mental health
24 treatment of prisoners?
25 **A.  No.**

Page  33

1  MS. ARBITER:  Asked and answered.
2  THE WITNESS:  No, I don't.
3  Q.  (By Mr. Altman)  Based upon the Coleman case, are you
4  aware of any changes to mental health treatment of
5  prisoners at the CMC?
6  **A.  So in regards to mental health, I know there were changes.**
7  **I don't know any specific changes or the specific changes**
8  **that were made.**
9  Q.  Were there any changes with respect to custody of mental
10 health patients as a result of the Coleman case?
11 **A.  I don't know.**
12 Q.  If those were changes that you made while you were warden
13 or deputy or assistant warden, would you have been aware
14 of those changes and maybe forgot them at this time?
15 **A.  If there is a change to my area of responsibility at that**
16 **time, I would have been aware of them.  I may not have**
17 **been aware that they were due to Coleman or that they were**
18 **changes.  They might have already been implemented by the**
19 **time I -- by that time it was part of my responsibility,**
20 **so I could have and I may not have remembered back then**
21 **but as of right now, I do not remember any changes**
22 **specific related to Coleman.  I'm sure there were, but I**
23 **do not remember them.**
24 Q.  In response to any suicides that you were aware of while
25 you were warden or deputy warden, et cetera, in that time

9  (Pages  30  to  33)

Josie Gastelo                                                                 Touloudjian v. Gastelo

---

Page 34

1    period, are you aware of any changes that were made in
2    your area?
3    **A. I do remember one change that was made in our area that**
4    **was due to suicide of an inmate who they found underneath**
5    **his bunk with a bag over his head and there were some**
6    **changes in ensuring that custody staff and this training,**
7    **it wasn't a change, it was just a retraining of staff to**
8    **ensure when they are doing their checks because there were**
9    **various checks on the entire population, inmate population**
10   **in a 24-hour period, that especially during nighttime they**
11   **are checking for living, breathing flesh, so I do remember**
12   **that staff got retrained on that due to that particular**
13   **suicide.**
14   Q.   If the mental health staff had determined that
15   Mr. Touloudjian needed to be observed every 15 minutes --
16        MS. ARBITER:  Are you asking her?
17        MR. ALTMAN:  I didn't finish yet.
18   Q.   (By Mr. Altman)  You would agree your staff should have
19   complied with that directive, right?
20        MS. ARBITER:  I don't have an objection.  You can
21   answer if you know.
22        THE WITNESS:  Okay.  If they were due to -- when you
23   are talking 15 minutes, that's a process -- that's called
24   Guard One, I believe, checks and that's the responsibility
25   of correction officers when they are in that particular

---

Page 35

1    building.
2         In the mental health crisis bed building, I'm not
3    sure, I don't recall if they were the ones doing those
4    checks or if they had healthcare staff, whether it be
5    psych tech or other staff doing the checks, but if it was
6    a responsibility of the officer, which would be in their
7    post orders for that particular case, then yes, they
8    should have been doing that.
9    Q.   And was there a specific policy or procedure at CMC that
10   said that?
11   **A. If it was a --**
12        MS. ARBITER:  Vague and ambiguous.
13        THE WITNESS:  I'm sorry.  Go ahead.
14        MS. ARBITER:  My objection is it's vague and
15   ambiguous.  Said what?
16        Go ahead and answer, if you know.
17        MR. ALTMAN:  Wait.  I'll withdraw that.
18   Q.   (By Mr. Altman)  Is there a specific policy and procedure
19   that said that guards had to comply with directives, such
20   as a 15-minute monitoring directive from mental health
21   professionals if they were involved in that building?
22   **A. If it is a Guard One system, then yes, it would be in**
23   **their post orders.**
24   Q.   I understand that.  I know that would be in their orders,
25   but is there a policy that said that the guards had to

---

Page 36

1    comply with these orders?
2    **A. No.  They get taught to comply with orders of their**
3    **supervisors and if they have any questions then they would**
4    **confer with -- let's say it's an officer whose taking**
5    **directions from a mental health clinician.  That would go**
6    **through the sergeant and they would be involved in letting**
7    **the officer know these are what has to be -- this is what**
8    **has to be done.  So, yeah, the officer would be complying**
9    **with the mental health clinician's direction saying they**
10   **need 15-minute checks and the sergeant would be in the**
11   **know on that, as well.**
12   Q.   You would agree that if the mental health professional
13   said that there needed to be 15-minute observations and
14   that was supposed to be conducted by the guards and the
15   guards didn't do that, that would be a problem, right?
16   **A. Yes.**
17   Q.   And how would such a situation be reviewed and analyzed if
18   there was a suicide?
19   **A. It would be reviewed when the investigation is done by**
20   **CCHCS indicating that this may have been a factor in the**
21   **suicide.  So we would then get that information in regards**
22   **to custody staff and proceed with the whole process of**
23   **reviewing the incident and possibly doing adverse action.**
24   Q.   Do you recall whether any such review and analysis was
25   ever done with respect to Mr. Touloudjian?

---

Page 37

1         MS. ARBITER:  I am going to again object on the
2    official information privilege.
3         Go ahead and answer if you know.
4         THE WITNESS:  I do not --
5         MR. ALTMAN:  Hold on.  What is that official
6    information privilege, by the way?  That's not one I've
7    heard before.
8         MS. ARBITER:  It covers privacy information, covers a
9    broad range of information that the CDCR has protected
10   that does not -- should not be disclosed.  I can provide
11   additional information for you on that later.
12        MR. ALTMAN:  I'd appreciate that because I've not
13   heard of that one before and we are in the middle of a
14   litigation.  I'm not quite sure I understand how that
15   would even apply where there is a specific litigation
16   involved.
17        MS. ARBITER:  Sure, and it has been in the discovery
18   responses.
19        MR. ALTMAN:  Okay, but I still don't -- that doesn't
20   mean they're correct.
21   Q.   (By Mr. Altman)  Warden, what did you do to prepare for
22   today's deposition?
23   **A. I reviewed the --**
24   Q.   And I'm going to be very clear here.  I'm sure you
25   probably had conversations with your counsel, but I am not

---

10  (Pages  34  to  37)

Josie Gastelo                                                    Touloudjian v. Gastelo

---

Page 38

1    asking you what you said to your counsel. I'm sure she
2    will jump on you as well if you start to talk, but I just
3    want to make it very clear I'm asking what you did, not
4    what was said. Okay?
5  A. **Okay.**
6  Q. What did you do to prepare for today's deposition?
7  A. **So I reviewed the complaint and, you know, reviewed it**
8     **very thoroughly and just went back in my head trying to**
9     **think of circumstances and what happened and what I**
10    **remember and there was I think a spreadsheet or something**
11    **that the attorney showed me in regards to -- God, I think**
12    **it was suicide and I can't remember now, but that's**
13    **basically pretty much it.**
14 Q. Did your counsel show you any documents other than that
15    spreadsheet?
16 A. **Yeah, she did. She sent me a copy of the incident report.**
17 Q. Okay. Did you look at any other documents that refreshed
18    your recollection of something you had known in the past
19    but had forgotten?
20 A. **No, I don't think so.**
21 Q. Did you talk to anyone other than your counsel about this
22    case?
23 A. **No.**
24 Q. Did you look anything up on your own about this case?
25 A. **No.**

---

Page 39

1  Q. Can we have an understanding that meeting means either
2     physical, by phone, by Zoom, they are all meetings. Can
3     we have that understanding?
4  A. **Repeat the question. I'm sorry.**
5  Q. That a meeting could be a physical meeting, a phone
6     meeting, a Zoom meeting. They are all meetings. Can we
7     have that understanding?
8  A. **Yes, that they are all meetings, yes.**
9  Q. How many times did you meet with Counsel to prepare for
10    today's deposition?
11 A. **Two times.**
12 Q. When was the last time?
13 A. **This morning.**
14 Q. Okay. How long did you meet for?
15 A. **About five minutes.**
16 Q. Okay. And what about the first time?
17 A. **It would've been last week, yeah, last week.**
18 Q. How long did you meet for?
19 A. **I think it was about an hour and a half.**
20 Q. Who was at that meeting?
21 A. **Just me and her, a Zoom meeting -- or Teams meeting, I**
22    **should say. I'm sorry. Teams.**
23       MR. ALTMAN: Let's take a break for a few minutes.
24       THE WITNESS: Sure.
25       MR. ALTMAN: How about a 10-minute break?

---

Page 40

1        THE WITNESS: Okay.
2        (Brief recess, 1:52 p.m. to 2:04 p.m.)
3  Q. (By Mr. Altman) Warden, would it have been important for
4     you to know if a prisoner coming into the prison had
5     recently attempted suicide?
6        MS. ARBITER: Vague and ambiguous.
7        Go ahead. You can answer.
8        THE WITNESS: No. It would be more important that
9     the CEO knows that information. It wouldn't be liberally
10    given to me because we do have several inmates who are
11    sent to our institution who have that prior history and I
12    don't become aware of all that information unless
13    something does occur.
14 Q. (By Mr. Altman) Did you become aware that Mr. Touloudjian
15    had attempted suicide the day before he was transferred to
16    CMC?
17 A. **I don't recall getting that information ahead of time or**
18    **after. I've seen it in the complaint that he had been at**
19    **other institutions and tried to commit suicide.**
20    **My apologies. It might've been in the report**
21    **that -- I spoke about earlier, where they investigate the**
22    **suicide. That information would be in there, as well. I**
23    **don't recall reading it, but I could have read it several**
24    **years ago and not remembered.**
25 Q. Now, if your team was going to be involved in custody,

---

Page 41

1     though, it would be important that you are aware that it
2     was part of a suicide attempt, correct?
3  A. **It would be important that the team, the custody team to**
4     **include the sergeant, lieutenant and potentially the**
5     **captain be aware of that. Not specifically me, but the**
6     **team that is going to be overseeing this inmate.**
7  Q. Now, were you aware that in 2017 that there were no
8     suicides at CMC in 2017?
9  A. **I think -- I don't remember being aware of that fact and**
10    **that's good news.**
11 Q. Are you aware that there were no suicides in 2019 at CMC?
12 A. **I don't remember that figure, no.**
13 Q. Do you possess any evidence to suggest that there were
14    suicides in 2017?
15 A. **No.**
16 Q. Do you have any evidence that shows that there were
17    suicides in 2019?
18 A. **No.**
19 Q. And are you aware that Mr. Touloudjian was the only
20    suicide at CMC in 2018?
21 A. **No.**
22 Q. Do you have any evidence to say there were other suicides
23    at CMC in 2018?
24 A. **No, personally, I do not, no.**
25 Q. Now, whose responsibility was it from the custody side to

---

11 (Pages 38 to 41)

American Reporting, Inc.
248-559-6750

Josie Gastelo                                                    Touloudjian v. Gastelo

## Page 42

1  make sure that Mr. Touloudjian was safe given his
2  condition when he came to CMC?
3  A.  Safe in regards to the cell that he was going to be housed
4      in?
5  Q.  Correct.
6  A.  Correct?  Is that what you're asking me?
7  Q.  Yes.
8  A.  That would be custody.  What they do is they go and
9      inspect each cell, you know, when they have somebody
10     transfer out and when they have somebody transfer in to
11     make sure there's no hidden weapons, anything like that
12     that could be -- that the inmate can use to injure other
13     staff, inmates or himself.  So they would be responsible
14     for ensuring that that cell is safe and inspected.
15 Q.  And whose responsibility would it have been to make sure
16     that potentially dangerous objects were not given to the
17     prisoner in his cell?
18 A.  Were not given to the prisoner?
19 Q.  Correct.
20 A.  Well, it would be the officer.  We are not sitting on the
21     inmate 24/7 and CMC has single-cell cells so it's only one
22     inmate per cell and they do have open cell time where
23     other inmates go in there and visit with them or they are
24     on the tier, so in regards to -- and the staff member
25     doesn't check their cells every day to make sure there are

## Page 43

1  no weapons or anything.
2      They do random cell searches, but not every cell if
3  looked at every day.  So it's the responsibility of the
4  custody staff to do their required cell checks.  They have
5  a certain number per week, per day, per month that they
6  have to check to make sure that the cell is safe without
7  any contraband, to include weapons, to include weapons
8  stock, to include an inappropriate hot pot, like that, but
9  they don't check every day.  So they are responsible for
10 checking periodically and when a cell is emptied of an
11 inmate and he has vacated that cell and when a new inmate
12 comes into that cell.
13 Q.  And what about with respect to suicidal inmates?
14 A.  So that, I can't specifically speak to.  I am not too
15     familiar with the policy, but it should be in their post
16     orders what they are supposed to be doing.  Now, they
17     have -- the post orders should indicate -- I'm trying to
18     think -- should indicate what their minimum issuance is,
19     but I'm sure it indicates that the inmate is under the
20     care of the clinician and whatever the clinician is
21     requesting is what the staff members should be
22     accommodating.
23 Q.  If there is a disagreement amongst the medical staff and
24     the custody staff with regards to services provided to a
25     particular inmate, how are those disagreements resolved?

## Page 44

1  A.  It would be resolved by getting -- so every -- let me give
2      you a little bit of history and I might be off, but from
3      what I can recall, this was a few years now, they have
4      group meetings every morning and it includes the officer
5      who is on duty for that day and they discuss what --
6      anything going on that the clinician has questions with or
7      the custody officer has questions with.  If there is a
8      disagreement in that little group, then it goes to the
9      supervisor.  They sit together and they discuss it and it
10     would normally be resolved by either the sergeant or the
11     lieutenant.
12     Custody staff are very -- because we have been a
13     mental health institution for several, several years, even
14     before they had mental health, this Coleman thing, they
15     are able to deal really well with the clinicians.  They
16     work very well together.  So it would be very rare that an
17     officer would tell a clinician, no, that's not what you've
18     got to do or, no, I don't think this should be done with
19     an inmate or I don't think he needs -- that is extremely
20     rare.  I've never heard of that in my career that they've
21     had such a disagreement.
22     The custody staff usually follows everything that the
23     clinician is telling the officer that the inmate needs.
24     So if it did happen, it would be taken up to the
25     supervisory level on both the healthcare side, mental

## Page 45

1  health side, and the custody side and would get resolved
2  either with the sergeant or lieutenant and if it couldn't
3  be done that way, we would take away the officer and
4  probably put him in another area and put another officer
5  in there, but I've never -- I've never seen that done
6  before.
7  Q.  Now, the policies and procedures used by -- the
8      interfacing between the medical staff and the custody
9      staff, did you have anything to do with the development of
10     those policies and procedures?
11 A.  I'm sorry.  Can you repeat the question?  You faded out a
12     little bit.
13 Q.  The policies and procedures concerning how the medical
14     staff and the custody staff interact, would those be
15     policies and procedures that you had a role in developing?
16 A.  So if it includes the -- as far as I know, there wouldn't
17     be really any procedure to involve both sides.  The
18     custody staff would have their own which would say, you
19     know, under the direction of the clinician or by the
20     guidance of the clinician.  The healthcare side, I cannot
21     speak to that.  I am not the person -- I am not
22     responsible whatsoever with any of their policies and
23     procedures unless something occurred and they include
24     custody which I cannot remember that ever happening.  They
25     have their own set of policies and procedures, custody has

12  (Pages  42  to  45)

Josie Gastelo

Touloudjian v. Gastelo

---

Page 46

1   their own set of policies and procedures and I oversee
2   custody.
3   Q.  I understand, but I just asked when there's interactions,
4       did you have anything to do with developing the policies
5       of how these interactions took place?
6   A.  No.
7   Q.  Who did?
8   A.  It's the post orders.  There are no -- as far as I know on
9       the custody side, there are no policies and procedures
10      saying how you're going to interact with each other.  It's
11      just going to be this is what your job is to do, this is
12      what your job is to do.
13  Q.  Now, is it unusual for the CMC to seek involuntary
14      treatment of a prisoner?
15          MS. ARBITER:  Calls for speculation.
16          THE WITNESS:  No, I'm not aware of when they do that.
17      I don't have to be told when they are seeking involuntary
18      treatment of an inmate.
19  Q.  (By Mr. Altman)  Who from the management on the custody
20      side would be aware of it?
21          MS. ARBITER:  That's a vague and ambiguous question.
22      You can answer if you know.
23          THE WITNESS:  I'm trying to think of a situation that
24      I know that that would've happened.  The only thing I am
25      aware of in regards to involuntary treatment is in a

Page 47

1   committee setting, meaning that the inmate doesn't want to
2   take a shot, you know, and the clinician really needs him
3   to take a shot, I think it's called Kehia, I'm not real
4   sure, and it would go to a committee which would normally
5   include the chief deputy warden and the clinician and the
6   counselor to discuss the case and I am not sure that this
7   happened with this situation.  This is just one that I
8   recall a long time ago, so it would at that point have
9   been either the associate warden or the chief deputy or
10  the warden.
11      COURT REPORTER:  You said it goes to the Kehia or
12  something.  I missed what you said.
13      THE WITNESS:  No, the classification action is I
14  think it's Kehia, K-e -- I can't remember how you spell
15  it, but I believe it's Kehia where there is a clinician
16  involved.
17      COURT REPORTER:  Thank you.
18  Q.  (By Mr. Altman)  Now, were there any kind of daily reports
19      that were created by the custody team?
20  A.  They do a daily activity report.
21  Q.  Is that something that you would see?
22  A.  Yes.
23  Q.  And so if there was anything about Touloudjian in the
24      daily activity reports, that would have come across your
25      desk, right?

---

Page 48

1   A.  Yes, and I will just caveat and say sometimes I don't see
2       it on that particular day.  The days can go on, I get
3       busy, but my chief deputy would normally review them every
4       day and if anything major would come up he would say, hey,
5       you need to look at this, this and this was going on, but
6       I do not recall if they put -- they might put suicide
7       information in there, but they will not -- it won't have
8       the name of the inmate.  It will be just we had an inmate
9       suicide at such and such time.  It was reported to
10      headquarters and that's pretty much it from what I recall.
11      They might have changed it.
12  Q.  Now, did you get reports from the chief medical executive?
13  A.  Official reports, written reports?
14  Q.  Yes.
15  A.  No.  The only thing was, like I said before, that suicide
16      report, we would get a copy and we would go to the
17      committee that they have to discuss that and that is the
18      only report.  All the other reports -- oh, and we would
19      get a monthly report.  Like I said, I attend -- either me
20      or my chief deputy or the associate warden would attend
21      the monthly healthcare meetings, QMC meetings, I think
22      they are called, and there would be a report, the notes,
23      the previous minutes from the prior meeting and that's it.
24          And the meeting was to discuss everything, not
25      just -- this meeting that we have once a month was to

Page 49

1   discuss every department in healthcare, dental, medical,
2   transportation, emergency response, all of that.  All of
3   that was included in that monthly meeting.
4   Q.  In your role as warden, was this a hands-on kind of role?
5       Was this the kind of thing where you were interacting with
6       lots of people?
7   A.  It's a hands-on role when time permits.  So there were
8       some weeks when I was -- had meetings every day, all week.
9       There were some weeks when I didn't have as much meetings
10      so I would try to get out there as much as possible.  So
11      it's a pretty big institution, 1800 employees.  It's
12      really difficult to get out there every day, but I would
13      try to get out at least and do rounds at least two, three
14      times a month, but it was difficult to find time after
15      that, after those times, depending on how busy my schedule
16      was.
17  Q.  What were you typically dealing with on a day-to-day
18      basis?
19  A.  Every day was a different day.  There was not a normal
20      schedule.  You know, I have scheduled meetings that are
21      scheduled, you know, every third day of the month, every
22      10th day of the month, regular meetings, headquarters
23      meetings.  There's Inmate Family Council meetings, the
24      Men's Advisory Committee meetings.  There are meetings
25      with outside entities.  There is meetings on employees who

---

13  (Pages  46  to  49)

Josie Gastelo                                                                    Touloudjian v. Gastelo

---

Page 50

1  we are doing adverse action on.  There is meetings, human
2  resources meetings in regards to return to work, hirings,
3  firings, laterals.
4        There is meetings on litigation.  There is meetings
5  on union meetings.  We have 20 unions that are represented
6  there.  So there's union meetings.  It goes on and on.
7  There is a multitude of meetings that take up your day.
8  Q.  Now, the 1800 employees that you said, is that just in
9  custody or is that total employees at the prison?
10 A.  No, I believe when I left in 2020 it was both, it was
11 healthcare and custody.
12 Q.  Approximately how many employees were there in custody?
13 A.  I'd say it's about even, maybe 900 and 900 on each side.
14 I don't remember the specific numbers.
15 Q.  And on the custody side in terms of management, was there
16 more than one deputy warden, more than one assistant
17 warden or was there just one?
18 A.  So in the management team there is one warden, one chief
19 deputy warden.  There is five associate wardens and I
20 think there is seven if I remember correctly seven
21 captains and those are all management and then the
22 lieutenants and the sergeants are supervisory and I don't
23 remember the number of those and then, of course, the
24 officers plus all the other non-custody staff that are
25 there, so cooks, Prison Industry Authority, secretaries,

---

Page 51

1  supervisors in personnel, records, plant operations,
2  maintenance people, landscaping people.  There's a lot.
3  Q.  Now, do all of those people fall under your umbrella?
4  A.  Yes.  Anything that is non-healthcare falls under my
5  umbrella.  When I say non-healthcare, I meant non-dental
6  and non-mental health, as well.  CCHCS, I don't have
7  anything, they don't fall under my umbrella.
8  Q.  During the time that you were warden, what did you do to
9  try to ensure that prisoners were receiving proper mental
10 health treatments?
11 A.  So I relied a lot on my management team to let me
12 know -- well, once a week I would meet with -- staff have
13 training.  It's called in-service training.  They have
14 their specific weeks.  They have to do a week and a half
15 of mandated training every year.  So every week on one day
16 I would go and talk to the staff where they are doing
17 their training for that particular week and just say, hey,
18 here is what's going on at the institution.  How can I
19 help you?  What's going on?  What do you need?  Things
20 like that and I would get feedback, a lot of feedback,
21 hey, we need this, we need that and so some of it would be
22 medical staff, dental staff, mental health staff because
23 they are all together getting the training on some topics.
24 They would let me know, too.
25       So if I were ever informed of something that they

---

Page 52

1  requested from the CCHCS side, I would share that with the
2  CEO Teresa Macias and if she needed assistance, I would
3  help her with that, but other than that, that's when I got
4  to really, you know, have some good discussion with staff,
5  but my supervisors are the ones that I rely on to pass
6  that information along to me.
7        I can't know everything, and so when we would
8  have -- we would have every other week meetings with the
9  management team.  We would talk about anything that came
10 up, anything going on.  We would just discuss a lot of
11 things in there.  If there was something that they needed
12 that I could fix, I would fix it.  They would share a lot
13 of information what the staff needed.
14       So I just ensured that my management team that we
15 have to equip our staff with the tools that they need to
16 do the job.  So if we are not doing that, you need to talk
17 to them and find out what they need.
18       Anything like that that would come about, if I knew
19 something was going on wrong, if there was a safety issue,
20 I would definitely deal with that.  That's very
21 high-priority.  A security issue is extremely high
22 priority.  Oh, there is a hole in our fence.  We need to
23 get that fixed right away.  So things that I became aware
24 of -- and let me tell you, I know I don't become aware of
25 a lot of things.  My managers fix things before they get

---

Page 53

1  to me, which I really appreciate, but let me know you
2  fixed it before I find out about it.
3        So that's how I tried to deal with the time that I
4  was the warden.  I worked for the staff, so I need to make
5  sure -- and with that being said, I worked for the inmate
6  population.  I would meet with them every -- I think it's
7  every two months.  It's called the Men's Advisory
8  Committee and if there was something going on, they have a
9  rep each area, if there was something going on they would
10 be honest with me and they say, hey, you know, we are not
11 getting this and we are supposed to be getting it.  Okay.
12 I'll look into that and then it would get corrected.
13       So they actually, the Men's Advisory Committee, had
14 to -- not had to, but when I was being vetted, they had a
15 discussion with them to see what kind of warden I was and
16 so I work for a lot of people and I try to do the best
17 thing I could for what they needed and tried to assist in
18 any way I could.
19       Sorry.  I didn't mean to ramble.
20 Q.  That's okay.  What do you remember about your reaction to
21 learning that Mr. Touloudjian had committed suicide?
22 A.  When they told me the way he had committed suicide, I
23 was -- it really stuck in my head because I can't imagine
24 what he would -- I can't imagine what he went through and
25 allowed himself to go through and how bad he must've been

---

                                        14  (Pages 50 to 53)

Josie Gastelo                                                          Touloudjian v. Gastelo

---

Page 54

1    thinking to do it that way.  That was the first time I've
2    ever heard of anybody doing it that way.
3    Q.   Did it cause you concern that these materials were given
4         to him while he was on suicide watch?
5    A.   No --
6              MS. ARBITER:  Calls for speculation.
7              She doesn't know what materials were given to him.
8              THE WITNESS:  That's what I was going to say.
9    Q.   (By Mr. Altman)  Okay.  You understand that he used food
10        packaging to choke himself, correct?  He just used food
11        packaging?
12   A.   I know that because of the complaint, but I didn't know
13        that at the time when I first heard about it.
14   Q.   Well, you just talked about the way in which he committed
15        suicide, so --
16   A.   Right.  I thought -- I thought he had stuffed his T-shirt
17        originally down his throat and then I'm sure once I read
18        the incident package and I don't recall reading the
19        incident package, but if that was in there, then I would
20        have known about it at that time.
21   Q.   And so you would have read the incident package, correct?
22   A.   I should have -- yeah, I should have read the incident
23        package after that time period.  Either I or my chief
24        deputy would have read the incident package because we
25        split up the incident packages in reviewing them, so I

---

Page 55

1    don't know if it fell on my desk or his desk.
2    Q.   Well, in any event, at the time you thought he had choked
3         himself on his T-shirt.
4    A.   Yes.
5    Q.   Did that cause you any concerns that there may be a hole
6         in the security plan for suicidal inmates?
7    A.   No.  I don't specifically recall that I became concerned
8         about that and if I would, I don't recall, but I would
9         have spoken to the CEO about it and I don't recall having
10        that conversation.
11   Q.   But I think you said, and I just want to be clear, that at
12        the time you had not heard of another prisoner choking
13        themselves with their T-shirt, correct?
14   A.   Choking themselves, I mean, tying it around their neck,
15        yes, but digesting it and trying to put it into his mouth,
16        no, I have not heard about that.  It was very unique to
17        me.
18   Q.   So I think I also heard you say you really didn't do
19        anything in response to that, to learning of that?
20             MS. ARBITER:  Misstates the testimony.
21             MR. ALTMAN:  Strike that.
22   Q.   (By Mr. Altman)  I'll ask it this way.  What did you do
23        when you learned at the time that Mr. Touloudjian had
24        choked himself with a T-shirt -- I mean, by swallowing it?
25   A.   I don't remember doing anything other than thinking that

---

Page 56

1    was a very rough way to commit suicide.
2    Q.   Did it cause you any concerns that maybe the person needed
3         to rethink clothing given to suicidal prisoners?
4    A.   No.
5    Q.   Why not?
6    A.   Because I just didn't think about that.  It's really sad
7         to say, but it's just really -- it's hard to stop someone
8         from committing suicide because they will find some way to
9         do it and to me this kind of shows it clearly, that, you
10        know, he was going to do it whatever we gave him and it's
11        unfortunate, but it's -- I don't see any preventable way
12        of that.
13   Q.   Now, you could've implemented a policy that said that any
14        prisoner that came to your facility who had attempted
15        suicide that you be told about that, correct?
16   A.   I could have made a policy for that and a lot of other
17        things that what-ifs --
18   Q.   I'm not asking about any other policies.  I'm asking
19        specifically if you wanted to, you could have created a
20        policy that said if an inmate comes to my prison who has
21        recently attempted suicide, I want to know about that,
22        right?
23   A.   Yes, but that would be stepping -- see, the CEO and myself
24        are equal, so I would confer with her before I make that
25        decision and make a policy like that.  I would not put a

---

Page 57

1    policy at play like that without conferring with the CEO
2    and having had that discussion, I don't -- I would have
3    run it through her and told her -- I probably could've
4    told her, hey, you know, I want to know about this, but it
5    would've been a lot of contact going on in regards
6    to -- just the dynamics of our institution, there are a
7    lot of attempted suicides and a lot of -- so much that
8    when we were reporting it to headquarters, they said,
9    well, you guys have a few a day because every cut would be
10   a suicide attempt.
11        So they had us run it through the clinicians before
12   we reported it to headquarters, any suicide attempt.  So
13   it would -- it's a big problem there.  It's a big issue
14   and concern on all the suicide attempts, but the
15   clinicians are doing a good job in regards to handling
16   that population.
17   Q.   And as we talked about earlier, there was only one
18        completed suicide in three years, correct?
19             MS. ARBITER:  Calls for speculation and we don't know
20             that that's true.
21   Q.   (By Mr. Altman)  You can answer.
22   A.   I don't know.  As I said before, I don't know the specific
23        numbers for each year.
24   Q.   You said earlier you had no evidence to refute that there
25        were no suicides in 2017.  Do you remember that?

15  (Pages  54  to  57)

Josie Gastelo                                                        Touloudjian v. Gastelo

---

Page 58

1   A.   Yes.  I don't personally have any evidence of that.
2   Q.   Wouldn't it be important for you to know that?
3   A.   No, I have -- there is a super-fit coordinator, which is
4        the clinician who is responsible for suicide.  If I needed
5        to have that information and we do report that information
6        once a year in a meeting that we have with our management
7        at headquarters, so I know that information for that
8        specific meeting, but as far as recalling it five or six
9        years later, I don't have that in my head to recall.  So
10       I'm sure the information is available through the
11       super-fit coordinator who works for mental health, but I
12       don't have that personally.
13  Q.   At the time that Mr. Touloudjian was in your prison, do
14       you know if there were other prisoners under suicide
15       watch?
16  A.   No, I do not.
17  Q.   Is it a rare event for prisoners to be under suicide watch
18       at your prison, at the prison at the time you were there?
19  A.   No, it's not rare.  Suicide watch for suicide precaution,
20       it's not rare.
21  Q.   Is there a difference between those two?
22  A.   There is, but I couldn't explain -- I don't know
23       specifically what the difference is, but I know there are
24       two forms of suicide precautions or suicide watch.
25  Q.   When I asked you if you could have created a policy to be

---

Page 59

1        informed of suicidal prisoners coming into your prison and
2        you said that you would confer with the chief medical
3        officer, you never did that, though?
4   A.   No, the chief executive officer.  They are two different
5        things.
6   Q.   Chief executive officer.
7   A.   Yeah, CEO.
8   Q.   The CEO.  You never did that, though, right?
9   A.   No, I did not, that I recall.
10  Q.   So was suicide a big problem in the CMC during the time
11       you were warden?
12  A.   It depends on every given year as far as how many suicides
13       we had during that year, so we were a mental health
14       institution, so with that came, unfortunately, inmates who
15       had attempted before or attempted at our institution or
16       carried it out.  So that's to be expected in a mental
17       health institution.  That's pretty much what we are known
18       for as being a large mental health institution or what we
19       were known for back then because there are newer
20       institutions that are mental health, but that 50-bed
21       building that was built was one of the first or second
22       ones that were built to accommodate the mental health
23       population.
24  Q.   You said there were about 50 beds in that facility?
25  A.   Yes.

---

Page 60

1   Q.   When you say known for mental health issues, do you mean
2        the CMC generally or just that you had a small portion of
3        the CMC that was designed to manage mentally ill patients?
4   A.   Just a portion of CMC which had been handling mental
5        health patients 20 years ago.  They had a specific yard
6        with specific housing.  Part of that housing was for
7        mental health inmates.  So they had it long before I ever
8        got there and then they built a 50-bed.  I think I got
9        there and it was almost completed and so they were known
10       for not having the problem of hiring clinicians because
11       they liked to live in that area, so we had no problem
12       hiring clinicians like some other institutions did.  So we
13       had a -- as far as I know, we still have a very good
14       mental health unit.
15  Q.   But the rest of the institution outside of that 50 beds
16       was just regular inmates; is that what you're saying?
17  A.   No.  There are some what they call Triple CMS inmates
18       which is -- and I am not specific how they categorize them
19       or how they diagnose them to be either mental health
20       inmates or a step-down, which is called a Triple CMS,
21       which is Clinical Correctional Case Management System,
22       which means they don't have to see their clinician every
23       day or every week and I'm not sure of exactly all of this.
24       I'm just giving you a really broad overlook of this and
25       they can see them once a month and they are housed pretty

---

Page 61

1        much in Facility D and so they just are not at that level
2        where they need -- I don't know what you would call it.
3        More intense mental health treatment, and then the rest of
4        the institution is called general population except for
5        half of one yard, which is the Administrative Segregation
6        Unit and then we have our fire camp which are our
7        firefighters.
8   Q.   Fire what?
9   A.   Firefighters, inmate firefighters.
10  Q.   You said the fire something.  I couldn't understand what
11       the word --
12  A.   Fire camp.  Fire camp.
13            MR. ALTMAN:  Let's go off the record for a few
14       minutes.  Let's come back at 10 to 2, 10 to 12 your time.
15            (Brief recess, 2:42 p.m. to 2:51 p.m.)
16            MR. ALTMAN:  Right.  I am going to mark exhibit.  I
17       will mark as Exhibit Number 1.
18            Nick, would you share your screen, please?
19            Just go all the way to the top, Nick.
20            MR. KYLE:  Okay.
21            MR. ALTMAN:  Are you at the top?
22            MR. KYLE:  I am at the top of the document, yes.
23            MR. ALTMAN:  Okay.  I am going to mark as Exhibit 1 a
24       document with the Bates number of AGO 001589 through 1676.
25  ///

---

16  (Pages  58  to  61)

Josie Gastelo                                                                Touloudjian v. Gastelo

---

Page 62

1      (Whereupon Deposition Exhibit Number 1 was marked for
2      identification.)
3  Q.  (By Mr. Altman)  And I am going to ask you, Warden, does
4      this appear to be an incident report package?  And we will
5      scroll down a little bit through it in a second, but is
6      that what this generally looks like to be?
7  A.  Yes.
8      MR. ALTMAN:  Okay.  I can't really read this, but,
9      Nick, would you scroll down to the next page?  Before you
10     go, this document is dated -- what's the date, Nick?
11     MR. KYLE:  It appears to be 2-26-2018, Keith.
12     MR. ALTMAN:  Okay.  And would you scroll -- I just
13     want to look and see that the subject of this report is
14     Alexandre Touloudjian.
15 Q.  (By Mr. Altman)  Do you see that, Ms. Gastelo?
16 A.  Yes.
17 Q.  Does this appear to be the incident package for
18     Mr. Touloudjian?
19 A.  Yes, it appears to be the attempted suicide incident
20     package.
21 Q.  But you realize he died a few days after?
22 A.  Yes.
23 Q.  You know, he died a few days afterwards.  You know, this
24     is done in February, he was already deceased, correct?
25 A.  I don't -- what day did he die?  I'm sorry.

---

Page 63

1  Q.  I believe it was January the 24th.
2  A.  Okay.  So yes, he apparently -- based on your information,
3      he died on the 24th and the date of this packet is the
4      26th.
5      MS. ARBITER:  Actually, Counsel, I believe he died,
6      they declared him dead on the 27th or the 28th.
7  Q.  (By Mr. Altman)  Okay.  Nevertheless, that's several weeks
8      before this package, correct?
9  A.  I thought it was 2-26.
10 Q.  Right --
11 A.  Oh, he died on January -- okay, yes.
12 Q.  About 30 days afterwards, correct?
13 A.  Yes, that's what the packet in front of me looks like it's
14     dated, yes.
15 Q.  Perfect.  And according to your testimony, you would have
16     reviewed this package at --
17 A.  It would have been -- I'm sorry.  I don't mean to
18     interrupt you.  Go ahead.
19 Q.  You would have reviewed this package sometime after its
20     creation, correct?
21     MS. ARBITER:  Objection --
22     THE WITNESS:  Yeah, either me or my chief deputy
23     warden would have reviewed it.
24 Q.  (By Mr. Altman)  All right.  You said -- well, you must
25     have reviewed it because you said earlier that you were

---

Page 64

1      kind of surprised or taken aback by the fact that he had
2      used his T-shirt to choke himself by ingesting it?
3  A.  I said I assumed he had used his T-shirt.  I said that's
4      what I thought he had done.  So --
5  Q.  If you didn't have any direct knowledge at the time, how
6      did you have the knowledge that he used his T-shirt?
7  A.  No, I didn't -- I said I assumed.  The only thing I could
8      think of was that -- because I heard he had choked
9      himself, the only thing I could think of is he
10     had -- and they did say he had stuffed stuff down his
11     throat, so the only thing I assumed was that he had used a
12     T-shirt.  It could have been a sock, but at that time I
13     assumed T-shirt.  So I do not recall seeing this incident
14     package and it could have been because my chief deputy
15     warden would have seen it or I would have seen it.  We
16     split the two incident packages, so -- we split -- how
17     should I say it, you know, reviewing them.  We split the
18     responsibility reviewing them.
19 Q.  I understand.  But my point is, is that you can't say one
20     way or the other whether you reviewed this packet or not,
21     correct?
22 A.  Correct.
23     MR. ALTMAN:  Nick, would you go down to where it
24     talked about what was, you know, removed from his throat?
25     MR. KYLE:  Sure.

---

Page 65

1      Keith, the narrative starts on AGO 001603 and
2      continues onto the following page.
3  Q.  (By Mr. Altman)  Warden, are you able to read that text?
4  A.  Yes.
5  Q.  Okay.  Would you read through this text and then let us
6      know when you need us to go to the next page?
7  A.  Okay.
8      Okay.  You can go to the next page.
9      Okay.  I'm done.
10 Q.  Warden, you would agree that the item that was taken out
11     of his throat was bread wrapped in cellophane, correct?
12 A.  According to this report, yes.
13     MR. ALTMAN:  Nick, would you scroll down to the next
14     page?
15 Q.  (By Mr. Altman)  It's a terrible picture, but I think you
16     can generally see that you would agree this appears to be
17     a picture of a cellophane-type substance.  Is that a fair
18     characterization?
19 A.  Yeah.  It looks like whatever it is it's wrapped in
20     plastic or cellophane, whatever, it looks like.
21 Q.  Now, is it your testimony that before today you had no
22     idea that the item used to choke himself was bread wrapped
23     in cellophane?
24 A.  Well, as I mentioned before, I did see the incident
25     package.  My attorney sent it to me and I reviewed that

---

17  (Pages 62 to 65)

Josie Gastelo                                              Touloudjian v. Gastelo

---

Page 66

1   and I think it mentions in there -- I think I read the
2   same one, unless they did one when he actually committed
3   suicide and it said the bread. So that's when I know it
4   was food or remembered that it was food. I don't know if
5   I knew back then. I can't remember, but I remembered
6   again if I did that it was this by reading the incident
7   package.
8   Q.  Okay. When did your attorney send you that document?
9   A.  It would have been a week ago and, as I said, I also read
10  the complaint and I don't remember if this is in the
11  complaint.
12  Q.  I understand.
13  A.  So it's either one, the complaint or the incident package
14  that made me remember or I remembered again.
15  Q.  And you would defer to this report, correct?
16  A.  In regards to?
17  Q.  The item that was removed from his throat.
18  A.  Right. Yes, if that's in this incident package, yes, I
19  would defer to the incident package once it was all -- I
20  don't know -- yeah, I would defer to that.
21  Q.  And you don't have any evidence as you sit here right now
22  that this is not the evidence package for Mr. Touloudjian?
23  A.  I personally have no evidence that it is not or is. I
24  don't have any personal information.
25  Q.  Does this look like an incident package?

---

Page 67

1   A.  Yes, it looks like an incident package.
2   Q.  And it says Alexandre Touloudjian?
3   A.  Yes.
4   Q.  If somebody at the CMC would have handed this to you,
5   would you presume this was the incident package for
6   Alexandre Touloudjian?
7   A.  It depends who would have handed it to me.
8   Q.  Okay, what would it depend on?
9   A.  It depends on who would have handed it to me because
10  inmates can -- you know, I received tons of email from
11  inmates with copies of packets, copies of things that are
12  not --
13  Q.  Okay, fair enough, but if a -- somebody --
14      MR. ALTMAN: Nick, take that down, please.
15  Q.  (By Mr. Altman) If somebody from management or an
16  appropriate level of the CMC handed this to you and said
17  this was the report, you'd take their word for it, right?
18  A.  Yes.
19      MS. ARBITER: I'd like to just point out something
20  for the record. This picture says bread rolled up in a
21  plastic bag. I just want to clarify that because other
22  documents say cellophane.
23      MR. ALTMAN: Okay. It is what it is.
24  Q.  (By Mr. Altman) But you don't dispute that this appears
25  to be some kind of plastic with something inside, correct?

---

Page 68

1   A.  Correct.
2   Q.  Now, should an inmate who is on suicide watch have been
3   given plastic as far as you know?
4   A.  Unless the mental health clinician gave clear direction to
5   not provide plastic, plastic bags, anything plastic to the
6   inmate, the staff member is going to give them their food
7   tray the way it is delivered because the inmates do not
8   like us touching their food. So the tray is being
9   delivered the way it is set up and now if the clinician
10  gave the direction no plastic and it was known to this
11  officer, the officer should not have given him this under
12  those clear restrictions.
13  Q.  As you sit here right now, do you know if those were the
14  restrictions?
15  A.  I do not.
16  Q.  I'd like you to assume that the evidence will show that
17  those were the restrictions. What would've happened to an
18  officer who failed to abide with those restrictions?
19      MS. ARBITER: Calls for speculation.
20  Q.  (By Mr. Altman) You can answer.
21  A.  There is preventive measures -- I'm sorry, I lose -- I
22  forget the description of it, but there is -- for every
23  state employee there is progressive discipline, so if a
24  state employee does not follow policy and procedures,
25  depending on the severity of the violation, they are

---

Page 69

1   subject to progressive discipline.
2   Q.  Would you have been involved in that discipline?
3   A.  I would've been involved in the discipline --
4   Q.  Hold on. Bad question.
5       With respect to Mr. Touloudjian, would you have been
6   involved in that issuance of that discipline if it was
7   appropriate?
8   A.  Yes. He is a -- if the charge was made against or if the
9   violation was made against the custody individual, then
10  yes. If it were a healthcare individual, then no.
11  Q.  Did you take any action against any of the individuals
12  associated with Mr. Touloudjian?
13  A.  Not that I can recall.
14  Q.  This would be considered a serious lapse given that it led
15  to a death, correct?
16      MS. ARBITER: You are calling for a legal conclusion.
17      MR. ALTMAN: That's not a legal conclusion. She's
18  the one who used the word serious.
19  Q.  (By Mr. Altman) Let me just lay --
20      MS. ARBITER: You are assuming that there was a
21  violation.
22      MR. ALTMAN: I said assuming there was a violation.
23  Q.  (By Mr. Altman) I'll ask it this way. Warden, when you
24  were the warden, did you have an attorney sitting next to
25  you at all times?

American Reporting, Inc.
248-559-6750

Josie Gastelo                                                    Touloudjian v. Gastelo

---

Page  70

1   A.  No, but I had an attorney who I could pick up the phone
2        and call.
3   Q.  That's not what I asked you.  Did you have an attorney
4        sitting next to you at all times?
5   A.  No.
6   Q.  Did you have an attorney assist you in every single
7        decision that you made?
8   A.  No.
9   Q.  You use the word serious before.  What did you mean by the
10       word serious?
11  A.  I said if there was a serious violation, meaning --
12       serious could be a whole variety of things.  It doesn't
13       have to necessarily be a death.  So the whole process
14       of progressive discipline is it's computed at several
15       levels and there is a matrix in regards to the severity of
16       an incident and the potential related penalties, there is
17       a scope of it, what the penalties could be based on the
18       offense, based on the history, based on a lot of things.
19            It's very -- it's a very good matrix and so you would
20       start with an investigation and it would lead up through
21       all those levels, all the different phases that we have to
22       get to before a decision is made whether or not, first of
23       all, it's going to be found that the staff member did
24       violate policy and then if they did, at what level and
25       that's where we going to those different phases and the

---

Page  71

1        matrix.
2   Q.  As the warden, would you consider if this was a lapse by a
3        custody personnel, would you consider this kind of a lapse
4        to be a serious violation?
5   A.  I would have to wait to get all of the facts including
6        what exactly was in this package, who delivered it, were
7        there any mental health clinicians saying -- was there any
8        instruction.  There's a lot of things I would need to look
9        at.  I can't make a rush decision and just look at this
10       picture and say, yes, I am going to charge you with a
11       serious violation.  It doesn't happen that way.
12  Q.  Now, is all the information necessary for such an
13       assessment supposed to be part of the investigation
14       packet?
15  A.  So it's part of CMC custody investigation, not the CCHCS
16       suicide information, that meeting that we had at that
17       produces a report, but if it was related to that incident,
18       then we would use the report that CCHCS had to review as
19       part of the investigation that CMC CDCR did.
20  Q.  And as you sit here right now, do you know if any custody
21       investigation was conducted as a result of
22       Mr. Touloudjian's death?
23  A.  No, I do not.
24  Q.  Could one have taken place without you knowing it?
25  A.  I'm sorry.  Can you repeat the question?

---

Page  72

1   Q.  Could an investigation have taken place of this kind of an
2        incident without you knowing about it?
3   A.  No, unless I was on an extended period of time off.  Other
4        than that, no.  I am aware of every investigation in
5        regards to custody staff or let me say CDC RCMP staff,
6        non-CCHCS staff that is ongoing.  I have weekly updates or
7        not weekly, but probably monthly updates on that
8        information.
9   Q.  In the early part of the year of 2018, were you on an
10       extended leave?
11  A.  No.
12  Q.  So it would seem you would've been around during the time
13       that such an investigation was conducted, right?
14  A.  Yes.
15  Q.  Approximately how many of these investigations take place
16       per month, per year, whatever is convenient for you?
17       MS. ARBITER:  Vague and ambiguous as to the meaning
18       of -- what type of investigation.
19       MR. ALTMAN:  An investigation of custody for a lapse.
20  Q.  (By Mr. Altman)  Approximately how many of those
21       investigations take place a month?
22  A.  So without looking back, I've been gone, like I said, two
23       and half years, without looking back at that time period
24       and seeing records, I couldn't tell you.  Now, it's
25       just -- it varies.  Sometimes it's a lot.  Sometimes it's

---

Page  73

1        not, so I couldn't tell you even the approximate number.
2   Q.  Well, what's the range?  You said sometimes it varies.
3        Sometimes it's a lot.  What do you mean by a lot?
4   A.  Well, sometimes we can have -- I don't know, just
5        different numbers.  I mean, it's so varied and you're
6        talking specifically about lapses, you said, correct?
7   Q.  Correct.  And I'm also referring to not raised by a
8        prisoner, shall be say, because I'm sure there's lots of
9        those complaints.
10  A.  I would have -- I would venture to say -- I'm just going
11       to guess.  If you want an answer --
12       MS. ARBITER:  Don't guess.  I don't want you to
13       guess.
14  Q.  (By Mr. Altman)  I would like a guess, but --
15  A.  Okay, then I am not going to guess.
16  Q.  No, unless your attorney instructs you not to answer, I'd
17       like the guess you were going to give.
18  A.  Okay.  The answer I was going to give was it varies so
19       much, I just -- I wouldn't even know how to -- if I guess,
20       I'm not confident in even a guess.  That's why I am really
21       apprehensive to guess and you're talking -- they range
22       from borderline investigations to full-blown
23       investigations to not just lapses, I couldn't recall how
24       many lapses we had.  There are offense violations for a
25       whole gamut of things, so I can't -- you would have to

---

American Reporting, Inc.
248-559-6750

Josie Gastelo                                                                    Touloudjian v. Gastelo

---

Page 74

1    look at old information. I can't provide that. I don't
2    know what that number is.
3    Q.  Was it more than one a day?
4        MS. ARBITER: Move on, Counsel.
5        MR. ALTMAN: No, I am not moving on. It's --
6        MS. ARBITER: She provided her answer. It is
7    bordering on harassment. She said she doesn't know.
8        MR. ALTMAN: It is not harassment at all and you
9    suggesting that it's harassment totally violates the
10   rules. So if you want to object, you can object. If you
11   want to move for protective order, by all means, do so,
12   but this is not harassment for me to ask my questions.
13       MS. ARBITER: I made my objection, Counsel.
14   Q.  (By Mr. Altman) Was it more than one a day?
15   A.  Sometimes.
16   Q.  Was it more than 10 a day?
17   A.  Sometimes.
18   Q.  Was it more than a hundred a day?
19   A.  No.
20   Q.  Was it more than 50 a day?
21   A.  No.
22   Q.  Okay. How often was it more than 10 in a day?
23   A.  I don't remember. That's getting really specific. I
24       don't remember how many times. I don't remember.
25   Q.  How many people were there doing the investigations?

---

Page 75

1    A.  I have an investigative services unit of -- focused on
2        investigations was two to three staff.
3    Q.  Two to three staff.
4    A.  Uh-huh.
5    Q.  And were they ever so overloaded that they couldn't
6        conduct their investigation?
7    A.  Yes.
8    Q.  What would be done when that happens?
9    A.  They would do it on overtime.
10   Q.  Okay. Did you ever have to bring in additional personnel
11       to do it?
12   A.  Not that I recall.
13   Q.  Were they allowed to do unlimited overtime or were there
14       limits?
15   A.  Depending on the situation.
16   Q.  What would it depend on?
17   A.  How close they were running up against time frames. On
18       the urgency of the investigation. A lot of different --
19       the access to getting stuff done. Specifically, what they
20       were doing. There's a lot of -- there's a lot of
21       different things that they would have to consider.
22   Q.  Just to make sure I understand, to the best of your
23       recollection, no investigation was done from a custody
24       perspective for Mr. Touloudjian's incident, right?
25   A.  No. No investigation against staff that I recall, that I

---

Page 76

1    am responsible for, that I recall occurred.
2        MR. ALTMAN: Nick, you can stop sharing.
3    Q.  (By Mr. Altman) Now, for there to have been an
4        investigation in the first place, is that something that
5        you would have had to initiate?
6    A.  Me or my chief deputy.
7    Q.  Just so I understand, is a chief deputy -- are there
8        deputies under the chief deputy?
9    A.  Yeah. Remember I told you it's the warden, the chief
10       deputy warden. There are associate wardens, but they
11       don't have the authorization for that. It's just me and
12       the chief deputy.
13   Q.  Okay, but does the chief deputy -- I am just trying it
14       from a definition perspective. Who is under the chief
15       deputy?
16   A.  The associate wardens, five of them.
17   Q.  There are not deputy wardens that are under the chief
18       deputy? I'm just talking about the name, the phrase.
19   A.  No. There is one chief deputy and there is five associate
20       wardens who work for the chief deputy, but don't have
21       authorization to initiate investigations.
22   Q.  I understand that. And then the captain, do I have that
23       right?
24   A.  Correct.
25   Q.  How many captains were there?

---

Page 77

1    A.  I believe -- let me see, I believe there is five, between
2        five and seven. I don't remember the exact amount.
3    Q.  You would agree that if there was some potential lapse of
4        the custody staff, there should have been an
5        investigation, right?
6    A.  If an allegation was made that there was a lapse in a
7        custody individual not following policy and procedure,
8        then that would be reviewed first by the -- in this case,
9        it would be the lieutenant or the captain to make the
10       recommendation to myself or the chief deputy or via the
11       chief deputy to me that they would like an investigation
12       on this and so we would -- they would submit me a memo, to
13       either the chief deputy or I. It would go to him and then
14       it would come to me and then -- indicating some of the
15       circumstances and then at that point we would decide
16       whether to initiate one or not.
17   Q.  Now, if you or your chief deputy reviewed this
18       investigation packet, could one of the two of you have
19       decided to initiate an investigation or does it always go
20       through the lieutenant or captain first?
21   A.  No, the chief or myself could take it upon ourselves to
22       make the decision to initiate an investigation.
23   Q.  Does there have to be a complaint by an inmate in order
24       for that to happen?
25   A.  No.

---

20  (Pages  74  to  77)

Josie Gastelo                                          Touloudjian v. Gastelo

Page  78

1   Q.  How often did you or the chief deputy initiate
2       investigations?
3   A.  Over what period of time?  I couldn't tell you.
4   Q.  Around 2018, how many times a month did you or the deputy,
5       chief deputy initiate an investigation?
6           MS. ARBITER:  I'm going to say this is, again,
7       speculative.
8           MR. ALTMAN:  How as it speculative?  How many times
9       did you initiate an investigation?  How is that
10      speculative?
11          MS. ARBITER:  Counsel, this is in 2018, that's five
12      years ago, Ms. Gastelo is no longer the warden and she
13      probably would need to have records in front of her to
14      provide that information to you.
15          MR. ALTMAN:  That's not speculative.  She can say she
16      doesn't know.  That is not speculation.
17  Q.  (By Mr. Altman)  You can answer.
18  A.  I don't know.
19          MS. ARBITER:  It is speculation because you are
20      asking her to make a recollection that she can't figure
21      out.
22          MR. ALTMAN:  Well, that's not speculation.
23  Q.  (By Mr. Altman)  I'm sorry, Warden.  What did you say?
24  A.  I said I don't know.
25  Q.  Was it more than one a month?

Page  79

1   A.  I don't know.
2   Q.  Was it more than 10 a month?
3   A.  I don't know.
4   Q.  Was it more than a hundred a month?
5   A.  I don't remember ever going past a hundred.  That's a huge
6       number.
7   Q.  Okay.  Was it ever more than 50 in a month?
8   A.  I don't know.
9   Q.  You might have done 50 investigation requests in a month?
10  A.  We could have.  I don't recall.  I don't know.
11  A.  Three a day or so.  Okay.
12          As the warden, why was it important for you to
13      conduct investigations?
14  A.  To ensure staff were following policies and procedures and
15      when there is a complaint against a staff member or some
16      evidence that they may not be following policies and
17      procedures, we need to check on all of them to make sure
18      that they -- we, first of all, provide them training, if
19      that's what is needed, if that's the reason they they
20      know, failed to do something and then continue from there
21      or if it's something that rises to the level that, you
22      know, they did do -- we do have evidence that they
23      violated policy.  We need to give them progressive
24      discipline so that they learn from that.
25  Q.  Now, when an inmate can't speak for themselves, who speaks

Page  80

1       on their behalf in an investigation process?
2   A.  So if an inmate is accusing -- let's say, okay, we deal
3       with staff complaints.  A staff complaint is when an
4       inmate makes a complaint against a staff member, a staff
5       did something wrong and it affected them personally.  So
6       if the inmate, let's say, has transferred to another
7       institution, we would still -- based on the information
8       that the inmate places in his complaint, he would
9       list -- we ask them to list any witnesses.  They will list
10      maybe staff and inmates.
11          So first we would interview the inmate to make sure
12      everything in his complaints is there.  We don't want to
13      add anymore.  So then if the inmate transfers before we
14      can do the investigation, we will interview the inmates
15      that he pointed out as witnesses in his complaint.  So
16      then we would interview them, take their statement as well
17      as the staff members that maybe he put down there as his
18      witness.  So many times it's another inmate that will
19      speak for that inmate, if he can't and that's as far as we
20      go.
21  Q.  As you sit here right now, at the time of
22      Mr. Touloudjian's death, is there anything that you would
23      do differently today?
24  A.  No, I don't believe there is anything I would've done
25      differently.

Page  81

1           MR. ALTMAN:  Let's go off the record until 3:30,
2       unless anyone needs longer.  Thank you.
3           THE WITNESS:  3:30 or 12:30?
4           MS. ARBITER:  It's 12:30 our time.
5           THE WITNESS:  Oh, okay.  So he's on a different time.
6       I didn't know he was on a different time.  Okay.
7           (Brief recess, 3:24 p.m. to 3:30 p.m.)
8           MR. ALTMAN:  Thank you, Warden.  I have no further
9       questions at this time.  I don't know if sister counsel
10      has some questions for you, but I'll leave that to her.
11          THE WITNESS:  Okay.  Thank you.
12          MS. ARBITER:  Who are you asking for questions?
13          MR. ALTMAN:  I pass the witness.  I don't know if you
14      have questions for her.
15          MS. ARBITER:  Oh, no.  I have no questions.
16          MR. ALTMAN:  Okay.  Now, you may leave, Warden.
17      Thank you for your time and cooperation.
18          THE WITNESS:  Okay.  Thank you guys.  Bye-bye.
19          (Whereupon the deposition was concluded at about
20      3:32 pm.)
21
22
23
24
25

21  (Pages  78  to  81)

American Reporting, Inc.
248-559-6750

Josie Gastelo                                              Touloudjian v. Gastelo

Page  82

CERTIFICATE OF NOTARY - COURT RECORDER

STATE OF MICHIGAN)
                 )
COUNTY OF OAKLAND)
                I, James A. Hengstebeck, a Notary
Public in and for the above county and state, do hereby certify
that witness JOSIE GASTELO remotely appeared before me at the
time hereinbefore set forth; that the witness was by me first
duly sworn to testify to the truth, the whole truth and nothing
but the truth; that thereupon the foregoing questions were
asked and foregoing answers made by the witness which were duly
recorded by me; that it was later reduced to written form under
my direction and supervision, and that this is, to the best of
my knowledge and belief, a true and correct transcript.
                I further certify that I am
neither of counsel to either party nor interested in the event
of this case.

                _____
                James A. Hengstebeck, CER 4623,
                Notary Public, Oakland County,
                Michigan
                My Commission Expires:  10-30-2028

22  (Page  82)

American Reporting, Inc.
248-559-6750

Josie Gastelo                                              Touloudjian v. Gastelo

Page 83

| **A** | | | |
|---|---|---|---|
| **a.m** 1:23 | 35:13,16 37:3 | **ambiguous** 7:19 | 37:12 53:1 |
| **aback** 64:1 | 40:7,17 63:18 | 11:1 12:18 | **apprehensive** |
| **abide** 68:18 | **Alexandre** 1:4 | 13:20 25:16 | 73:21 |
| **able** 44:15 65:3 | 62:14 67:2,6 | 29:3 35:12,15 | **appropriate** |
| **above-entitled** | **allegation** 77:6 | 40:6 46:21 | 32:1 67:16 |
| 2:1 | **allegations** 29:8 | 72:17 | 69:7 |
| **absolutely** 13:2 | **allowed** 21:14 | **amount** 16:15 | **approximate** |
| **access** 75:19 | 53:25 75:13 | 77:2 | 73:1 |
| **accommodate** | **allowing** 27:5 | **analysis** 36:24 | **Approximately** |
| 59:22 | **Altman** 2:7,8 | **analyzed** 36:17 | 4:12,13 6:2,7 |
| **accommodating** | 3:4 4:5,7,7,12 | **annuitant** 5:22 | 6:11 16:13 |
| 43:22 | 4:14,17,20 5:1 | **answer** 7:21 | 50:12 72:15,20 |
| **accusing** 80:2 | 5:4,7,10,18 | 12:19 13:22,23 | **ARBITER** 2:14 |
| **action** 36:23 | 7:20,21 11:2 | 17:19 18:9 | 7:19 11:1,5 |
| 47:13 50:1 | 11:10 12:20 | 21:12 23:18 | 12:18 13:20 |
| 69:11 | 13:22 16:3,5,9 | 25:1 26:18 | 16:2,4,7 17:5 |
| **activity** 47:20,24 | 16:13 17:7,9 | 28:1,15 29:4,5 | 17:10,17,22 |
| **actual** 15:25 | 17:12,19,24 | 31:8 34:21 | 18:4,9 19:8,12 |
| 20:16 | 18:7,20 19:10 | 35:16 37:3 | 19:14 20:4,23 |
| **Ad** 1:6 | 19:13,18,23 | 40:7 46:22 | 21:1 22:10,15 |
| **add** 80:13 | 20:8,24 21:3,6 | 57:21 68:20 | 23:17 24:3,25 |
| **additional** 37:11 | 21:11 22:12,16 | 73:11,16,18 | 25:16 26:16 |
| 75:10 | 22:17 23:18 | 74:6 78:17 | 27:24 28:12 |
| **administrative** | 24:9 25:1,17 | **answered** 20:4 | 29:3 33:1 |
| 20:7 61:5 | 26:18 28:6,22 | 33:1 | 34:16,20 35:12 |
| **administrator** | 29:4 33:3 | **answering** 4:23 | 35:14 37:1,8 |
| 1:5 | 34:17,18 35:17 | **answers** 82:11 | 37:17 40:6 |
| **adverse** 36:23 | 35:18 37:5,12 | **anybody** 54:2 | 46:15,21 54:6 |
| 50:1 | 37:19,21 39:23 | **anymore** 80:13 | 55:20 57:19 |
| **Advisory** 49:24 | 39:25 40:3,14 | **anytime** 5:10 | 63:5,21 67:19 |
| 53:7,13 | 46:19 47:18 | **anyway** 25:6 | 68:19 69:16,20 |
| **Aenlle-Rocha** | 54:9 55:21,22 | **apologies** 40:20 | 72:17 73:12 |
| 1:12 | 57:21 61:13,16 | **apparently** 32:1 | 74:4,6,13 78:6 |
| **affect** 14:1 | 61:21,23 62:3 | 63:2 | 78:11,19 81:4 |
| **ago** 40:24 47:8 | 62:8,12,15 | **appear** 62:4,17 | 81:12,15 |
| 60:5 61:24 | 63:7,24 64:23 | **APPEARAN...** | **area** 7:24 10:19 |
| 65:1 66:9 | 65:3,13,15 | 2:6 | 28:4,5 32:8,16 |
| 78:12 | 67:14,15,23,24 | **appeared** 82:7 | 33:15 34:2,3 |
| **agree** 22:20 | 68:20 69:17,19 | **Appearing** 2:11 | 45:4 53:9 |
| 24:17 34:18 | 69:22,23 72:19 | 2:18 | 60:11 |
| 36:12 65:10,16 | 72:20 73:14 | **appears** 62:11 | **argument** 24:13 |
| 77:3 | 74:5,8,14 76:2 | 62:19 65:16 | **arrived** 11:3 |
| **ahead** 16:4 18:6 | 76:3 78:8,15 | 67:24 | **asked** 13:13 17:2 |
| 20:5 28:1 29:5 | 78:17,22,23 | **apply** 37:15 | 19:18,19 20:4 |
| | 81:1,8,13,16 | **appreciate** | 29:18 33:1 |

| | | | |
|---|---|---|---|
| 46:3 58:25 | | | |
| 70:3 82:11 | | | |
| **asking** 4:22 7:12 | | | |
| 11:6,6 16:21 | | | |
| 20:25 24:9,14 | | | |
| 34:16 38:1,3 | | | |
| 42:6 56:18,18 | | | |
| 78:20 81:12 | | | |
| **assessment** | | | |
| 71:13 | | | |
| **assist** 53:17 70:6 | | | |
| **assistance** 52:2 | | | |
| **assistant** 6:15 | | | |
| 33:13 50:16 | | | |
| **assisting** 5:24 | | | |
| **associate** 6:9 7:1 | | | |
| 8:7 10:18,22 | | | |
| 28:5 29:20 | | | |
| 47:9 48:20 | | | |
| 50:19 76:10,16 | | | |
| 76:19 | | | |
| **associated** 6:17 | | | |
| 31:12,15,20 | | | |
| 69:12 | | | |
| **assume** 68:16 | | | |
| **assumed** 64:3,7 | | | |
| 64:11,13 | | | |
| **assuming** 69:20 | | | |
| 69:22 | | | |
| **attack** 11:17 | | | |
| **attempt** 20:9 | | | |
| 41:2 57:10,12 | | | |
| **attempted** 13:19 | | | |
| 20:8,10 25:19 | | | |
| 40:5,15 56:14 | | | |
| 56:21 57:7 | | | |
| 59:15,15 62:19 | | | |
| **attempts** 9:10 | | | |
| 57:14 | | | |
| **attend** 15:22,23 | | | |
| 28:18 48:19,20 | | | |
| **attending** 28:20 | | | |
| **attends** 28:19 | | | |
| **attorney** 4:8 | | | |
| 38:11 65:25 | | | |

66:8 69:24
70:1,3,6 73:16
**authority** 7:18
7:22 50:25
**authorization**
76:11,21
**available** 26:23
58:10
**aware** 8:15,18
8:25 9:11,13
9:16,17 10:1
10:12,14,24
11:7,12 12:10
20:3 25:14,19
25:23,25 27:16
28:23 29:19
31:10,19 32:5
33:4,13,16,17
33:24 34:1
40:12,14 41:1
41:5,7,9,11,19
46:16,20,25
52:23,24 72:4
**awareness** 11:7

**B**

**back** 21:3,7,9
22:16 33:20
38:8 59:19
61:14 66:5
72:22,23
**bad** 23:19,19
24:19 53:25
69:4
**bag** 34:5 67:21
**bags** 68:5
**based** 28:13
33:3 63:2
70:17,18,18
80:7
**basically** 6:24
7:13 38:13
**basis** 49:18
**Bates** 61:24
**becoming** 6:16

**bed** 20:20 26:25
35:2
**beds** 59:24
60:15
**beginning** 11:22
**behalf** 2:11,18
27:8 80:1
**Belated** 19:8
**belief** 82:14
**believe** 15:23
17:14 21:16
27:10 34:24
47:15 50:10
63:1,5 77:1,1
80:24
**believes** 24:15
**best** 53:16 75:22
82:13
**big** 22:21 26:9
31:10,19 49:11
57:13,13 59:10
**bit** 44:2 45:12
62:5
**bodily** 11:20
**bordering** 74:7
**borderline** 73:22
**bread** 65:11,22
66:3 67:20
**break** 5:11,11
39:23,25
**breathing** 34:11
**Brief** 40:2 61:15
81:7
**bring** 75:10
**broad** 37:9
60:24
**Broadway** 2:16
**buck** 7:17
**building** 10:20
26:25 35:1,2
35:21 59:21
**built** 59:21,22
60:8
**bunk** 34:5
**business** 7:1

**busy** 48:3 49:15
**Bye-bye** 81:18

**C**

**CA** 2:17
**California** 1:1
2:15 5:19,23
5:25 6:4,9,12
31:14
**call** 8:8 15:24
20:24 22:12,13
27:4 60:17
61:2 70:2
**called** 34:23
47:3 48:22
51:13 53:7
60:20 61:4
**calling** 69:16
**calls** 13:20 16:7
19:8 20:23
22:10 23:17
24:3,25 26:16
46:15 54:6
57:19 68:19
**camp** 61:6,12,12
**capacity** 1:15
**captain** 10:19,20
10:21 11:16
28:4 41:5
76:22 77:9,20
**captains** 50:21
76:25
**care** 7:23,23,24
10:9,9,10
43:20
**career** 44:20
**carried** 59:16
**carry** 24:8,10
**case** 1:9 23:19
29:12 33:3,10
35:7 38:22,24
47:6 60:21
77:8 82:17
**categorize** 60:18
**cause** 2:1 22:22

23:2 54:3 55:5
56:2
**caused** 11:20
**causing** 10:11
**caveat** 48:1
**CCHCS** 5:23
10:8 15:2,19
26:9 27:8 28:9
32:14 36:20
51:6 52:1
71:15,18
**CDC** 72:5
**CDCR** 37:9
71:19
**CDCR's** 27:14
**cell** 20:17 21:14
21:17 42:3,9
42:14,17,22,22
43:2,2,4,6,10
43:11,12
**cellophane**
65:11,20,23
67:22
**cellophane-type**
65:17
**cells** 20:20 42:21
42:25
**CENTRAL** 1:1
**CEO** 15:10 40:9
52:2 55:9
56:23 57:1
59:7,8
**CER** 2:2 82:19
**certain** 9:1 24:6
43:5
**certainly** 9:21
13:7
**CERTIFICATE**
82:1
**Certified** 2:2
**certify** 82:6,15
**cetera** 14:17
15:14 33:25
**chain** 6:23 10:16
11:10 14:20

18:18 21:21
22:2
**challenges** 9:8
**change** 31:5
32:20 33:15
34:3,7
**changed** 48:11
**changes** 32:6,9
32:10,23 33:4
33:6,7,7,9,12
33:14,18,21
34:1,6
**characterizati...**
65:18
**charge** 10:3 69:8
71:10
**check** 42:25 43:6
43:9 79:17
**checking** 34:11
43:10
**checks** 34:8,9,24
35:4,5 36:10
43:4
**chief** 6:4,23 7:25
8:3 10:23
15:23 28:19
29:19 30:21
31:6 47:5,9
48:3,12,20
50:18 54:23
59:2,4,6 63:22
64:14 76:6,7,8
76:9,12,13,14
76:17,19,20
77:10,11,13,17
77:21 78:1,5
**choke** 54:10
64:2 65:22
**choked** 55:2,24
64:8
**choking** 55:12
55:14
**choose** 23:22,22
**circular** 24:13
**circumstances**

20:14 38:9
77:15
**clarify** 67:21
**classes** 6:25
**classification**
  8:21 9:5 14:11
  14:14 47:13
**clean** 4:24
**clear** 11:4 19:23
  37:24 38:3
  55:11 68:4,12
**clearly** 56:9
**Clinical** 60:21
**clinican** 22:3
**clinician** 21:20
  23:8 24:5,15
  36:5 43:20,20
  44:6,17,23
  45:19,20 47:2
  47:5,15 58:4
  60:22 68:4,9
**clinician's** 23:12
  36:9
**clinicians** 26:3,6
  44:15 57:11,15
  60:10,12 71:7
**close** 75:17
**closely** 14:11
**closest** 28:2
**clothing** 56:3
**CMC** 8:1,2 9:10
  13:18 15:10
  16:1,16 33:5
  35:9 40:16
  41:8,11,20,23
  42:2,21 46:13
  59:10 60:2,3,4
  67:4,16 71:15
  71:19
**CMS** 60:17,20
**Coleman** 31:25
  32:5 33:3,10
  33:17,22 44:14
**Colony** 6:1,5,9
**come** 8:20 9:6

10:23 12:24
25:9 30:2,4
47:24 48:4
52:18 61:14
77:14
**comes** 8:25 9:1
  43:12 56:20
**coming** 8:18 9:2
  40:4 59:1
**command** 10:16
  11:11 14:20
  18:18 21:22
  22:2
**Commission**
  82:21
**commit** 19:25
  23:22 25:20,25
  26:5 27:6 30:1
  40:19 56:1
**committed** 7:9
  7:14 13:1
  18:21,24 19:19
  53:21,22 54:14
  66:2
**committee** 8:21
  8:22 14:14
  47:1,4 48:17
  49:24 53:8,13
**committees** 9:1
  9:5
**committing**
  12:11 56:8
**compiled** 18:15
**complaint** 19:4
  19:15,16 25:10
  25:11 38:7
  40:18 54:12
  66:10,11,13
  77:23 79:15
  80:3,4,8,15
**complaints** 73:9
  80:3,12
**complete** 28:9
**completed** 15:25
  57:18 60:9

**compliance** 30:6
**complied** 34:19
**comply** 23:6,8
  23:10,15 24:1
  24:17 35:19
  36:1,2
**complying** 36:8
**computed** 70:14
**concern** 54:3
  57:14
**concerned** 55:7
**concerning**
  12:17 45:13
**concerns** 55:5
  56:2
**concluded** 81:19
**conclusion**
  22:11,14 69:16
  69:17
**condition** 11:25
  21:13 42:2
**conditions** 9:25
**conduct** 75:6
  79:13
**conducted** 36:14
  71:21 72:13
**confer** 36:4
  56:24 59:2
**conferring** 57:1
**confident** 73:20
**connected** 4:14
**consider** 22:21
  22:24 71:2,3
  75:21
**considered**
  69:14
**constantly** 7:7
**consulting** 5:23
**contact** 57:5
**contained** 11:15
**continue** 79:20
**continues** 65:2
**contraband** 43:7
**convenient**
  72:16

**conversation**
  55:10
**conversations**
  37:25
**cooks** 50:25
**cooperation**
  81:17
**coordinator**
  58:3,11
**copies** 67:11,11
**copy** 38:16
  48:16
**Corinna.Arbit...**
  2:19
**correct** 12:7
  13:4 14:2,5,9
  14:19,25 15:15
  15:16 16:20
  18:1 19:3
  20:17 21:22
  22:2,3,5,18,23
  24:21 25:15,21
  26:21 29:2,14
  30:3 37:20
  41:2 42:5,6,19
  54:10,21 55:13
  56:15 57:18
  62:24 63:8,12
  63:20 64:21,22
  65:11 66:15
  67:25 68:1
  69:15 73:6,7
  76:24 82:14
**corrected** 53:12
**correction** 34:25
**correctional**
  18:15 26:7
  60:21
**Corrections**
  5:20
**correctly** 50:20
**CORRINA** 2:14
**could've** 56:13
  57:3
**Council** 49:23

**counsel** 4:3
  37:25 38:1,14
  38:21 39:9
  63:5 74:4,13
  78:11 81:9
  82:16
**counselor** 47:6
**county** 2:3 82:4
  82:6,20
**course** 10:16
  50:23
**court** 1:1 9:25
  12:4,6,13 21:6
  47:11,17 82:1
**covers** 37:8,8
**created** 47:19
  56:19 58:25
**creation** 63:20
**crisis** 20:19
  26:25 35:2
**critical** 15:20
**current** 5:19
**currently** 5:22
**custody** 7:22
  10:3,4,14,19
  10:19,21 12:3
  14:8,10,14
  15:5,19 18:10
  20:18 21:15,16
  21:18 23:7
  27:11,15,20
  28:4 29:6,8,11
  29:22 30:7,25
  32:13,14 33:9
  34:6 36:22
  40:25 41:3,25
  42:8 43:4,24
  44:7,12,22
  45:1,8,14,18
  45:24,25 46:2
  46:9,19 47:19
  50:9,11,12,15
  69:9 71:3,15
  71:20 72:5,19
  75:23 77:4,7

Josie Gastelo                                    Touloudjian v. Gastelo

cut 57:9

**D**

D 3:1 61:1
DAG 2:21
daily 47:18,20
  47:24
dangerous 42:16
date 1:22 4:19
  62:10 63:3
dated 62:10
  63:14
day 9:18,22 20:7
  20:10,11 40:15
  42:25 43:3,5,9
  44:5 48:2,4
  49:8,12,19,19
  49:21,22 50:7
  51:15 57:9
  60:23 62:25
  74:3,14,16,18
  74:20,22 79:11
day-to-day
  49:17
days 20:9 25:19
  48:2 62:21,23
  63:12
dead 63:6
deal 44:15 52:20
  53:3 80:2
dealing 49:17
dealt 11:15
death 69:15
  70:13 71:22
  80:22
deceased 62:24
December 5:21
decide 77:15
decided 14:23
  77:19
decision 21:25
  22:1 56:25
  70:7,22 71:9
  77:22
decision-maki...

12:1
decisions 15:12
declared 63:6
defendant 1:17
  2:18 4:9
defer 66:15,19
  66:20
definitely 52:20
definition 76:14
definitively 13:6
Deigo 2:17
delegate 31:1
delegated 31:1,2
  34:14
delivered 68:7,9
  71:6
delivering 20:19
dental 7:23 10:9
  13:24 14:12
  26:8 49:1
  51:22
department
  2:15 5:20
  31:11,13 49:1
depend 67:8
  75:16
depending 49:15
  68:25 75:15
depends 8:23
  11:14 59:12
  67:7,9
deposed 4:10,17
deposition 1:20
  3:7 37:22 38:6
  39:10 62:1
  81:19
deputies 76:8
deputy 6:4,24
  10:23 15:23
  28:19 29:19
  30:21 31:6
  33:13,25 47:5
  47:9 48:3,20
  50:16,19 54:24
  63:22 64:14
  76:6,7,8,10,12

76:13,15,17,18
76:19,20 77:10
77:11,13,17
78:1,4,5
description
  68:22
designed 60:3
desk 47:25 55:1
  55:1
determine 14:13
determined
  11:24 27:13
  34:14
developing
  45:15 46:4
development
  30:13,17 45:9
diagnose 60:19
die 62:25
died 62:21,23
  63:3,5,11
difference 58:21
  58:23
different 49:19
  59:4 70:21,25
  73:5 75:18,21
  81:5,6
differently 80:23
  80:25
difficult 49:12
  49:14
digesting 55:15
direct 64:5
directed 24:12
direction 21:19
  22:3 28:3 30:9
  36:9 45:19
  68:4,10 82:13
directions 22:5
  24:11,18 36:5
directive 24:2
  34:19 35:20
directives 30:6
  35:19
director 8:7

disagreement
  43:23 44:8,21
disagreements
  43:25
discipline 68:23
  69:1,2,3,6
  70:14 79:24
disclosed 37:10
discovery 37:17
discuss 44:5,9
  47:6 48:17,24
  49:1 52:10
discussing 7:4
discussion 52:4
  53:15 57:2
dispute 67:24
DISTRICT 1:1
  1:1
DIVISION 1:2
document 61:22
  61:24 62:10
  66:8
documented
  23:7
documents
  38:14,17 67:22
doing 15:1 26:22
  34:8 35:3,5,8
  36:23 43:16
  50:1 51:16
  52:16 54:2
  55:25 57:15
  74:25 75:20
door 15:21
due 33:17 34:4
  34:12,22
duly 5:15 82:9
  82:11
duty 44:5
dynamics 57:6

**E**

E 3:1
earlier 40:21
  57:17,24 63:25

early 15:10 72:9
education 6:19
  6:21
effectuate 12:2
either 15:22
  19:21 28:3,18
  28:18 29:23
  31:1 39:1
  44:10 45:2
  47:9 48:19
  54:23 60:19
  63:22 66:13
  77:13 82:16
electrified 10:7
Electronic 2:2
email 67:10
emergency 49:2
employee 68:23
  68:24
employees 49:11
  49:25 50:8,9
  50:12
emptied 43:10
encompasses
  27:9
ensure 18:16
  34:8 51:9
  79:14
ensured 52:14
ensuring 34:6
  42:14
entire 8:1 34:9
entities 49:25
equal 8:5,6
  56:24
equip 52:15
errors 27:10
especially 34:10
Esquire 2:7,14
  2:21
essentially 7:8
ESTATE 1:4
et 1:23 14:17
  15:14 33:25
event 15:25 55:2

Josie Gastelo

Touloudjian v. Gastelo

Page 87

58:17 82:16
**evidence** 19:5,11
19:19,24 41:13
41:16,22 57:24
58:1 66:21,22
66:23 68:16
79:16,22
**exact** 17:1,2
77:2
**exactly** 23:24
60:23 71:6
**Examination**
3:4 5:17
**excuse** 10:18
20:24
**execute** 22:4
**Executing** 22:1
**executive** 7:25
48:12 59:4,6
**exhibit** 3:7
61:16,17,23
62:1
**EXHIBITS** 3:6
**expect** 25:24
31:7
**expected** 59:16
**experience**
23:12 24:5
**expert** 20:23,25
22:11,14
**Expires** 82:21
**explain** 8:24
58:22
**extended** 72:3
72:10
**extremely** 44:19
52:21

___ F ___

**facility** 13:19
56:14 59:24
61:1
**fact** 25:9 41:9
64:1
**factor** 36:20

**facts** 71:5
**faded** 45:11
**fading** 12:21
**failed** 68:18
79:20
**failures** 27:5,15
27:20
**fair** 7:3,16 65:17
67:13
**fall** 14:4,20,24
15:6 21:21
51:3,7
**fallen** 14:9 15:13
22:2
**falls** 14:19 20:17
51:4
**familiar** 26:24
43:15
**family** 4:8 49:23
**far** 26:8 45:16
46:8 58:8
59:12 60:13
68:3 80:19
**Farmington**
2:10
**February** 62:24
**feedback** 51:20
51:20
**fell** 55:1
**fence** 10:7 52:22
**Fernando** 1:12
**figure** 41:12
78:20
**file** 26:6
**find** 9:21 49:14
52:17 53:2
56:8
**finish** 4:22,23
34:17
**fire** 61:6,8,10,12
61:12
**firefighters** 61:7
61:9,9
**firings** 50:3
**first** 5:15 6:14

25:2 39:16
54:1,13 59:21
70:22 76:4
77:8,20 79:18
80:11 82:8
**firsthand** 25:3
**five** 6:2 16:18
32:22 39:15
50:19 58:8
76:16,19 77:1
77:2 78:11
**five-year** 16:17
16:22 17:13,16
**fix** 52:12,12,25
**fixed** 52:23 53:2
**flesh** 34:11
**focused** 75:1
**follow** 30:8,9
68:24
**following** 21:19
65:2 77:7
79:14,16
**follows** 5:16
44:22
**food** 19:3,6,20
19:25 20:16,19
20:22 24:23
25:7,7,12 30:1
30:2 54:9,10
66:4,4 68:6,8
**foregoing** 82:10
82:11
**forget** 68:22
**forgive** 8:11
**forgot** 33:14
**forgotten** 13:11
13:16 38:19
**form** 13:3 82:12
**formal** 6:19,21
**forms** 58:24
**forth** 82:8
**found** 10:25
11:12 34:4
70:23
**frames** 75:17

**front** 63:13
78:13
**full-blown** 73:22
**further** 81:8
82:15

___ G ___

**gamut** 73:25
**Gastelo** 1:15,21
3:3 5:14 62:15
78:12 82:7
**general** 7:11
61:4
**generally** 8:15
60:2 62:6
65:16
**getting** 40:17
44:1 51:23
53:11,11 74:23
75:19
**give** 44:1 68:6
73:17,18 79:23
**given** 20:22 23:5
30:1 32:1,6
40:10 42:1,16
42:18 54:3,7
56:3 59:12
68:3,11 69:14
**giving** 60:24
**go** 4:20 10:22,22
11:10 16:4
18:6,17,18
20:5 28:1 29:5
35:13,16 36:5
37:3 40:7 42:8
42:23 47:4
48:2,16 51:16
53:25 61:13,19
62:10 63:18
64:23 65:6,8
77:13,19 80:20
81:1
**God** 38:11
**goes** 44:8 47:11
50:6

**going** 4:21 6:24
7:4,5 9:24
12:13 17:5
18:4 21:6
22:10 23:21,22
27:24 28:12
32:19 37:1,24
40:25 41:6
42:3 44:6
46:10,11 48:5
51:18,19 52:10
52:19 53:8,9
54:8 56:10
57:5 61:16,23
62:3 68:6
70:23,25 71:10
73:10,15,17,18
78:6 79:5
**good** 4:5 5:13
23:19 29:21
41:10 52:4
57:15 60:13
70:19
**great** 11:20
**grounds** 18:5,7
**group** 30:16
32:19 44:4,8
**guard** 30:2
34:24 35:22
**guards** 14:17
29:25 35:19,25
36:14,15
**guess** 11:5 16:20
73:11,12,13,14
73:15,17,19,20
73:21
**guidance** 14:15
45:20
**guys** 57:9 81:18

___ H ___

**half** 39:19 51:14
61:5 72:23
**handed** 67:4,7,9
67:16

**handling** 57:15
60:4
**hands-on** 49:4,7
**happen** 23:14,15
24:19 44:24
71:11 77:24
**happened** 8:16
9:15,18,18
14:25 18:12
24:21,22 38:9
46:24 47:7
68:17
**happening** 32:9
45:24
**happens** 27:7
75:8
**harassing** 17:10
**harassment** 17:5
17:7,18,22
74:7,8,9,12
**hard** 8:23 56:7
**harm** 10:11,25
22:22,22 23:2
**head** 5:2,2 34:5
38:8 53:23
58:9
**headquarters**
8:10 9:20
28:18 48:10
49:22 57:8,12
58:7
**health** 7:23,24
9:7,25 10:10
10:20 11:25
13:24 14:12,16
14:19,21 15:1
15:7,12 20:19
21:12,19 22:3
23:4,8,12,16
23:24 24:4,11
24:15,18 26:2
26:6,8,25
27:11 31:12,15
31:20 32:1,7
32:23 33:4,6

33:10 34:14
35:2,20 36:5,9
36:12 44:13,14
45:1 51:6,10
51:22 58:11
59:13,17,18,20
59:22 60:1,5,7
60:14,19 61:3
68:4 71:7
**healthcare** 26:23
27:11 30:6
35:4 44:25
45:20 48:21
49:1 50:11
69:10
**hear** 16:5
**heard** 11:17
26:2 37:7,13
44:20 54:2,13
55:12,16,18
64:8
**hearing** 20:12
20:13
**help** 51:19 52:3
**Hengstebeck** 2:1
82:5,19
**hereinbefore**
82:8
**hey** 29:20 48:4
51:17,21 53:10
57:4
**hidden** 42:11
**high** 9:3 52:21
**high-priority**
52:21
**higher** 30:19
**highest** 7:18,22
**Hills** 2:10
**HIPAA** 26:9,10
**hiring** 60:10,12
**hirings** 50:2
**history** 40:11
44:2 70:18
**Hold** 37:5 69:4
**hole** 52:22 55:5

**Hon** 1:12
**honest** 53:10
**Honestly** 13:12
**hospital** 11:23
20:13
**hot** 43:8
**hour** 39:19
**hours** 9:18
**house** 10:8
27:22
**housed** 14:1,4
42:3 60:25
**housing** 14:13
14:16 15:16
60:6,6
**huge** 79:5
**human** 50:1
**hundred** 17:9,12
17:14,25 74:18
79:4,5
**hurt** 24:16

**I**

**idea** 65:22
**identification**
62:2
**ill** 14:14 15:2
60:3
**imagine** 53:23
53:24
**immediately**
9:12
**implemented**
33:18 56:13
**important** 22:7
22:13,20 23:6
23:10,13 24:1
24:10,14 40:3
40:8 41:1,3
58:2 79:12
**in-service** 51:13
**inappropriate**
43:8
**incident** 3:8
11:19 18:11,17

18:18 27:19
36:23 38:16
54:18,19,21,22
54:24,25 62:4
62:17,19 64:13
64:16 65:24
66:6,13,18,19
66:25 67:1,5
70:16 71:17
72:2 75:24
**include** 41:4
43:7,7,8 45:23
47:5
**included** 6:23
49:3
**includes** 44:4
45:16
**including** 71:5
**indicate** 12:12
21:17 43:17,18
**indicated** 23:8
**indicates** 43:19
**indicating** 18:11
36:20 77:14
**individual** 1:15
69:9,10 77:7
**individuals**
18:12 69:11
**Industry** 50:25
**information**
9:19 14:15
18:16 19:15
26:8 27:25
28:13 29:23
36:21 37:2,6,8
37:9,11 40:9
40:12,17,22
48:7 52:6,13
58:5,5,7,10
63:2 66:24
71:12,16 72:8
74:1 78:14
80:7
**informed** 51:25
59:1

**ingested** 19:24
**ingesting** 19:20
64:2
**initial** 8:21
**initiate** 76:5,21
77:16,19,22
78:1,5,9
**injure** 42:12
**injury** 11:20
**inmate** 8:23 9:1
9:7,10 10:5,24
11:18 21:13,18
23:21,22 24:6
26:4,20 34:4,9
41:6 42:12,21
42:22 43:11,11
43:19,25 44:19
44:23 46:18
47:1 48:8,8
49:23 53:5
56:20 61:9
68:2,6 77:23
79:25 80:2,4,6
80:8,11,13,18
80:19
**inmate's** 21:17
**inmates** 8:24 9:2
9:6 10:21
14:13 15:2
26:9,10 40:10
42:13,23 43:13
55:6 59:14
60:7,16,17,20
67:10,11 68:7
80:10,14
**inmates'** 13:24
14:16
**inside** 67:25
**inspect** 42:9
**inspected** 42:14
**instances** 9:4
**institution** 7:23
8:20,25 10:4
13:25 14:2,4
40:11 44:13

49:11 51:18
57:6 59:14,15
59:17,18 60:15
61:4 80:7
**institutions** 26:5
40:19 59:20
60:12
**instruction** 71:8
**instructs** 73:16
**intense** 61:3
**interact** 45:14
46:10
**interacting** 49:5
**interactions**
46:3,5
**interested** 82:16
**interfacing** 45:8
**interrupt** 63:18
**interval** 14:22
14:24
**interview** 80:11
80:14,16
**investigate**
40:21
**investigated**
18:3
**investigation**
27:4,12,18,21
27:23 36:19
70:20 71:13,15
71:19,21 72:1
72:4,13,18,19
75:6,18,23,25
76:4 77:5,11
77:18,19,22
78:5,9 79:9
80:1,14
**investigations**
28:7 72:15,21
73:22,23 74:25
75:2 76:21
78:2 79:13
**investigative** 8:3
75:1
**involuntarily**

9:24
**involuntary**
11:25 12:2,12
46:13,17,25
**involve** 12:5
21:2 45:17
**involved** 12:5
15:5 18:13,13
27:21,22 31:11
31:15,20 35:21
36:6 37:16
40:25 47:16
69:2,3,6
**involvement**
9:25
**issuance** 43:18
69:6
**issue** 14:19
52:19,21 57:13
**issues** 31:12 60:1
**item** 65:10,22
66:17
**items** 19:1,3,21

---
**J**

**Jackson** 2:23
**James** 2:1 21:3
82:5,19
**January** 7:5
63:1,11
**job** 46:11,12
52:16 57:15
**JOSIE** 1:15,21
3:3 5:14 82:7
**jump** 38:2
**Jung** 2:21
**Justice** 2:15
**justify** 24:7

---
**K**

**K-e** 47:14
**kaltman@law...**
2:12
**Kandace** 2:21
**Kehia** 47:3,11

47:14,15
**Keith** 2:7,8 4:7
62:11 65:1
**keys** 10:7
**kind** 7:4 14:7
24:13 26:7
27:4 31:11
47:18 49:4,5
53:15 56:9
64:1 67:25
71:3 72:1
**knew** 25:8 52:18
66:5
**know** 5:5,11
11:6,21 12:12
14:22 16:16,24
17:1,4,11,20
17:23 18:9,21
19:12,14,16
24:22 26:4,8
26:15,16,21
27:1 28:1 29:9
29:11,15 30:7
31:14,19 33:6
33:7,11 34:21
35:16,24 36:7
36:11 37:3
38:7 40:4 42:9
45:16,19 46:8
46:22,24 47:2
49:20,21 51:12
51:24 52:4,7
52:24 53:1,10
54:7,12,12
55:1 56:10,21
57:4,4,19,22
57:22 58:2,7
58:14,22,23
60:13 61:2
62:23,23 64:17
64:24 65:6
66:3,4,20
67:10 68:3,13
71:20 73:4,19
74:2,7 78:16

78:18,24 79:1
79:3,8,10,20
79:22 81:6,9
81:13
**knowing** 71:24
72:2
**knowledge**
12:17,25 13:3
13:5,7,8,10,14
25:2,3,12 26:3
29:1 31:3 64:5
64:6 82:14
**known** 11:18
38:18 54:20
59:17,19 60:1
60:9 68:10
**knows** 40:9
**Kushner** 2:23
**Kyle** 2:22 61:20
61:22 62:11
64:25

---
**L**

**L** 1:12
**landscaping**
51:2
**lapse** 69:14 71:2
71:3 72:19
77:3,6
**lapses** 73:6,23
73:24
**large** 59:18
**Lastly** 5:10
**laterals** 50:3
**Law** 2:8
**lay** 69:19
**lead** 70:20
**learn** 25:3,6,9
28:6,8 79:24
**learned** 20:10
25:5 27:2 29:9
55:23
**learning** 53:21
55:19
**leave** 72:10

81:10,16
**led** 69:14
**left** 50:10
**legal** 22:10,14
69:16,17
**let's** 7:6 22:16
32:22 36:4
39:23 61:13,14
80:2,6 81:1
**letting** 36:6
**level** 8:23 11:14
11:14,16 30:19
44:25 61:1
67:16 70:24
79:21
**levels** 70:15,21
**liberally** 40:9
**lieutenant** 11:16
18:15 41:4
44:11 45:2
77:9,20
**lieutenants**
50:22
**liked** 60:11
**limited** 23:4
**limits** 75:14
**line** 28:13
**lines** 15:14
**list** 80:9,9,9
**litigation** 31:11
31:15,20,23
37:14,15 50:4
**little** 44:2,8
45:12 62:5
**live** 60:11
**lived** 20:8
**living** 34:11
**local** 32:13,15
**long** 5:12,25 6:6
6:10,12 9:15
20:2 39:14,18
47:8 60:7
**longer** 78:12
81:2
**look** 38:17,24

48:5 53:12
62:13 66:25
71:8,9 74:1
**looked** 43:3
**looking** 72:22,23
**looks** 62:6 63:13
65:19,20 67:1
**lose** 68:21
**loss** 10:8
**lot** 51:2,11,20
52:10,12,25
53:16 56:16
57:5,7,7 70:18
71:8 72:25
73:3,3 75:18
75:20,20
**lots** 49:6 73:8
**lowest** 10:17

_____

**M**

**Macias** 15:11
52:2
**Mafia** 9:4
**maintenance**
51:2
**major** 31:5
32:19 48:4
**making** 23:13
**manage** 60:3
**management**
10:15,17,17
15:18,24 32:12
32:16,17,18
46:19 50:15,18
50:21 51:11
52:9,14 58:6
60:21 67:15
**managers** 52:25
**managing** 14:18
**mandated** 51:15
**mark** 61:16,17
61:23
**marked** 62:1
**materials** 23:5
24:6,16 54:3,7

**matrix** 70:15,19
71:1
**matter** 4:9 32:5
**meal** 25:13
**mean** 10:3 11:11
22:21 23:20
37:20 53:19
55:14,24 60:1
63:17 70:9
73:3,5
**meaning** 47:1
70:11 72:17
**means** 39:1
60:22 74:11
**meant** 51:5
**measures** 68:21
**medical** 10:9
13:24 14:12
26:7 43:23
45:8,13 48:12
49:1 51:22
59:2
**meet** 5:11 12:14
15:17,21 39:9
39:14,18 51:12
53:6
**meeting** 9:17
20:6 28:17,18
28:19,19,20,23
29:17,21 39:1
39:5,5,6,6,20
39:21,21 48:23
48:24,25 49:3
58:6,8 71:16
**meetings** 15:18
15:24 39:2,6,8
44:4 48:21,21
49:8,9,20,22
49:23,23,24,24
49:25 50:1,2,4
50:4,5,6,7 52:8
**member** 11:18
11:22 21:16
42:24 68:6
70:23 79:15

80:4
**members** 11:21
43:21 80:17
**memo** 77:12
**Men's** 5:25 6:4,9
49:24 53:7,13
**mental** 7:24 9:7
9:25 10:10,20
11:25 13:24
14:12,16,19,21
15:1,7,12
20:19 21:12,19
22:3 23:4,8,12
23:16,24 24:4
24:10,15,18
26:2,5,8,25
27:11 31:12,15
31:20 32:1,7
32:23 33:4,6,9
34:14 35:2,20
36:5,9,12
44:13,14,25
51:9,22 58:11
59:13,16,18,20
59:22 60:1,4,7
60:14,19 61:3
68:4 71:7
**mentally** 14:13
15:2 60:3
**mentioned**
65:24
**mentions** 66:1
**met** 15:19
**MI** 2:10
**Michigan** 82:3
82:20
**middle** 37:13
**might've** 14:23
40:20
**Mile** 2:9
**mind** 16:8
**minimum** 43:18
**minutes** 34:15
34:23 39:15,23
48:23 61:14

**missed** 31:13
47:12
**Misstates** 55:20
**monitored** 14:22
**monitoring**
14:18 35:20
**month** 43:5
48:25 49:14,21
49:22 60:25
72:16,21 78:4
78:25 79:2,4,7
79:9
**monthly** 15:23
48:19,21 49:3
72:7
**months** 53:7
**morning** 4:5
9:17 20:6
39:13 44:4
**mouth** 55:15
**move** 17:6 74:4
74:11
**moving** 6:18
74:5
**multitude** 50:7
**must've** 53:25

_____

**N**

**N** 3:1
**name** 4:7 48:8
76:18
**narrative** 65:1
**necessarily**
14:10 30:12
70:13
**necessary** 71:12
**necessitated**
6:25
**necessitating**
9:25
**neck** 55:14
**need** 5:10 14:1
14:23 15:7
32:16,17 36:10
48:5 51:19,21

51:21 52:15,16
52:17,22 53:4
61:2 65:6 71:8
78:13 79:17,23
**needed** 11:24
15:20 34:15
36:13 52:2,11
52:13 53:17
56:2 58:4
79:19
**needs** 5:12 24:7
44:19,23 47:2
81:2
**neither** 82:16
**never** 16:8 25:8
28:6 44:20
45:5,5 59:3,8
**Nevertheless**
63:7
**new** 43:11
**newer** 59:19
**news** 41:10
**nice** 4:24
**Nicholas** 2:22
**Nick** 61:18,19
62:9,10 64:23
65:13 67:14
76:2
**nighttime** 34:10
**Nods** 5:1
**non-CCHCS**
72:6
**non-custody**
50:24
**non-dental** 51:5
**non-healthcare**
51:4,5
**non-mental** 51:6
**normal** 18:18
49:19
**normally** 8:22
44:10 47:4
48:3
**Notary** 2:2 82:1
82:5,20

Josie Gastelo                                         Touloudjian v. Gastelo

notes 48:22
number 3:7
  16:11 17:1,2,8
  43:5 50:23
  61:17,24 62:1
  73:1 74:2 79:6
numbers 50:14
  57:23 73:5

**O**

Oakland 2:3
  82:4,20
object 17:5 18:4
  22:10 27:24
  28:12 37:1
  74:10,10
objection 7:19
  11:9 16:2,6,8
  17:10,17,17,22
  19:8 22:15
  34:20 35:14
  63:21 74:13
objects 42:16
observations
  36:13
observed 34:15
obviously 24:15
  26:14,20
occur 40:13
occurred 20:15
  23:19 45:23
  76:1
offense 12:11
  70:18 73:24
Office 2:8 6:15
officer 7:25 8:3
  9:20 15:8 20:7
  21:23 23:20
  24:7,7 35:6
  36:4,7,8 42:20
  44:4,7,17,23
  45:3,4 59:3,4,6
  68:11,11,18
officers 24:10
  26:7 30:4,5,8

34:25 50:24
official 27:24
  28:13 37:2,5
  48:13
oh 29:5 48:18
  52:22 63:11
  81:5,15
okay 4:6,7,24,25
  5:2,3,5,6,8,9
  5:12,13 6:3
  7:16,20 8:3
  10:11 12:22,23
  15:12 16:9
  18:20,24 21:8
  21:12 26:19
  28:2,16 34:22
  37:19 38:4,5
  38:17 39:14,16
  40:1 53:11,20
  54:9 61:20,23
  62:8,12 63:2,7
  63:11 65:5,7,8
  65:9 66:8 67:8
  67:13,23 73:15
  73:18 74:22
  75:10 76:13
  79:7,11 80:2
  81:5,6,11,16
  81:18
old 74:1
on-the-job 6:24
once 28:12
  48:25 51:12
  54:17 58:6
  60:25 66:19
ones 22:4 35:3
  52:5 59:22
ongoing 72:6
open 15:21
  42:22
operations 51:1
opinion 20:23
  20:25
order 74:11
  77:23

orders 35:7,23
  35:24 36:1,2
  43:16,17 46:8
originally 54:17
out-to-court
  12:7,9,10
outside 49:25
  60:15
overloaded 75:5
overlook 60:24
oversee 46:1
overseeing 41:6
overseen 7:25
overtime 75:9
  75:13

**P**

p.m 1:23 4:2
  40:2,2 61:15
  61:15 81:7,7
package 3:8
  18:17 54:18,19
  54:21,23,24
  62:4,17,20
  63:8,16,19
  64:14 65:25
  66:7,13,18,19
  66:22,25 67:1
  67:5 71:6
packages 54:25
  64:16
packaging 19:3
  19:6,20,25
  24:24 25:7,12
  30:2 54:10,11
packet 63:3,13
  64:20 71:14
  77:18
packets 67:11
page 3:2 62:9
  65:2,6,8,14
part 7:22 12:1
  27:5,18 30:16
  32:18 33:19
  41:2 60:6

71:13,15,19
  72:9
particular 15:3
  34:12,25 35:7
  43:25 48:2
  51:17
particularly
  16:10
party 82:16
pass 52:5 81:13
passed 7:4 20:9
  20:11,13
patient 14:18
patients 33:10
  60:3,5
penalties 70:16
  70:17
pending 4:9
  5:12
people 18:13
  22:4 23:10,15
  24:17 25:24
  26:4,20 49:6
  51:2,2,3 53:16
  74:25
Perfect 63:15
period 7:12 11:2
  16:17,22 17:13
  17:16 31:9
  32:3 34:1,10
  54:23 72:3,23
  78:3
periodically
  43:10
permission
  32:16,17
permits 49:7
person 28:3
  45:21 56:2
personal 4:15
  66:24
personally 12:15
  27:21 41:24
  58:1,12 66:23
  80:5

personnel 51:1
  71:3 75:10
perspective
  75:24 76:14
pertains 29:6
phases 70:21,25
phone 39:2,5
  70:1
phrase 76:18
physical 39:2,5
pick 70:1
picture 65:15,17
  67:20 71:10
PIO 9:19
place 28:23 46:5
  71:24 72:1,15
  72:21 76:4
placed 14:7
  21:17
places 80:8
Plaintiff 1:9
  2:11
plan 55:6
plant 51:1
plastic 65:20
  67:21,25 68:3
  68:5,5,5,10
play 21:6 57:1
played 21:9
please 5:5 17:6
  21:4,5 61:18
  67:14
plus 50:24
pm 81:20
point 7:6 9:13
  29:10 47:8
  64:19 67:19
  77:15
pointed 80:15
policies 30:13,14
  30:17,20,22,22
  30:23,24 32:10
  32:13,15 45:7
  45:10,13,15,22
  45:25 46:1,4,9

56:18 79:14,16
**policy** 30:9 31:3
  31:5 35:9,18
  35:25 43:15
  56:13,16,20,25
  57:1 58:25
  68:24 70:24
  77:7 79:23
**population** 10:5
  34:9,9 53:6
  57:16 59:23
  61:4
**portion** 12:3
  60:2,4
**pose** 10:25
**position** 5:19 6:3
  6:6,8,10,14,18
  6:19,25 10:17
**possess** 41:13
**possible** 13:5,10
  13:14,17 22:25
  49:10
**possibly** 36:23
**post** 35:7,23
  43:15,17 46:8
**pot** 43:8
**potential** 70:16
  77:3
**potentially** 41:4
  42:16
**practice** 4:22
**precaution** 15:4
  58:19
**precautions**
  58:24
**predict** 23:21
**prepare** 37:21
  38:6 39:9
**Present** 2:21
**presume** 5:8
  67:5
**pretty** 15:25
  38:13 48:10
  49:11 59:17
  60:25

**preventable**
  56:11
**preventive**
  68:21
**previous** 48:23
**prior** 6:18 40:11
  48:23
**priority** 52:22
**prison** 6:12,22
  7:17,18 8:1,12
  8:14,19 25:14
  25:18,19,22
  26:12 30:25
  31:19 40:4
  50:9,25 56:20
  58:13,18,18
  59:1
**prisoner** 8:14,18
  9:24 10:11
  11:24 12:6
  14:7,21 20:21
  22:1,8 23:5,11
  23:25 40:4
  42:17,18 46:14
  55:12 56:14
  73:8
**prisoner's** 20:16
**prisoners** 8:20
  11:12 13:18
  22:18,22 31:16
  31:21 32:6,24
  33:5 51:9 56:3
  58:14,17 59:1
**prisons** 31:14
**privacy** 37:8
**privilege** 18:7
  27:25 28:14
  37:2,6
**privileged** 18:4
**probably** 37:25
  45:4 57:3 72:7
  78:13
**problem** 36:15
  57:13 59:10
  60:10,11

**procedure** 18:2
  18:8 20:25
  30:10 31:3,5
  35:9,18 45:17
  77:7
**procedures**
  30:13,14,18,20
  30:25 32:10,13
  32:15 45:7,10
  45:13,15,23,25
  46:1,9 68:24
  79:14,17
**proceed** 36:22
**process** 11:20
  12:1,5 18:19
  34:23 36:22
  70:13 80:1
**produce** 28:17
**produces** 71:17
**professional**
  23:4,16,25
  24:19 36:12
**professional's**
  24:11
**professionals**
  35:21
**progressive**
  68:23 69:1
  70:14 79:23
**promotion** 6:23
**proper** 51:9
**proposed** 31:3
**Prosequendum**
  1:6
**protected** 37:9
**protection** 14:8
**protective** 14:7
  74:11
**protocols** 10:7
**provide** 27:17
  37:10 68:5
  74:1 78:14
  79:18
**provided** 20:7
  43:24 74:6

**psych** 35:5
**psychiatrists**
  21:2
**psychologists**
  21:2
**PT)/1:00** 1:23
**public** 2:2 9:19
  10:5 23:2 82:6
  82:20
**put** 27:8 45:4,4
  48:6,6 55:15
  56:25 80:17

_____

**Q**

**QMC** 48:21
**quarterly** 15:24
**question** 5:4,8
  5:12 7:10 11:5
  11:9 13:23
  21:3,5,9,11
  23:24 26:19
  30:15 31:4,8
  31:17 39:4
  45:11 46:21
  69:4 71:25
**questioning**
  28:13
**questions** 4:23
  4:24 7:12
  27:19 36:3
  44:6,7 74:12
  81:9,10,12,14
  81:15 82:10
**quite** 37:14

_____

**R**

**raised** 73:7
**ramble** 53:19
**random** 43:2
**range** 37:9 73:2
  73:21
**rare** 15:25 44:16
  44:20 58:17,19
  58:20
**RCMP** 72:5

**Rd** 2:9
**reaction** 53:20
**read** 21:3 40:23
  54:17,21,22,24
  62:8 65:3,5
  66:1,9
**reading** 19:4
  25:11 29:17
  40:23 54:18
  66:6
**real** 47:3
**realize** 62:21
**really** 7:5 44:15
  45:17 47:2
  49:12 52:4
  53:1,23 55:18
  56:6,7 60:24
  62:8 73:20
  74:23
**reason** 79:19
**recall** 25:11
  28:10,16,20
  29:23 32:9,21
  32:23 35:3
  36:24 40:17,23
  44:3 47:8 48:6
  48:10 54:18
  55:7,8,9 58:9
  59:9 64:13
  69:13 73:23
  75:12,25 76:1
  79:10
**recalling** 58:8
**receive** 11:24
  24:18,23
**received** 27:3
  67:10
**receiving** 28:10
  29:23 51:9
**recess** 40:2
  61:15 81:7
**recollection**
  29:13,15,17
  38:18 75:23
  78:20

recommendati... 77:10
record 4:24
22:15 61:13
67:20 81:1
recorded 82:12
Recorder 2:2
82:1
records 13:24
51:1 72:24
78:13
reduced 82:12
referring 25:5
32:11 73:7
refreshed 38:17
refute 57:24
regards 7:23
10:6,7,17
14:16 15:6
20:15 30:19
31:8 33:6
36:21 38:11
42:3,24 43:24
46:25 50:2
57:5,15 66:16
70:15 72:5
regular 15:18
49:22 60:16
related 9:3
33:22 70:16
71:17
relates 10:6
relayed 21:14
relied 51:11
rely 52:5
remember 4:19
13:5,8,12,13
16:10,15 20:12
20:13 25:10
32:3 33:21,23
34:3,11 38:10
38:12 41:9,12
45:24 47:14
50:14,20,23
53:20 55:25

57:25 66:5,10
66:14 74:23,24
74:24 76:9
77:2 79:5
remembered
33:20 40:24
66:4,5,14
remote 1:20 4:1
4:3
remotely 82:7
removed 64:24
66:17
rep 53:9
repeat 21:5
26:19 39:4
45:11 71:25
report 3:8 8:3,4
8:6 9:20 11:19
18:11,14,15,18
20:7 27:3,9,9
27:14,14,17
28:8,10,17
29:14,16,16,18
29:20 38:16
40:20 47:20
48:16,18,19,22
58:5 62:4,13
65:12 66:15
67:17 71:17,18
reported 8:7,9
9:19 48:9
57:12
reporter 21:6,10
47:11,17
reporting 57:8
reports 28:4
47:18,24 48:12
48:13,13,18
represented
50:5
representing 4:8
request 23:13
requested 52:1
requesting
43:21

requests 79:9
require 12:4
required 43:4
requirements
23:9,11
resolved 43:25
44:1,10 45:1
resources 50:2
respect 7:3
12:14 28:10
30:5 32:23
33:9 36:25
43:13 69:5
response 18:13
33:24 49:2
55:19
responses 5:1
37:18
responsibility
7:24,25 33:15
33:19 34:24
35:6 41:25
42:15 43:3
64:18
responsible
14:18 20:18
22:17 30:11,12
30:14,17 42:13
43:9 45:22
58:4 76:1
rest 60:15 61:3
restrictions
20:22 21:13
68:12,14,17,18
result 18:20 32:5
33:10 71:21
rethink 56:3
retired 5:21,21
5:22 8:8
retrained 34:12
retraining 34:7
return 50:2
review 26:7
30:22 36:24
48:3 71:18

reviewed 31:6
36:17,19 37:23
38:7,7 63:16
63:19,23,25
64:20 65:25
77:8,17
reviewing 26:6
30:20 36:23
54:25 64:17,18
right 1:7 5:3
12:6 16:1,18
17:25 18:21
23:6 24:19
26:1,15 29:13
33:21 34:19
36:15 47:25
52:23 54:16
56:22 59:8
61:16 63:10,24
66:18,21 67:17
68:13 71:20
72:13 75:24
76:23 77:5
80:21
rights 26:10
rises 79:21
risk 9:3 10:11,25
11:13,14,15
role 45:15 49:4,4
49:7
rolled 67:20
rough 56:1
rounds 49:13
rules 74:10
run 57:3,11
running 75:17
rush 71:9

──────── S ────────
sad 56:6
safe 42:1,3,14
43:6
safety 10:4,7
22:18 52:19
San 2:17

SARKIS 1:6,7
saying 13:6 36:9
46:10 60:16
71:7
says 19:16 23:25
67:2,20
schedule 49:15
49:20
scheduled 49:20
49:21
scope 70:17
screen 61:18
scroll 62:5,9,12
65:13
searches 43:2
second 59:21
62:5
secondhand
25:4
secretaries
50:25
security 9:3 10:4
52:21 55:6
see 14:24 47:21
48:1 53:15
56:11,23 60:22
60:25 62:13,15
65:16,24 77:1
seeing 64:13
72:24
seek 28:3 46:13
seeking 46:17
seen 19:4 40:18
45:5 64:15,15
Segregation
61:5
send 66:8
sent 38:16 40:11
65:25
sergeant 36:6,10
41:4 44:10
45:2
sergeants 50:22
serious 9:7
69:14,18 70:9

Josie Gastelo

Touloudjian v. Gastelo

70:10,11,12
71:4,11
**services** 7:1
43:24 75:1
**set** 45:25 46:1
68:9 82:8
**setting** 47:1
**seven** 6:11 50:20
50:20 77:2
**severity** 68:25
70:15
**shakes** 5:2
**shape** 13:3
**share** 31:7 52:1
52:12 61:18
**sharing** 76:2
**shortly** 11:3
**shot** 47:2,3
**shoved** 19:1
**show** 38:14
68:16
**showed** 38:11
**shows** 19:24
41:16 56:9
**side** 10:8,14
14:14 18:10
21:17 27:11,11
27:11,15,22
41:25 44:25
45:1,1,20 46:9
46:20 50:13,15
52:1
**sides** 45:17
**sign** 30:22,23,24
32:11
**simply** 13:16
**single** 70:6
**single-cell** 42:21
**sister** 81:9
**sit** 8:22 9:2,5
18:20 29:13
44:9 66:21
68:13 71:20
80:21
**sitting** 42:20

69:24 70:4
**situation** 36:17
46:23 47:7
75:15
**six** 58:8
**small** 60:2
**sock** 64:12
**solely** 30:12,14
30:16
**somebody** 14:23
42:9,10 67:4
67:13,15
**sorry** 7:10 12:8
12:21,22 16:3
31:13,17 35:13
39:4,22 45:11
53:19 62:25
63:17 68:21
71:25 78:23
**Sounds** 5:13
**speak** 12:22
15:20 43:14
45:21 79:25
80:19
**speaking** 32:14
**speaks** 79:25
**specific** 4:19
6:16 10:19
12:25 14:22
18:2 28:4,5,20
32:8,9 33:7,7
33:22 35:9,18
37:15 50:14
51:14 57:22
58:8 60:5,6,18
74:23
**specifically**
20:12 41:5
43:14 55:7
56:19 58:23
73:6 75:19
**specifics** 29:1
30:7
**speculate** 16:16
17:1

**speculating** 27:8
**speculation**
13:21 16:2,7
19:9,10,13,21
23:17 24:3,25
26:16 46:15
54:6 57:19
68:19 78:16,19
78:22
**speculative**
19:16 78:7,8
78:10,15
**spell** 47:14
**split** 30:21 54:25
64:16,16,17
**spoke** 32:18
40:21
**spoken** 55:9
**spreadsheet**
38:10,15
**staff** 10:5 11:17
11:21,22 14:10
14:11,12,12,13
14:16 15:2,2,5
15:7 20:18
21:15,16,18
23:7 26:23
27:5,13 30:8
34:6,7,12,14
34:18 35:4,5
36:22 42:13,24
43:4,21,23,24
44:12,22 45:8
45:9,14,14,18
50:24 51:12,16
51:22,22,22
52:4,13,15
53:4 68:6
70:23 72:5,5,6
75:2,3,25 77:4
79:14,15 80:3
80:3,4,4,10,17
**start** 38:2 70:20
**started** 4:21
6:14 32:9

**starts** 10:16 65:1
**state** 5:23 68:23
68:24 82:3,6
**statement** 80:16
**STATES** 1:1
**status** 13:25
**Ste** 2:9
**step** 22:16
**step-down** 60:20
**stepping** 56:23
**stipulated** 4:3
**stock** 43:8
**stop** 56:7 76:2
**stops** 7:17
**Strike** 21:24
55:21
**stuck** 53:23
**stuff** 64:10 75:19
**stuffed** 54:16
64:10
**subject** 62:13
69:1
**submit** 77:12
**substance** 65:17
**suffocated** 19:2
**suggest** 41:13
**suggesting** 74:9
**suicidal** 20:21
23:11 25:14
26:15,21 43:13
55:6 56:3 59:1
**suicide** 7:9,14
9:10 13:1,15
13:19 15:3,3
15:25 16:19,22
16:23 18:22,25
19:20,25 20:2
20:3,14,14
23:23 25:19,20
25:25 26:5,14
26:17,20,22,24
27:2,6,7,9
28:21 29:2,21
29:22 30:1
31:10 34:4,13

36:18,21 38:12
40:5,15,19,22
41:2,20 48:6,9
48:15 53:21,22
54:4,15 56:1,8
56:15,21 57:10
57:12,14,18
58:4,14,17,19
58:19,24,24
59:10 62:19
66:3 68:2
71:16
**suicides** 16:11
16:13,17 17:3
17:12,16,21
18:2 33:24
41:8,11,14,17
41:22 57:7,25
59:12
**super-fit** 58:3,11
**supervision**
82:13
**supervisor** 21:15
21:20,20 44:9
**supervisors** 30:9
36:3 51:1 52:5
**supervisory**
44:25 50:22
**supposed** 14:21
14:22 15:1
22:9 24:23
25:6,12 36:14
43:16 53:11
71:13
**sure** 17:15 22:8
28:21 33:22
35:3 37:14,17
37:24 38:1
39:24 42:1,11
42:15,25 43:6
43:19 47:4,6
53:5 54:17
58:10 60:23
64:25 73:8
75:22 79:17

Josie Gastelo                                    Touloudjian v. Gastelo

80:11
surprised 64:1
swallowing
 55:24
swearing-in 4:4
sworn 5:15 82:9
system 6:12,22
 8:1 31:19
 35:22 60:21

**T**

T-shirt 54:16
 55:3,13,24
 64:2,3,6,12,13
take 4:21 5:11
 22:16 39:23
 45:3 47:2,3
 50:7 67:14,17
 69:11 72:15,21
 77:21 80:16
taken 2:1 11:23
 44:24 64:1
 65:10 71:24
 72:1
takes 14:15
talk 38:2,21
 51:16 52:9,16
talked 54:14
 57:17 64:24
talking 7:8 11:2
 21:25 25:22
 32:15 34:23
 73:6,21 76:18
taught 36:2
team 22:21 23:6
 24:1 25:24
 32:19 40:25
 41:3,3,6 47:19
 50:18 51:11
 52:9,14
teams 15:19
 39:21,22
tech 35:5
tell 5:7 22:24
 23:20 44:17

52:24 72:24
 73:1 78:3
telling 23:20
 44:23
Teresa 15:11
 52:2
terms 10:15
 15:13 50:15
terrible 65:15
testified 5:15
testify 82:9
testimony 13:2
 26:10 55:20
 63:15 65:21
text 65:3,5
Thank 12:23
 47:17 81:2,8
 81:11,17,18
thing 44:14
 46:24 48:15
 49:5 53:17
 64:7,9,11
things 4:20,21
 11:23 22:8
 23:25 24:19
 51:19 52:11,23
 52:25,25 56:17
 59:5 67:11
 70:12,18 71:8
 73:25 75:21
think 5:10 8:7
 15:7 17:24
 38:9,10,11,20
 39:19 41:9
 43:18 44:18,19
 46:23 47:3,14
 48:21 50:20
 53:6 55:11,18
 56:6 60:8 64:8
 64:9 65:15
 66:1,1
thinking 11:8
 54:1 55:25
third 49:21
thoroughly 38:8

thought 54:16
 54:16 55:2
 63:9 64:4
three 49:13
 57:18 75:2,3
 79:11
throat 19:1
 54:17 64:11,24
 65:11 66:17
tier 42:24
time 1:23 4:17
 7:12 8:9 11:1,2
 13:11,14 30:11
 31:9 32:3
 33:14,16,19,19
 33:25 39:12,16
 40:17 42:22
 47:8 48:9 49:7
 49:14 51:8
 53:3 54:1,13
 54:20,23 55:2
 55:12,23 58:13
 58:18 59:10
 61:14 64:5,12
 72:3,12,23
 75:17 78:3
 80:21 81:4,5,6
 81:9,17 82:8
timeframe 16:1
times 4:12 39:9
 39:11 49:14,15
 69:25 70:4
 74:24 78:4,8
 80:18
today 65:21
 80:23
today's 37:22
 38:6 39:10
told 46:17 53:22
 56:15 57:3,4
 76:9
tons 67:10
tools 52:15
top 61:19,21,22
topics 51:23

total 16:10,15,18
 50:9
totally 74:9
touching 68:8
Touloudjian 1:4
 1:6,7 4:8 7:4,9
 7:13 11:3
 12:14,17,25
 13:3,6,7,9,10
 13:15 18:21
 19:24 24:23
 25:6,14,17
 27:6 28:11
 29:14,25 31:18
 32:22 34:15
 36:25 40:14
 41:19 42:1
 47:23 53:21
 55:23 58:13
 62:14,18 66:22
 67:2,6 69:15,22
Touloudjian's
 20:2 27:2 29:1
 31:10 71:22
 75:24 80:22
trained 30:5,8
training 6:16,18
 6:21,24 7:2
 30:7 34:6
 51:13,13,15,17
 51:23 79:18
transcript 82:14
transfer 8:14
 13:18,25 42:10
 42:10
transference
 20:16
transferred
 25:18 40:15
 80:6
transfers 80:13
transport 12:7,9
transportation
 10:20 12:6
 49:2

transports 12:10
tray 20:19 68:7
 68:8
treated 9:24
treatment 10:9
 10:10,10 12:2
 12:12 15:13,16
 31:16,21 32:2
 32:7,24 33:4
 46:14,18,25
 61:3
treatments
 11:25 51:10
tried 25:20,25
 26:4 40:19
 53:3,17
Triple 60:17,20
true 19:17 57:20
 82:14
truth 82:9,9,10
try 12:22 49:10
 49:13 51:9
 53:16
trying 17:7 38:8
 43:17 46:23
 55:15 76:13
turn 18:17
twice 15:19
two 4:13 6:7
 39:11 49:13
 53:7 58:21,24
 59:4 64:16
 72:22 75:2,3
 77:18
tying 55:14
type 72:18
typical 13:18
typically 9:15
 49:17

**U**

Uh-huh 75:4
ultimate 15:12
ultimately 10:24
 11:11 14:17

Josie Gastelo                                          Touloudjian v. Gastelo

| | | | | |
|---|---|---|---|---|
| 21:21 22:17 | **vague** 7:19 11:1 | 10:18,22,23 | 49:8 51:12,14 | 6:9 |
| 30:24 | 12:18 13:20 | 12:20,24 16:11 | 51:15,17 52:8 | **works** 58:11 |
| **umbrella** 14:5,9 | 25:16 29:3 | 16:17 28:5,19 | 60:23 66:9 | **would've** 10:12 |
| 14:19,24 15:6 | 35:12,14 40:6 | 29:19,20 30:11 | **weekend** 9:23 | 11:22 14:9 |
| 15:13,15 20:17 | 46:21 72:17 | 30:21 31:6 | **weekly** 15:18 | 15:14 29:18 |
| 30:3,4 51:3,5,7 | **varied** 73:5 | 33:12,13,25,25 | 72:6,7 | 30:17 39:17 |
| **underneath** 34:4 | **varies** 72:25 | 37:21 40:3 | **weeks** 49:8,9 | 46:24 57:5 |
| **understand** 5:5 | 73:2,18 | 47:5,9,10 | 51:14 63:7 | 68:17 69:3 |
| 5:8 7:10 9:21 | **variety** 70:12 | 48:20 49:4 | **went** 27:10 38:8 | 72:12 80:24 |
| 11:5 13:13 | **various** 19:1 | 50:16,17,18,19 | 53:24 | **wouldn't** 27:16 |
| 14:17 21:1 | 34:9 | 51:8 53:4,15 | **weren't** 28:25 | 29:9 40:9 |
| 22:7,13 24:9 | **venture** 73:10 | 59:11 62:3 | **WESTERN** 1:2 | 45:16 58:2 |
| 24:13 27:3 | **verbal** 5:1 | 63:23 64:15 | **what-ifs** 56:17 | 73:19 |
| 35:24 37:14 | **vetted** 53:14 | 65:3,10 69:23 | **whatsoever** | **wrapped** 65:11 |
| 46:3 54:9 | **videoconference** | 69:24 71:2 | 45:22 | 65:19,22 |
| 61:10 64:19 | 1:20 4:1 | 76:9,10 78:12 | **withdraw** 16:8 | **write** 18:14 |
| 66:12 75:22 | **violate** 70:24 | 78:23 79:12 | 35:17 | **written** 48:13 |
| 76:7,22 | **violated** 79:23 | 81:8,16 | **witness** 3:2 4:4,6 | 82:12 |
| **understanding** | **violates** 74:9 | **wardens** 50:19 | 4:11,13,16,18 | **wrong** 27:10,13 |
| 7:7,11 18:24 | **violation** 68:25 | 76:10,16,17,20 | 4:25 5:3,6,9,13 | 29:7,9,11,22 |
| 21:1 31:23,25 | 69:9,21,22 | **wasn't** 23:24 | 5:15 16:10 | 29:24 52:19 |
| 39:1,3,7 | 70:11 71:4,11 | 24:23 25:12 | 17:11,23 18:10 | 80:5 |
| **Understood** | **violations** 73:24 | 34:7 | 20:6 21:5,8 | |
| 23:1,4 | **visit** 42:23 | **watch** 15:2,3 | 22:11 24:4 | **X** |
| **unfortunate** | **vs** 1:13 | 26:14,17,20,22 | 28:2,16 33:2 | **X** 3:1 |
| 56:11 | | 54:4 58:15,17 | 34:22 35:13 | |
| **unfortunately** | **W** | 58:19,24 68:2 | 37:4 39:24 | **Y** |
| 59:14 | **W** 2:9,16 | **watched** 15:4,8 | 40:1,8 46:16 | **yard** 60:5 61:5 |
| **union** 50:5,6 | **wait** 4:22,23 | **watches** 26:24 | 46:23 47:13 | **yeah** 22:24 |
| **unions** 50:5 | 21:24 35:17 | **watching** 15:8 | 54:8 63:22 | 24:20 36:8 |
| **unique** 55:16 | 71:5 | **way** 13:3 15:10 | 80:18 81:3,5 | 38:16 39:17 |
| **unit** 60:14 61:6 | **want** 4:20 6:11 | 19:20 22:24,25 | 81:11,13,18 | 54:22 59:7 |
| 75:1 | 7:6 16:16,20 | 23:21 37:6 | 82:7,8,11 | 63:22 65:19 |
| **UNITED** 1:1 | 17:1 24:5 38:3 | 45:3 53:18,22 | **witnesses** 80:9 | 66:20 76:9 |
| **unlimited** 75:13 | 47:1 55:11 | 54:1,2,14 | 80:15 | **year** 16:11 51:15 |
| **unusual** 16:12 | 56:21 57:4 | 55:22 56:1,8 | **word** 61:11 | 57:23 58:6 |
| 46:13 | 62:13 67:21 | 56:11 61:19 | 67:17 69:18 | 59:12,13 72:9 |
| **updates** 72:6,7 | 73:11,12 74:10 | 64:20 68:7,9 | 70:9,10 | 72:16 |
| **urgency** 75:18 | 74:11 80:12 | 69:23 71:11 | **work** 4:14,16 | **years** 4:18 6:2,7 |
| **use** 5:1 42:12 | **wanted** 11:3 | **ways** 22:22 | 5:2 14:11 | 6:11,13 7:8,13 |
| 70:9 71:18 | 56:19 | **We'll** 5:11 | 44:16 50:2 | 8:8 16:18 31:9 |
| **usually** 44:22 | **warden** 4:5 5:19 | **weapons** 42:11 | 53:16 76:20 | 31:18 32:21,22 |
| | 5:21,25 6:4,9 | 43:1,7,7 | **worked** 8:10 | 40:24 44:3,13 |
| **V** | 6:16,17,19,20 | **week** 15:19 | 53:4,5 | 57:18 58:9 |
| **vacated** 43:11 | 7:1,17 8:9,12 | 39:17,17 43:5 | **working** 5:22 | 60:5 72:23 |

Josie Gastelo                                    Touloudjian v. Gastelo

78:12

**Z**

**Zoom** 39:2,6,21

**0**

**001589** 61:24
**001603** 65:1

**1**

**1** 3:7 61:17,23
  62:1
**1:52** 40:2
**10** 16:25 17:3
  25:19 61:14,14
  74:16,22 79:2
**10-30-2028**
  82:21
**10-minute** 39:25
**10:00** 1:23
**10th** 49:22
**12** 2:9 61:14
**12:30** 81:3,4
**12:57** 4:2
**15** 34:15,23
**15-minute** 35:20
  36:10,13
**1676** 61:24
**17** 1:22 4:2
**1800** 49:11 50:8

**2**

**2** 61:14
**2-26** 63:9
**2-26-2018** 62:11
**2:04** 40:2
**2:20-CV-0052...**
  1:9
**2:42** 61:15
**2:51** 61:15
**20** 17:21 50:5
  60:5
**2015** 8:13
**2017** 16:14 41:7
  41:8,14 57:25
**2018** 7:5 13:11

13:14 15:10
16:1 41:20,23
72:9 78:4,11
**2019** 41:11,17
**2020** 5:21 50:10
**2023** 1:22 4:2
**24-hour** 34:10
**24/7** 42:21
**24th** 63:1,3
**26th** 63:4
**27th** 63:6
**28th** 63:6

**3**

**3,000** 8:24
**3:24** 81:7
**3:30** 81:1,3,7
**3:32** 81:20
**30** 63:12
**32** 6:13
**33228** 2:9
**375** 2:9

**4**

**4623** 2:2 82:19
**48334-3309** 2:10

**5**

**5** 3:4
**50** 17:16 59:24
  60:15 74:20
  79:7,9
**50-bed** 59:20
  60:8

**6**

**600** 2:16
**62** 3:7

**7**

**8**

**9**

**900** 50:13,13
**92101-4270** 2:17